# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Kyle Guggenberger, by his parents and guardians, Keith and Ginger Guggenberger; Jay Hannon, by his parent and guardian, Patricia Hannon; Abigail Pearson, by her parents and guardians, Ellen and Jeff Pearson; Amber Brick, by her parents and agents, Robert and Anne Brick; and on behalf of others similarly situated, | Civil No. 15-3439 (DWF/BRT) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| State of Minnesota; the Minnesota Department of Human Services, an agency of the State of Minnesota; and Emily Johnson Piper, Commissioner of the Minnesota Department of Human Services, | |
| Defendants. | |

_____

Pamela S. Hoopes, Esq., Minnesota Disability Law Center; Barnett I. Rosenfield, Esq., Mid-Minnesota Legal Aid; and Mark R. Azman, Esq., and Shamus P. O'Meara, Esq., O'Meara Leer Wagner & Kohl, PA, counsel for Plaintiffs.

Alethea M. Huyser, Assistant Solicitor General, Scott H. Ikeda and Ian M. Welsch, Assistant Attorneys General, Minnesota Attorney General's Office, counsel for Defendants.

_____

# INTRODUCTION

This matter is before the Court on the Motion to Dismiss filed by Defendants the

State of Minnesota, the Minnesota Department of Human Services ("DHS"), and DHS

Commissioner Emily Johnson Piper ("Commissioner Johnson Piper")[1] (collectively, "Defendants").  (Doc. No. 35.)  For the reasons set forth below, the Court grants in part and denies in part the motion.

## BACKGROUND

## I.   Minnesota's Waiver Services for Individuals with Disabilities

The State of Minnesota participates in Medicaid, a health care program operated and funded jointly by individual states and the federal government.  (Am. Compl. ¶ 24.) Plaintiffs allege that federal Medicaid requirements obligate Minnesota to provide various services, including treatment in institutional settings, for persons with developmental disabilities.  (*Id.* ¶ 25.)  As an alternative to providing care and treatment in institutional settings, Plaintiffs allege that Minnesota may provide Home and Community Based Waiver Services ("Waiver Services"), which encompass a variety of services and supports which Plaintiffs allege are "designed to help people with disabilities live in his or her own home and access his or her community."  (*Id.* ¶ 26.) Plaintiffs allege that states that choose to offer these optional Waiver Services must do so in accordance with federal law.  (*Id.* ¶ 27.)

Defendants operate four Waiver Services programs for individuals with disabilities as part of Minnesota's Medicaid program known as Medical Assistance

---

[1]     Plaintiffs brought their complaint against former DHS Commissioner Lucinda Jesson in her official capacity.  (*See* Doc. No. 41 ("Am. Compl.") ¶ 22.)  On December 14, 2015, Commissioner Emily Johnson Piper replaced Commissioner Lucinda Jesson in this role.  (*See* Doc. No. 37 at 2 n.1.)  As such, Commissioner Johnson Piper is substituted for Commissioner Jesson pursuant to Federal Rule of Civil Procedure 25(d).  (*See id.*)

("MA").  (*Id.* ¶¶ 35, 36.)  According to Plaintiffs, these Waiver Services programs

include the Developmental Disabilities ("DD") Waiver, the Community Alternatives for

Disabled Individuals ("CADI") Waiver, the Community Alternative Care ("CAC")

Waiver, and the Brain Injury ("BI") Waiver.  (*Id.* ¶ 36.)  Plaintiffs allege that the State of

Minnesota and DHS are responsible for administering the Medicaid Waiver Services

programs.  (*See id.* ¶ 20.)  Plaintiffs allege that DHS is "an agency designated as a

department of the government of the State of Minnesota," (*id.* ¶ 18), and that

Commissioner Johnson Piper "serves as the 'single state agency' responsible for the

administration of the Medicaid program in Minnesota" (*id.* ¶ 22).  Plaintiffs allege that

they, along with thousands of similarly situated individuals, have been deemed eligible

for these Waiver Services but have not received services due to their placement on

waiting lists.  (*Id.* ¶ 48.)

Plaintiffs allege that Minnesota "[c]ounties act as 'local agencies' of the state" to

aid in the administration of the Waiver Services programs.  (*Id.* ¶ 36, 37.)  Specifically,

Plaintiffs allege that Defendants identify each county's total budget to spend for each

Waiver, and the counties "create individual waiver services budgets and . . . manage

those budgets in the aggregate, within amounts specified by Defendants as available to

serve eligible persons under each waiver."  (*Id.* ¶¶ 38, 39.)  Plaintiffs assert that both the

counties and the Defendants withhold a portion of the funds available as "reserves."  (*Id.*

¶ 40.)  Plaintiffs claim that the counties are authorized by state statute "to reserve a

certain portion of the available funding for unexpected situations that might arise during

the year."  (*Id.*)  In addition, Plaintiffs allege that "Defendants also withhold funds under

3

each Waiver to address unexpected, crisis needs." (*Id.*)  Plaintiffs assert that these

additional reserves withheld by Defendants "eas[e] the burden on counties to handle all

unexpected costs at a local level." (*Id.*)  Plaintiffs allege that Waiver Services funds are

returned to the State's general fund if unspent in a given year.  (*Id.* ¶ 42; *see also id.*

¶ 49.)  In particular, Plaintiffs assert that "[u]nspent Waiver funds are not carried over or

otherwise reserved for the Waiver programs to remove people from the waitlists and pay

for Waiver Services in future years." (*Id.* ¶ 42.)

## II.    The Named Plaintiffs

The named Plaintiffs in this case are four individuals with disabilities who allege

that they have been deemed eligible for Waiver Services but have not been provided such

services and have instead been placed on waiting lists for three years or more.  (*See id.*

¶¶ 59-62.)  Plaintiff Kyle Guggenberger ("Guggenberger") alleges that he was placed on

a waiting list over five years ago after being found eligible for DD Waiver Services.  (*Id.*

¶ 59.C.)  Plaintiff Jay Hannon ("Hannon") also alleges that he was placed on a waiting

list approximately five years ago after being found eligible for DD Waiver Services.  (*Id.*

¶ 60.C.)  Plaintiff Abigail Pearson ("Pearson") alleges that she was placed on a waiting

list over fourteen years ago after being found eligible for DD Waiver Services.  (*Id.*

¶ 61.C.)  Plaintiff Amber Brick ("Brick") alleges that she was placed on a waiting list

over three years ago after being found eligible for CADI Waiver Services.  (*Id.* ¶ 62.B.)

The four named Plaintiffs allege that they are between the ages of twenty-two and

twenty-five and reside at home with their parents.  (*Id.* ¶¶ 59.A, 60.A, 61.A, 62.A.)

Each of the named Plaintiffs alleges that he or she receives some services due to their disabilities.  (*See id.* ¶¶ 59.A, 60.A, 61.A, 62.A (referencing DD Case Management Services, PCA Services, DT&H Services, employment supports, Adult Rehabilitative Mental Health Services, and job placement services).)  However, each Plaintiff also alleges that he or she is in need of additional supports and services available through the DD or CADI Waivers.  (*See id.* ¶¶ 59.A, 60.B, 61.B, 62.A.)  Such services include, for example, independent housing options; services to teach the individual to live on his or her own and access the community; behavioral support services; and services aimed at developing the individual's independent living skills in areas such as budgeting, nutrition, healthcare, and employment.  (*See id.* ¶¶ 59.A, 59.B, 60.B, 61.B, 62.A.)

Plaintiffs allege that their placement on waiting lists and their inability to access Waiver Services causes feelings of isolation and segregation from society, and has exacerbated their disabilities.  (*See id.* ¶¶ 59.A, 59.B, 60.A, 61.A, 62.A.)  All four named Plaintiffs allege that they have not received formal updates about their progress toward moving off the waiting lists to receive Waiver Services.  (*Id.* ¶¶ 59.C, 60.C, 61.C., 62.C.)  With the exception of Pearson, Plaintiffs allege that they have not received any notice or opportunity to challenge the ongoing denial of Waiver Services.  (*Id.* ¶¶ 59.C, 60.C, 62.C.)  Pearson alleges that she received one notice which "purported to abruptly and improperly deny Waiver Services to her."  (*Id.* ¶ 61.D.)  Pearson alleges that this notice failed to provide proper advance notice of the proposed action and did not articulate the legal basis justifying the proposed action.  (*Id.*)  Aside from this one notice, Pearson alleges that she has not otherwise received any notice or opportunity to challenge the

ongoing denial of Waiver Services.  (*Id.* ¶ 61.C.)  Plaintiffs allege that the counties in which they live "routinely and repeatedly maintained reserves and failed to spend all of their available Waiver funds, while Plaintiffs remained on wait lists."  (*Id.* ¶ 63.)[2]

## III.    Plaintiffs' Claims

Plaintiffs bring their claims on their own behalf and on behalf of a putative class of similarly situated individuals with disabilities[3] in Minnesota who have been deemed eligible for Waiver Services but are currently on a waiting list for such services.  (*Id.* ¶¶ 66, 67.A.)  As of April 1, 2015, Plaintiffs allege, 3,586 individuals were on the DD Waiver waiting list, and 1,430 individuals were on the CADI Waiver waiting list.  (*Id.* ¶ 51.)  Plaintiffs allege that their continued placement on waiting lists for Waiver Services violates federal law in several respects.  (*See generally id.*)  Plaintiffs claim that Defendants have "fundamentally mismanage[d]" Minnesota's Waiver Services programs, "depriv[ing] thousands of persons with disabilities of available services and supports intended to help them live independent, inclusive lives in their communities."  (*Id.* ¶ 1.) Plaintiffs allege that Defendants "have failed to ensure that otherwise eligible individuals are not improperly placed on wait lists for services when money is available under the Waivers to serve their needs."  (*Id.* ¶ 50.)  According to Plaintiffs, Defendants have failed to undertake necessary administrative steps to remedy underspending by Minnesota

---

[2]     Plaintiffs reside in either Hennepin or Anoka Counties.  (*See id.* ¶¶ 8, 10, 12, 14.)

[3]     Plaintiffs' putative class includes individuals with developmental and other disabilities, and Plaintiffs allege that they and the putative class members are "substantially limited in major life activities such as learning, working, walking and brain function."  (*Id.* ¶¶ 67.A, 92.)

counties.  (*Id.*)  In addition, Plaintiffs allege that Commissioner Johnson Piper does not have an effective and comprehensive plan "for ensuring that Plaintiffs and members of the Plaintiff class be provided with Waiver services within the funding appropriated by the Legislature each year, rather than placing them on wait lists, to enable them to live in the most integrated settings possible, consistent with their needs and preferences."  (*Id.* ¶ 99.)  Plaintiffs allege that Defendants' actions have caused them harm and have caused them to remain isolated from their communities in a discriminatory manner in violation of federal law.  (*Id.* ¶ 2.)

In particular, Plaintiffs allege that Defendants have "improperly allow[ed] over $1 billion of funds legislatively appropriated for these critical programs to go unspent." (*Id.*; *see also id.* ¶ 47 (providing charts identifying over $1 billion of unspent Waiver Services funds since 1995).)  Plaintiffs claim that Defendants allow counties to reserve Waiver Services funds in amounts that "far exceed[] what is reasonable or necessary." (*Id.* ¶ 41.)  To support this allegation, Plaintiffs reference multiple State reports documenting the amount of unspent reserves in Minnesota counties between 1995 and 2015.  (*See generally id.* ¶¶ 43-47.)  According to Plaintiffs, DHS has made recommendations in these reports that counties reduce their reserves, spend additional funding, and reduce their waiting lists.  (*See id.* ¶ 43.)  Specifically, one report notes that many counties "had room in their budgets to provide additional services or add more participants to programs."  (*Id.*)  Plaintiffs allege that DHS's most recent Waiver Services review reported that 72 out of 81 lead agencies (Minnesota counties) had unspent reserves of 4% or more in their DD Waiver budgets.  (*Id.* ¶ 44.)  Of these 72 lead

agencies, 30 had reserves of 10% or more.  (*Id.*)  Plaintiffs further allege that 75 out of 81

lead agencies had unspent reserves of 4% or more in their CAC/CADI/BI[4] Waiver

budgets.  (*Id.*)  Of these, 48 had reserves of 10% or more.  (*Id.*)  Plaintiffs allege that

DHS stated in a 2013 report regarding Hennepin County, "[T]here is room to add more

participants via new or reuse slots or service optimization to reduce or eliminate the

waiting list and enhance the quality of participant's lives through services such as

supportive [sic] employment."  (*Id.*)  This report also stated, "Typically a 1% to 2%

allocation reserve is more than adequate to manage risk for county [sic] of this size."

(*Id.*)  Further, Plaintiffs allege that Defendants failed to spend all appropriated Waiver

Services funds in the most recent state fiscal year so that allocated funds reverted to the

State's general fund.  (*Id.* ¶ 49.)  Plaintiffs allege that Defendants could have provided

them with the services they seek without fundamentally altering the State's programs or

unduly burdening the State.  (*Id.* ¶ 65.)  Specifically, Plaintiffs allege that Defendants

could have provided these services with unspent Waiver funds.  (*Id.*)

　　　　According to Plaintiffs, "Defendants have failed to take administrative steps to

insure [sic] that individuals on the wait lists are removed from the list and provided

Waiver Services at a reasonable pace, within a reasonable amount of time."  (*Id.* ¶ 52.)

Further, Plaintiffs allege that individuals with disabilities who are placed on waiting lists

"are routinely denied advance notice of the decision not to offer them Waiver Services,"

---

[4]　　　　According to Plaintiffs, Defendants manage CADI Waivers collectively with the
Community Alternative Care ("CAC") Waiver and the Brain Injury ("BI") Waiver.  (*See
id.* ¶¶ 36, 46.)

are not told whether they fall into a statutory priority group for allocating Waiver

Services, and are not informed why they are placed or kept on waiting lists. (*Id.* ¶ 53.)

Without such information, Plaintiffs allege, individuals have a limited ability to make

informed choices about accepting or applying for other services. (*Id.* ¶ 54.) Plaintiffs

also allege that individuals on waiting lists "are routinely denied the opportunity to

challenge their placement on a wait list in a hearing on the merits." (*Id.* ¶ 55.) Plaintiffs

allege that additional funding recently allocated by the State for DD and CADI Waiver

Services is "insufficient to ensure that the needs of Plaintiffs and all other individuals on

wait lists are met within a reasonable time and pace, and with adequate notice of rights

and due process protections." (*Id.* ¶ 56, 57.) Plaintiffs also allege that Commissioner

Johnson Piper has not informed individuals on waiting lists of the availability of Waiver

Services as an alternative to institutional care and has denied such individuals the right to

choose Waiver Services. (*Id.* ¶ 81.)

Plaintiffs assert the following claims against Commissioner Johnson Piper only:

(1) violation of 42 U.S.C. § 1983 through failure to furnish services with reasonable

promptness in violation of 42 U.S.C. § 1396a(a)(8); (2) violation of 42 U.S.C. § 1983

through failure to inform of feasible alternatives and denial of choice of Waiver Services

in violation of 42 U.S.C. § 1396n(c)(2)(C); (3) violation of 42 U.S.C. § 1983 through a

violation of Plaintiffs' Due Process rights under the Fourteenth Amendment, the

Medicaid Act, and its implementing regulations; and (4) violation of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12132. (*Id.* ¶¶ 25-32.) Plaintiffs assert the

following claim against all Defendants:  violation of § 504 of the Rehabilitation Act,

29 U.S.C. § 794(a).  (*Id.* ¶¶ 32, 33.)

Plaintiffs ask the Court to allow this action to proceed as a class action pursuant to

Federal Rule of Civil Procedure 23.  (*See id.* at Prayer for Relief ¶¶ A-D.)  Plaintiffs seek

declaratory, injunctive, and other relief to enforce their rights and to remedy Defendants'

violations of federal law.  (*See id.* ¶¶ E-I.)  Specifically, Plaintiffs seek a permanent

injunction that requires Defendants to provide Waiver Services to Plaintiffs and similarly

situated individuals "in the most integrated setting appropriate to their individual needs

and preferences consistent with applicable law."  (*Id.* ¶ F.)  Plaintiffs also seek an

injunction "requiring that the Defendants fund and provide Waiver Services with

reasonable promptness and at a reasonable pace" and "order[ing] that such funds remain

available until members of [the] plaintiff class are provided such services."  (*Id.* ¶ G.)

Defendants move to dismiss Plaintiffs' claims under Rules 12(b)(1) and 12(b)(6) of the

Federal Rules of Civil Procedure.  (*See* Doc. Nos. 35, 37.)

## DISCUSSION

## I.      Legal Standard

### A.      Fed. R. Civ. P. 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the

Court's subject matter jurisdiction.  To survive a motion to dismiss for lack of subject

matter jurisdiction, the party asserting jurisdiction has the burden of proving jurisdiction.

*V S Ltd. P'ship v. Dep't of Hous. & Urban Dev.*, 235 F.3d 1109, 1112 (8th Cir. 2000)

(citation omitted).  "Subject-matter jurisdiction is a threshold requirement which must be

assured in every federal case." *Kronholm v. F.D.I.C.*, 915 F.2d 1171, 1174 (8th Cir. 1990).

A motion to dismiss for lack of subject matter jurisdiction may challenge a plaintiff's complaint either on its face or on the factual truthfulness of its averments. *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citations omitted).  When a defendant brings a facial challenge—a challenge that, even if truthful, the facts alleged in a claim are insufficient to establish jurisdiction—a court reviews the pleadings alone, and the non-moving party receives the same protections as it would defending against a motion brought pursuant to Rule 12(b)(6).  *Id.* (citation omitted).  In a factual challenge to jurisdiction, the court may consider matters outside the pleadings, and the non-moving party does not benefit from the safeguards of Rule 12(b)(6).  *Id.* at 728-30 n.4 (citations omitted) (holding that on a Rule 12(b)(1) motion challenging subject-matter jurisdiction, the court "has authority to consider matters outside the pleadings").

### B.     Fed. R. Civ. P. 12(b)(6)

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant.  *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).  In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).  A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and

11

exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6).

*Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id*. at 555. As the United States Supreme Court reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.[5]

## II.    Justiciability

Defendants argue that Plaintiffs' claims are not justiciable, contending that they are rendered moot by recent changes in Minnesota law or, alternatively, are not yet ripe

---

[5]    Defendants submitted an affidavit and numerous exhibits along with their Motion to Dismiss. Plaintiffs argue that the Court should convert Defendants' motion to a motion for summary judgment and allow discovery if the Court considers these materials. "If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). However, "Rule 12(b)(6) motions are not automatically converted into motions for summary judgment simply because one party submits additional matters in support of or [in] opposition to the motion." *Sorace v. U.S.*, 788 F.3d 758, 767 (8th Cir. 2015) (internal quotation marks and citation omitted). In considering Defendants' Motion to Dismiss here, the Court has not relied upon matters outside of the pleadings and declines to convert the motion. *See id.*

because such changes have not yet been fully implemented.  Although they do not primarily frame their arguments on standing grounds, Defendants also suggest that Plaintiffs have failed to establish standing because they purportedly fail to demonstrate that Defendants' allegedly harmful conduct will likely occur or continue under the new statutory scheme.  Because standing is an essential prerequisite to the Court's exercise of jurisdiction, the Court will address whether Plaintiffs' have standing to assert their claims before reaching Defendants' ripeness and mootness arguments.

### A.    Standing

The party invoking federal jurisdiction bears the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The burden corresponds with the degree of evidence required at the relevant stage of litigation.  *Id.*  "At the pleading stage . . . general factual allegations of injury . . . may suffice."  *Id.*; *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 869 (8th Cir. 2013).  If a plaintiff lacks standing, a district court has no subject matter jurisdiction over the matter and must dismiss the case.  *Young Am. Corp. v. Affiliated Comp. Servs., Inc.*, 424 F.3d 840, 843 (8th Cir. 2005).

Article III of the Constitution limits the power of the federal courts to deciding only actual "cases" and "controversies."  U.S. Const., art. III, § 2, cl. 1.  To establish constitutional Article III standing, a plaintiff must demonstrate:  (1) an injury-in-fact; (2) a causal connection between that injury and the challenged conduct; and (3) the likelihood that a favorable decision by the court will redress the alleged injury.  *Lujan*, 504 U.S. at 560.  These constitutional requirements of standing limit federal courts to deciding only cases where the plaintiffs can show a "personal injury fairly traceable to

13

the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984).

A plaintiff seeking injunctive relief must show that he "faces a threat of future or ongoing harm." *Park v. Forest Serv. of the United States*, 205 F.3d 1034, 1037 (8th Cir. 2000). An injury resulting from past "illegal conduct" alone is not enough to support a claim for injunctive relief. *Id.* Likewise, a plaintiff's speculation that a future injury may occur is not sufficient to warrant injunctive relief. *Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). A plaintiff must show that the threat of injury is "real and immediate." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). In so doing, a plaintiff can show that injunctive relief "will remedy the alleged harm." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 108 (1998). With these guidelines in mind, the Court concludes that Plaintiffs have established standing to pursue their claims against Defendants.

First, Plaintiffs have sufficiently alleged an injury-in-fact. Each Plaintiff alleges that he or she is currently lacking necessary supports and services that could enable him or her to live independently in the community. Plaintiffs allege that this lack of services is presently causing specific tangible harms including feelings of societal isolation and an exacerbation of their disabilities. Plaintiffs also allege particular harms based on the lack of notice or an opportunity to challenge being denied Waiver Services. Specifically, Plaintiffs allege that their ability to make informed choices about services is impaired by the lack of notice about why they were initially placed or are kept on waiting lists.

Second, Plaintiffs have established the requisite causal connection between their injuries and Defendants' conduct. Plaintiffs allege that the additional supports and

services they need to integrate into the community are available through the DD or CADI Waiver programs.  Plaintiffs allege that Defendants are responsible for managing and administering the Waiver Services programs under which they have been placed on long waiting lists.  In particular, Plaintiffs allege that Commissioner Johnson Piper is the "single state agency" tasked with administering Minnesota's Medicaid program including the Waiver Services programs.  They allege that Defendants have mismanaged Minnesota's Waiver Services programs and have allowed Minnesota counties to routinely underspend their allocated Waiver Services funding while Plaintiffs and others remain on waiting lists.  Plaintiffs specifically allege that Commissioner Johnson Piper does not have "a comprehensive and effectively working plan for ensuring that Plaintiffs and members of the Plaintiff class be provided with Waiver Services within the funding appropriated by the Legislature each year. . . ."  (Am. Compl. ¶ 99.)  According to Plaintiffs, Defendants' conduct in mismanaging the Waiver Services program has caused their ongoing harms.[6]

Third, the Court concludes that a favorable decision by this Court would redress Plaintiffs' injuries.  Plaintiffs request a declaration from this Court that Defendants have violated their rights under the Medicaid Act, the ADA, the Rehabilitation Act, and the Fourteenth Amendment Due Process Clause.  Plaintiffs allege that these violations are

---

[6]     The Court rejects Defendants' suggestion that amendments to Minnesota laws make it unclear whether Defendants' conduct will continue to harm Plaintiffs in the future.  Notwithstanding the new statutory scheme, Plaintiffs allege current, ongoing harms and have sufficiently alleged that such harms are tied to Defendants' continuing conduct in administering the Waiver Services program.

ongoing, and the Court's imposition of Plaintiffs' requested injunctive relief will remedy Plaintiffs' injuries. *See, e.g.*, *Steel Co.*, 523 U.S. at 108 ("If respondent had alleged a continuing violation . . ., the injunctive relief requested would remedy that alleged harm."). Specifically, Plaintiffs seek an injunction which would "requir[e] Defendants to provide Plaintiffs . . . with Waiver Services in the most integrated setting appropriate to their individual needs and preferences consistent with applicable law." (Am. Compl. at Prayer for Relief ¶ F.) This requested relief is directly tied to Defendants' alleged unlawful conduct under the ADA and the Rehabilitation Act and would redress Plaintiffs' injuries resulting from their isolation and segregation from society. In addition, Plaintiffs seek an injunction "requiring that the Defendants fund and provide Waiver Services with reasonable promptness and at a reasonable pace to members of the plaintiff class" and an order from the Court that "such funds remain available until members of [the] plaintiff class are provided such services." (*Id.* ¶ G.) Such an injunction would address Plaintiffs' Medicaid Act claims and would redress the injuries they have suffered by being placed on waiting lists for Waiver Services for many years.

Plaintiffs have standing to pursue their claims, and the Court will therefore address Defendants' additional justiciability challenges.

### B.    Mootness

Defendants argue that Plaintiffs' claims are moot. In support of this argument, Defendants identify multiple recent amendments to Minnesota laws governing the allocation of Waiver Services funds, effective in May 2015. First, Minnesota statutes have been amended to impose a 3% cap on the amount of allocated Waiver Services

funds that counties can maintain as reserves.  *See* Minn. Stat. § 256B.0916, subd. 11.

Second, the newly-amended laws limit counties' fiscal responsibility for overspending

should they spend funds in excess of their individual Waiver Services allocations.  *See*

*id.* § 256B.0916, subd. 12.  Third, there is no longer a growth limit on the CADI Waiver

Program.  *See* Laws of Minnesota, 2011, 1st Special Session, Ch. 9, art. 10, sec. 3,

subd. 3(g).  Finally, Defendants also argue that they are in the process of making changes

to the DD and CADI Waiver Programs through the implementation of Minnesota's

*Olmstead* Plan, approved by this Court in the related case *Jensen, et al. v. Minnesota*

*Department of Human Services, et al.*, Civ. No. 09-1775 (D. Minn.).  Defendants argue

that Plaintiffs' Amended Complaint focuses on the mismanagement of county reserves

under prior versions of Minnesota law.  Thus, Defendants argue, Plaintiffs' claims are

rendered moot by these recent changes in the law governing Waiver Services.

Plaintiffs argue that their claims are based on ongoing violations of federal law

and that recent amendments to Minnesota laws do not moot their claims.  Specifically,

Plaintiffs point out that they are not seeking declaratory or injunctive relief with respect

to the Minnesota statutes Defendants have identified.  And even if Defendants enforce the

new limits on county reserves, Plaintiffs argue, their Medicaid, Due Process, ADA, and

Rehabilitation Act claims would still be viable.  In addition, Plaintiffs point out that the

goals in Minnesota's *Olmstead* Plan are not binding or enforceable obligations sufficient

to moot Plaintiffs' claims.  Plaintiffs note that Defendants carry a heavy burden to prove

mootness and argue that they have failed to do so.

17

Article III's case and controversy requirement prohibits federal courts from hearing disputes that are no longer live.  *See Allen v. Likins*, 517 F.2d 532, 534 (8th Cir. 1975).  Because courts have no power to issue advisory opinions, a case must involve "a real and substantial controversy" as opposed to a mere academic dispute based on hypothetical facts.  *Id.* (internal quotation marks and citation omitted); *see also Deerbrook Pavilion, LLC v. Shalala*, 235 F.3d 1100, 1103 (8th Cir. 2000).  "A case is moot when it is 'impossible for the court to grant any effectual relief whatever.'"  *Id.* (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)).  The party asserting that a case has become moot bears "[t]he heavy burden of proving mootness."  *Kennedy Bldg. Assocs. v. Viacom Inc.*, 375 F.3d 731, 745 (8th Cir. 2004) (internal quotation marks and citation omitted).

In order to establish mootness on the basis of a defendant's voluntary cessation of the alleged unlawful conduct, a defendant must meet the "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 190 (2000).  Defendants have not clearly established, or even affirmatively alleged, that they have voluntarily discontinued the purportedly unlawful conduct that Plaintiffs challenge in this case.  Although Defendants direct the Court to multiple amendments to state laws governing Waiver Services, they fail to establish that they have discontinued the challenged *conduct*—the routine and ongoing mismanagement of the State's Waiver Services program.  Plaintiffs allege continuing harms through their ongoing placement on

waiting lists, and Defendants continue to carry the responsibility for these harms.  On this basis alone, the Court could properly reject Defendants' mootness argument.

The Court also concludes that the recent changes to Minnesota laws governing Waiver Services do not moot Plaintiffs' claims.  Importantly, the Court does not interpret Plaintiffs' claims to be directed at the prior versions of these laws.  Although Plaintiffs provide the Court with detailed information regarding the history of Defendants' administration of the Waiver Services programs under the prior statutory scheme, Plaintiffs allege personal harms and direct injury caused by Defendants' *continuing* conduct as of December 2015—seven months after the amendments to the relevant statutes became effective.  Plaintiffs have not lodged their claims under prior versions of Minnesota statutes governing Waiver Services.  Rather, Plaintiffs challenge Defendants' current and ongoing failure to properly administer the State's Waiver Services programs under the existing statutory regime.  Cases cited by Defendants to support their mootness argument involved amendments to the specific laws at issue during the pendency of litigation.  *See Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955, 964-65 (8th Cir. 2015); *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678, 684, 687 (8th Cir. 2012); *see also Arc of Cal. v. Douglas*, 757 F.3d 975, 979, 982 (9th Cir. 2014).  Here, Plaintiffs do not seek declaratory or injunctive relief with respect to the amended laws themselves, and the new laws governing Waiver Services went into effect months before Plaintiffs filed their complaint.  Thus, these changes in the law do not moot Plaintiffs' claims.

Finally, the Court concludes that Defendants' ongoing implementation of new administrative policies under Minnesota's *Olmstead* Plan does not moot Plaintiffs'

claims.  A defendant's "'announcement of an intention to change or adoption of a plan to work toward lawful behavior' is generally insufficient" to moot a case.  *See Rosemere Neighborhood Ass'n v. U.S. Envtl. Prot. Agency*, 581 F.3d 1169, 1173 n.3 (9th Cir. 2009) (quoting 13C Charles Alan Wright et al., *Federal Practice and Procedure* § 3533.7 (3d ed. 2008)).  In addition, a court need not "wait and see how [a] new policy work[s] out" in response to a defendant's argument that its administrative policy moots the plaintiffs' claims.  *See Gluth v. Kangas*, 951 F.2d 1504, 1507 (9th Cir. 1991) (rejecting an argument that the Department of Corrections' post-litigation adoption of a new law library access policy mooted plaintiffs' federal claim that they had been denied meaningful access to the courts).  The evolving implementation of Minnesota's *Olmstead* Plan approved by the Court in *Jensen* does not resolve Plaintiffs' claims against the Defendants. Notwithstanding Defendants' implementation of the *Olmstead* Plan and their commitment to working toward specific goals to improve the pace of the Waiver Services waiting lists, the Court concludes that this case presents a live controversy capable of effectual relief.  *See Deerbrook*, 235 F.3d at 1103.[7]

---

[7]      The Court notes that it is particularly hesitant to conclude that any new laws or policies governing Minnesota's Waiver Services programs moot this case given the longstanding history of underspending and mismanagement that Plaintiffs have alleged. The Court is deeply concerned about the "$1 billion of funds" that the Defendants have purportedly left unspent over nearly two decades while thousands of individuals in this state go without critical services to help them live fuller and more inclusive lives in the community.  (*See* Am. Compl. ¶ 1.)  Given these allegations, the Court finds it would be improper to conclude that this case is moot based solely on Defendants' assertions that they are in the process of implementing a handful of very new changes to its Waiver Services program.  *Cf. League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 474 (6th Cir. 2008) (rejecting an argument that the state's passage of new legislation aimed at

(Footnote Continued on Next Page)

### C.      Ripeness

In the alternative, Defendants argue that if Plaintiffs' claims are based on current

versions of Minnesota laws governing Waiver Services, they are not ripe.

As with standing and mootness, the ripeness doctrine ensures that a court's

exercise of jurisdiction meets both the constitutional requirements of Article III and

prudential limitations.  *See Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d

1032, 1037 (8th Cir. 2000).  The Supreme Court has explained that:

> [The ripeness doctrine's] basic rationale is to prevent the courts, through
> avoidance of premature adjudication, from entangling themselves in
> abstract disagreements over administrative policies, and also to protect the
> agencies from judicial interference until an administrative decision has been
> formalized and its effects felt in a concrete way by the challenging parties.
> The problem is best seen in a twofold aspect, requiring us to evaluate both
> the fitness of the issues for judicial decision and the hardship to the parties
> of withholding court consideration.

*Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).

Under the fitness factor, "[t]he case is more likely to be ripe if it poses a purely

legal question and is not contingent on future possibilities."  *Pub. Water Supply Dist. No.*

*10 of Cass Cty. v. City of Peculiar, Mo.*, 345 F.3d 570, 573 (8th Cir. 2003) (citations

omitted); *see also Parrish v. Dayton*, 761 F.3d 873, 876 (8th Cir. 2014) ("A claim is not

ripe for adjudication if it rests upon contingent future events that may not occur as

anticipated, or indeed may not occur at all." (quoting *Texas v. United States*, 523 U.S.

---

(Footnote Continued From Previous Page)
correcting deficiencies in the state's administration of elections mooted voters' federal
claims based on the state's "pervasive, severe, chronic, and persistent" administration
problems dating back several decades).

296, 300 (1998))).  Even if a dispute raises some contingencies, however, a court may

properly exercise review "where an issue is largely legal in nature, may be resolved

without further factual development, or where judicial resolution will largely settle the

parties' dispute."  *Neb. Pub. Power*, 234 F.3d at 1038 (citations omitted).

　　　Under the hardship factor, a court may consider both financial harm and harm

caused by "uncertainty-induced behavior modification in the absence of judicial review."

*Iowa League of Cities v. Envtl. Prot. Agency*, 711 F.3d 844, 867 (8th Cir. 2013) (internal

quotation marks and citations omitted).  The immediacy and directness of the harm is

also relevant.  *See Abbott Labs.*, 387 U.S. at 152.  The ripeness factors "are weighed on a

sliding scale, but each must be satisfied 'to at least a minimal degree.'"  *Iowa League of*

*Cities*, 711 F.3d at 867.

　　　The Eighth Circuit has previously identified "the extent to which judicial

intervention would interfere with administrative action" as a third relevant factor in the

ripeness inquiry.  *Nat'l Right to Life Political Action Comm. v. Connor*, 323 F.3d 684,

692-93 (8th Cir. 2003).  An assertion of ongoing agency action, however, will not always

prevent the court's exercise of jurisdiction.  *See* 13B Charles Alan Wright et al., *Federal*

*Practice & Procedure* § 3532.6 (3d ed. 2016) ("[A]ny agency attempt to defeat review by

the bare assertion that the agency position may some day change should be summarily

rejected.").  In addition, "protracted inaction by state officials may itself be a wrong, or at

least defeat any claim that a federal court should await further state developments."  *Id.*

§ 3532.3; *see also Groome Resources Ltd., L.L.C. v. Parish of Jefferson*, 234 F.3d 192,

199-200 (5th Cir. 2000).  Further, ripeness is not automatically defeated by ongoing

revision or implementation of an administrative agency's regulatory plan, *see Ohio Envtl.*

*Council v. U.S. Dist. Court, S. Dist. of Oh., E. Div.*, 565 F.2d 393, 397-98 (6th Cir. 1977),

or by the possibility of future regulatory changes, *see Am. Petroleum Inst. v. U.S. Envtl.*

*Prot. Agency*, 906 F.2d 729, 739-40 (D.C. Cir. 1990).

Defendants contend that Plaintiffs' claims are not fit for judicial resolution at this

time because Defendants are still in the process of implementing recent legislative

changes and Minnesota's *Olmstead* Plan. Defendants assert that "[i]t is currently

unknown and wholly speculative to guess how these changes will affect Plaintiffs'

specific applications for waiver services." (Doc. No. 37 at 17.) In addition, Defendants

argue that Plaintiffs' claims are not ripe because Plaintiffs have failed to allege an

immediate danger of direct injury and acknowledge that they are not currently

institutionalized.

Plaintiffs disagree and contend that their claims are ripe for adjudication. First,

they argue that their claims present primarily legal questions regarding Defendants'

purported violations of federal laws. Plaintiffs note, "Defendants have pointed to no

missing relevant and material facts needed to create Plaintiffs' claims, and there are no

contingencies that must occur before the claims mature." (Doc. No. 43 at 16.) Second,

Plaintiffs allege that they are facing direct and sustained harms as opposed to a threat of

future injury. Plaintiffs further argue that the ongoing implementation of Minnesota's

*Olmstead* Plan does not render their claims unripe because the plan does not legally bind

the Defendants or eliminate the harms Plaintiffs are currently experiencing.

The Court concludes that this case is ripe for review. The issues before the Court are primarily legal, and future factual developments will not meaningfully enhance the Court's ability to undertake review of the legal issues raised by Plaintiffs' claims. Further, the hardship to Plaintiffs of withholding judicial review is concrete. Plaintiffs do not allege or speculate that they face a threat of future harm; Plaintiffs allege that they are harmed currently on an ongoing basis every day that they are denied essential Waiver Services based on Defendants' purported mismanagement and administration. Notwithstanding Defendants' argument that their implementation of new statutes and Minnesota's *Olmstead* Plan make this case unripe, the Court concludes that delaying resolution of Plaintiffs' claims is unwarranted.

Further, awaiting additional developments will not sharpen the Court's analysis of Plaintiffs' claims and will only exacerbate the direct and ongoing harms Plaintiffs allege they are facing.[8] Unless and until Plaintiffs' are removed from the waiting lists for Waiver Services, their legal claims challenging Defendants' ongoing administration of the Waiver Services programs will remain viable and unresolved. Although Defendants emphasize that Minnesota's new statutory scheme may somehow affect Plaintiffs'

---

[8]   The Court notes that it is irrelevant to the Court's analysis whether Plaintiffs are currently institutionalized or facing a threat of imminent institutionalization. Plaintiffs have sufficiently alleged that they are currently suffering specific harms due to Defendants' administration of the Waiver Services programs, notwithstanding the fact that they are residing in the community and receiving some services. *Cf. Dykes v. Dudek*, Civ. No. 4:11CV116, 2011 WL 4904407, at *2 (N.D. Fla. Oct. 14, 2011) ("It is not the threat of institutionalization which is a cognizable injury. Rather, the 'waiting lists for enrollment on the DD Waivers where [the community plaintiffs] languish for years without services' are the injury.").

applications for Waiver Services, the Court's analysis of Plaintiffs' current claims will not benefit from waiting to see what might happen at a future time. In short, the Court "in all likelihood 'will be in no better position later than [it is] now to confront'" the legal issues presented. *Johnson v. Stuart*, 702 F.2d 193, 197 (9th Cir. 1983) (quoting *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 145 (1974)); *cf. Neb. Pub. Power*, 234 F.3d at 1039 ("Were we to withhold adjudication, [the parties] would perforce return here shortly, making precisely the same arguments, with nary a scintilla of additional relevant evidence.").

The Court concludes that Plaintiffs' claims are justiciable. Plaintiffs have established standing to pursue their claims, and the claims are neither moot nor unripe for judicial resolution.

## III.   Sovereign Immunity

The Court next considers Defendants' argument that Plaintiffs' claims and requested relief are barred by sovereign immunity. The Eleventh Amendment provides that states and their agencies are immune from suit in federal court, unless the state has consented to be sued, or Congress has abrogated the state's immunity by some express statutory provision. *See Will v. Mich. Dep't. of State Police,* 491 U.S. 58, 66-67 (1989); *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 619 (8th Cir. 1995). The Supreme Court has identified a longstanding exception to Eleventh Amendment sovereign immunity, permitting suits against state officers that seek prospective injunctive relief to enforce compliance with federal law. *See Ex parte Young*, 209 U.S. 123 (1908). Plaintiffs have asserted all of their claims against Commissioner Johnson Piper, and have only asserted

their Rehabilitation Act claim against the State of Minnesota and DHS.  The Court will

first analyze the extent to which *Ex parte Young* applies to Plaintiffs' claims against

Commissioner Johnson Piper before analyzing whether the State of Minnesota is immune

from Plaintiffs' claims under § 504 of the Rehabilitation Act.

### A.      Claims for Injunctive Relief Against the Commissioner

Defendants argue that Plaintiffs' claims are barred by sovereign immunity

principles established under the Eleventh Amendment.  While acknowledging that

individuals may properly seek prospective relief against state officials under *Ex parte*

*Young*, Defendants argue that Plaintiffs seek relief that is barred because the monetary

consequences to the State are not merely ancillary but are the primary purpose of

Plaintiffs' claims.  Defendants contend, "Plaintiffs do not seek an order merely requiring

Defendants to comply with federal law, . . . they seek an order compelling Defendants to

fund waiver services and keep funding available."  (Doc. No. 45 at 3.)  Defendants also

raise general federalism concerns, arguing that Plaintiffs are asking the Court to

"interfere with Defendants' right to manage state funding by requiring the state to

indefinitely continue its participation in a voluntary medical assistance program," (Doc.

No. 37 at 8), and by overriding State decisions regarding how to spend its limited funds.

Defendants further argue that remedying Plaintiffs' claims would implicate

separation-of-powers concerns due to improper judicial interference with federal

Medicaid statutes enacted by Congress and administered by the Secretary of the

Department of Health and Human Services ("HHS").

26

Plaintiffs argue that their claims against Commissioner Johnson Piper may proceed notwithstanding the Eleventh Amendment because Plaintiffs properly seek prospective injunctive and declaratory relief under *Ex parte Young*.  Plaintiffs also argue that any fiscal consequences to the State are ancillary to their request for injunctive relief and are thus proper.  Further, Plaintiffs acknowledge that Defendants' participation in Medicaid is voluntary but emphasize that such voluntary participation necessitates compliance with federal statutes and regulations governing the Medicaid program.  In response to Defendants' federalism and separation of powers arguments, Plaintiffs argue that they are not seeking to override the State's funding decisions.  Specifically, Plaintiffs note that "[n]owhere in Plaintiffs' Amended Complaint . . . is any demand that the State use *non*-Waiver Services funds to pay for Waiver Services."  (Doc. No. 43 at 21.)  Rather, Plaintiffs explain, "Plaintiffs ask only that the State spend legislatively appropriated Waiver Services funds on Waiver Services for individuals already deemed eligible for such services."  (*Id.*)  Plaintiffs also argue that Defendants waived sovereign immunity when they agreed to create and implement Minnesota's *Olmstead* Plan which commits to reducing Waiver Services waiting lists.

The exception to sovereign immunity established in *Ex parte Young* is an "[e]xtremely important" and "substantial" limitation on state sovereign immunity "accepted as necessary to 'permit federal courts to vindicate federal rights.'"  *Denke v. S.D. Dep't of Soc. Servs.*, 829 F.2d 688, 689 (8th Cir. 1987); *Va. Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1638 (2011) (citation omitted).  Specifically, "the power of federal courts to enjoin 'continuing violation[s] of federal law [is] necessary to

vindicate the federal interest in assuring the supremacy of that law.'" *Fond du Lac Band of Chippewa Indians v. Carlson*, 68 F.3d 253, 255 (8th Cir. 1995) (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)). The *Ex parte Young* exception to sovereign immunity permits federal courts to grant prospective relief against state officials in order to enjoin their future compliance with federal law. *Edelman v. Jordan*, 415 U.S. 651, 664 (1974). However, a federal court may not impose retroactive relief that requires state officials "to use state funds to make reparation for the past." *Id.* at 665.

The line between proper relief under *Ex parte Young* and relief prohibited by the Eleventh Amendment can sometimes be difficult to draw. *See id.* at 667. However, the Supreme Court has clarified that "a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective" to determine whether *Ex parte Young* applies. *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (internal quotation marks and citation omitted); *see also Gibson v. Ark. Dep't of Corr.*, 265 F.3d 718, 720 (8th Cir. 2001).

If the relief sought is prospective in nature, it is proper "notwithstanding a direct and substantial impact on the state treasury." *Milliken v. Bradley*, 433 U.S. 267, 289 (1977) (finding an injunctive relief order to be proper despite its explicit requirement that the state bear one half of the cost of developing a comprehensive educational program); *see also Papasan v. Allain*, 478 U.S. 265, 281-82 (1986) (declining to dismiss on Eleventh Amendment grounds plaintiffs' claim challenging the state's unequal allocation

28

of resources to state school districts, even though remedying the disparity "might require

the expenditure of state funds").  As the Supreme Court explained in *Edelman v. Jordan*,

> State officials, in order to shape their official conduct to the mandate of the
> Court's decrees, would more likely have to spend money from the state
> treasury than if they had been left free to pursue their previous course of
> conduct.  Such an ancillary effect on the state treasury is a permissible and
> often an inevitable consequence of the principle announced in *Ex parte
> Young*.

*Edelman*, 415 U.S. at 668.  Thus, to determine whether *Ex parte Young* applies to

override Eleventh Amendment sovereign immunity, the Court must focus not on the

impact of the requested relief on the state treasury, but on whether the relief sought is

fundamentally prospective or retrospective in nature.  *See Mo. Child Care Ass'n v. Cross*,

294 F.3d 1034, 1042 (8th Cir. 2002); *see also Antrican ex rel. Antrican v. Odom*, 290

F.3d 178, 186 (4th Cir. 2002); *Lewis v. New Mexico Dep't of Health*, 261 F.3d 970, 977

(10th Cir. 2001).[9]

---

[9]   The Eighth Circuit has affirmed these principles on numerous occasions.  *See, e.g.*,
*Skelton v. Henry*, 390 F.3d 614, 617 (8th Cir. 2004); *Love v. McCown*, 38 F. App'x 355,
356 (2002); *Randolph v. Rodgers*, 253 F.3d 342, 348 (8th Cir. 2001); *Nix v. Norman*, 879
F.2d 429, 432 (8th Cir. 1989); *Jenkins by Agyei v. State of Mo.*, 855 F.2d 1295, 1307 (8th
Cir. 1988), *aff'd in part, rev'd in part sub nom. Missouri v. Jenkins*, 495 U.S. 33 (1990);
*Denke*, 829 F.2d 688; *Slaughter v. Levine*, 801 F.2d 288, 300 (8th Cir. 1986); *Miener v.
State of Mo.*, 673 F.32d 969, 982 (8th Cir. 1982).
    Defendants cite Sixth Circuit caselaw that directs courts to focus on the monetary
impact of the plaintiff's requested relief.  (Doc. No. 37 at 18-19 ("A court may enter a
prospective injunction that costs the state money, but only if the monetary impact is
ancillary, i.e., not the primary purpose of the suit." (quoting *Barton v. Summers*, 293 F.3d
944, 950 (6th Cir. 2002)).)  While affirming that courts may order prospective
non-monetary relief that requires the state to make incidental expenditures, the Sixth
Circuit has suggested that "[t]he dividing line . . . is whether the money or the
non-monetary injunction is the primary thrust of the suit."  *Barton*, 293 F.3d at 949.  In
recent cases, the Seventh Circuit has also appeared to emphasize the importance of the

(Footnote Continued on Next Page)

29

The Court concludes that Plaintiffs' claims against Commissioner Johnson Piper fall within the scope of the *Ex parte Young* exception to sovereign immunity.  To remedy ongoing violations of federal laws including the Medicaid Act, the ADA, the Rehabilitation Act, and the Due Process Clause of the Fourteenth Amendment, Plaintiffs seek injunctive relief that would operate prospectively against the Commissioner to affect her conduct in the future.  Specifically, Plaintiffs seek a permanent injunction that requires Defendants to provide Plaintiffs with Waiver Services "in the most integrated setting appropriate to their individual needs and preferences consistent with applicable law."  (Am. Compl. at Prayer for Relief ¶ F.)  Plaintiffs also seek an injunction "requiring that the Defendants fund and provide Waiver Services with reasonable promptness and at a reasonable pace" and "order[ing] that such funds remain available until members of [the] plaintiff class are provided such services."  (*Id.* ¶ G.)  Because Plaintiffs seek only prospective injunctive relief, their claims against Commissioner Johnson Piper fall squarely under the *Ex parte Young* exception to sovereign immunity.  *See Boulet v.*

_____

(Footnote Continued From Previous Page)
requested relief's impact on the state treasury.  *See Council 31 of the Am. Fed'n of State, Cty. and Mun. Emps., AFL-CIO v. Quinn*, 680 F.3d 875, 882-83 (7th Cir. 2012).

Despite some caselaw in other Circuits adopting a different approach to the *Ex parte Young* inquiry, this Court is bound to follow the Eighth Circuit's approach to sovereign immunity questions.  Thus, the Court will focus on the straightforward inquiry of whether the relief sought is properly deemed prospective in nature, notwithstanding the extent of the fiscal consequences to the State.  Notably, however, even if the Court were to focus on the impact of Plaintiffs' requested relief upon the state treasury, the Court would conclude that the impact is not so substantial as to impose an Eleventh Amendment bar.  As in *Milliken*, "[t]his case simply does not involve individual citizens' conducting a raid on the state treasury for an accrued monetary liability."  433 U.S. 267 at n.22.

*Cellucci*, 107 F. Supp. 2d 61, 74 (D. Mass. 2000) ("[T]he plaintiffs request an order that the defendants grant the requested services with reasonable promptness—an order affecting prospective action only.").

Although the relief Plaintiffs seek relates to and will likely involve the expenditure of funds, it is not the type of retroactive monetary relief barred by the Eleventh Amendment. Specifically, Plaintiffs' requested relief will not be "measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials." *Edelman*, 415 U.S. at 668. Plaintiffs do not request retroactive relief "to . . . compensat[e] . . . for conduct and consequences completed in the past," *Milliken*, 433 U.S. at 290 n.21, or to "bestow an award for accrued monetary liability," *Papasan*, 478 at 282. Rather, Plaintiffs seek "relief that serves directly to bring an end to a present violation of federal law" which is ongoing and causing Plaintiffs continuing harms. *Id.* at 278. If Plaintiffs requested to be made whole through financial compensation for the past months or years in which they were placed on the Waiver Services waiting lists, such relief would be barred by the Eleventh Amendment. However, Plaintiffs make no such request. Therefore, the Court may properly award prospective injunctive relief to remedy Plaintiffs' harms. Any impact upon the State's treasury will be ancillary to such relief and is therefore permissible under the Eleventh Amendment. *See Mo. Child Care Ass'n*, 294 F.3d at 1042; *see also Boulet*, 107 F. Supp. 2d at 74.

Defendants also assert that Plaintiffs' claims implicate state sovereignty concerns and are barred by principles of federalism. Even if a claim would otherwise be proper under *Ex parte Young*, a suit may be prohibited under the Eleventh Amendment where

"the suit and the remedy it seeks 'implicate[] special sovereignty interests.'" *See Union Elec. Co. v. Mo. Dep't of Conservation*, 366 F.3d 655, 658 (8th Cir. 2004) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997)).  Although Defendants have not specifically invoked the "special sovereignty interests" exception to *Ex parte Young*, the Court interprets their arguments to be directed at similar concerns.  First, Defendants assert that Plaintiffs improperly request the Court to order Defendants to continue participating in Medicaid indefinitely.  Second, Defendants argue that Plaintiffs' requested relief would infringe state sovereignty by dictating how the State should spend its limited funds.

The Court disagrees with Defendants.  First, as Defendants assert and Plaintiffs admit, Defendants' participation in Medicaid and its provision of any Waiver Services is voluntary.  This Court cannot order the State to fund such services if the legislature chooses to abandon its participation in Medicaid or its provision of Waiver Services.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 29 (1981).  However, because Defendants have chosen to provide these services in the State of Minnesota, their participation must comply with federal law.  *Mo. Child Care Ass'n*, 294 F.3d at 1036 ("[O]nce a state agrees to take the funds offered through [a federal program created pursuant to the Spending Clause], the state is bound to 'comply with federally imposed conditions.'" (quoting *Pennhurst*, 451 U.S. at 17)).

Second, Plaintiffs do not ask the Court to dictate expenditures from the State treasury.  Rather, the relief they seek centers on the administration, use, and oversight of funds that the State legislature independently decides to allocate for Waiver Services.

32

The Court may properly order Defendants to properly administer the funds the State has allocated to provide Waiver Services for individuals with disabilities.  Such an order would not "ha[ve] the effect of dictating state or local budget priorities," *see Horne v. Flores*, 557 U.S. 433, 448 (2009), but would simply require Defendants to comply with federal laws within the budget previously established by the State.[10]

Finally, the Court concludes that no special sovereignty interests are implicated by the relief Plaintiffs seek.  "A state's interest in administering a welfare program at least partially funded by the federal government is not such a core sovereign interest as to preclude the application of *Ex parte Young*."  *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1287 (10th Cir. 1999); *see also Antrican*, 290 F.3d at 189 (finding no special sovereignty

---

[10]    Plaintiffs' request "that the Court enter an order that such funds remain available until members of the plaintiff class are provided such services" could be construed to infringe upon the State's funding decisions by requiring the State to keep funds available for Waiver Services when they would otherwise revert to the State's general fund under Minnesota law.  (*See* Am. Compl. at Prayer for Relief ¶ G.)  From Defendants' perspective, Plaintiffs' "requested relief . . . invalidates duly enacted Minnesota law that deals with the disposition of unspent monies at the end of each fiscal year." (See Doc. No. 37 at 19 n.9 (citing Minn. Stat. § 16A.28, subd. 3).)  Plaintiffs contend, however, that "[i]f the Court orders Defendants to comply with the Medicaid Act, and provide Waiver Services to the extent of available funding, there will be no unspent funds (or very little) that would lapse to the originating fund."  (Doc. No. 43 at 21.)  While the Court acknowledges that Plaintiffs' requested relief could be clearer on this point, it reads any ambiguity in Plaintiff's favor at this stage of the proceedings. *Cf. Andrus v. Ark.*, 197 F.3d 953, 955-56 (8th Cir. 1999) (noting that Plaintiffs' complaint "could have been clearer" but construing the complaint as "request[ing] injunctive relief . . . with sufficient clarity" and allowing the claims to proceed).  Furthermore, to the extent Plaintiffs seek relief that would improperly infringe upon the State's funding decisions, the Court can properly deny such relief while granting proper injunctive relief in light of Plaintiffs' claims.  The Court will reserve determination on the precise scope of relief it may impose in the future, emphasizing that any relief it grants will properly account for the important federalism concerns Defendants have raised.

interests in a § 1983 Medicaid case because it "involve[d] a federally designed healthcare program in which the federal government has invited the States to participate if they agree to certain federally established conditions"); *Lewis v. N.M. Dep't of Health*, 94 F. Supp. 2d 1217, 1232 (D.N.M. 2000) ("[T]hough states certainly have a special interest in administering their own social services programs, when they accept federal funding for a program they cannot escape suit against state officials for failure to comply with federal law governing that program under *Ex parte Young*."). As noted above, Defendants have elected to participate in Medicaid and must therefore comply with its requirements. Any sovereignty interests the State retains in administering Minnesota's Waiver Services programs under Medicaid must be exercised in compliance with federal law.

Defendants' last contention is that remedying Plaintiffs' claims would raise federal separation-of-powers concerns due to congressionally-approved limits on Waiver Services and the HHS Secretary's administration of the Medicaid Act. Without prematurely delving into the merits of Plaintiffs' Medicaid Act claims, the Court concludes that these separation-of-powers concerns do not preclude the Court's exercise of jurisdiction over Plaintiffs' claims. Multiple federal appellate courts have permitted plaintiffs to pursue claims seeking prospective injunctive relief to remedy ongoing violations of the Medicaid Act. *See Westside Mothers v. Haveman*, 289 F.3d 852, 861 (6th Cir. 2002); *J.B. ex rel. Hart*, 186 F.3d at 1286-87; *Doe v. Chiles*, 136 F.3d 709, 720 (11th Cir. 1998). Indeed, the Tenth Circuit has specifically found prospective injunctive

relief to be proper in order to remedy alleged violations of 42 U.S.C. § 1396a(a)(8)'s

reasonable promptness requirement.  *See Lewis*, 261 F.3d at 977-78.

The Court concludes that Plaintiffs' claims against Commissioner Johnson Piper

may proceed because Plaintiffs properly seek prospective injunctive relief under the

*Ex parte Young* exception to sovereign immunity to enjoin ongoing violations of federal

law.  That their requested relief may have an ancillary effect upon the State treasury is no

bar to their claims, and the Court's imposition of the requested relief would not

improperly interfere with state sovereignty.[11]

### B. Rehabilitation Act Claim Against all Defendants

Defendants argue that under both *Ex parte Young* and controlling Eighth Circuit

caselaw governing Congress's abrogation of state sovereign immunity under the

Rehabilitation Act, the State of Minnesota is not a proper party to Plaintiffs' complaint.

Specifically, Defendants assert that Minnesota's acceptance of federal Medicaid funds

only effectuates a waiver of sovereign immunity with respect to the individual agency

that receives the funds.

Plaintiffs contend that both DHS and the State of Minnesota are proper parties to

their Rehabilitation Act claim.  Because Congress has abrogated state immunity under

§ 504 of the Rehabilitation Act, Plaintiffs argue, the State of Minnesota has waived its

---

[11]    Because the Court concludes that these claims are permissible under *Ex parte Young*, the Court does not address Plaintiffs' additional argument that Defendants have waived sovereign immunity based on their implementation of Minnesota's *Olmstead* Plan in *Jensen*. *See Verizon*, 535 U.S. at 645 (declining to decide whether a state commission waived sovereign immunity because the plaintiff's claims against individual commissioners were proper under *Ex parte Young*).

sovereign immunity with respect to such claims by accepting federal funds to administer the State's Medicaid program.

As noted above, express Congressional abrogation may override the sovereign immunity afforded to states and their agencies under the Eleventh Amendment. *See Will,* 491 U.S. at 66-67; *Egerdahl,* 72 F.3d at 619. With respect to the Rehabilitation Act, Congress has enacted the following provision to abrogate state sovereign immunity: "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 . . . ." 42 U.S.C. § 2000d-7(a)(1). Applying this provision to a Rehabilitation Act claim against State of Arkansas, the Eighth Circuit has explained that "[t]he Rehabilitation Act requires States that accept federal funds to waive their Eleventh Amendment immunity to suits brought in federal court for violations of Section 504." *Jim C. v. United States,* 235 F.3d 1079, 1081 (8th Cir. 2000). However, because the definition of a "program or activity" covered under the Rehabilitation Act does not include a state itself, the state's waiver of sovereign immunity is limited to the state agency that accepts or distributes the federal funds. *See id.* at 1080-81 (construing 29 U.S.C. § 794(b)). In other words, "[t]he acceptance of funds by one state agency . . . leaves unaffected both other state agencies and the State as a whole." *Id.* at 1081; *see also Doe v. Nebraska,* 345 F.3d 593, 598 (8th Cir. 2003) ("[T]his waiver of sovereign immunity is limited and applies only to the individual agency that receives the federal funds."). This is true even if the state itself is the entity that "applie[s] for and receive[s] federal grants" to be used by a specific agency. *See Doe,* 345 F.3d at 599-600.

36

Plaintiffs allege that the State of Minnesota has elected to participate in Medicaid, a health care program jointly funded by the federal government and the State. (Am. Compl. ¶ 24.) Plaintiffs further allege that Commissioner Johnson Piper, the DHS Commissioner, "serves as the 'single state agency' responsible for the administration of the Medicaid program in Minnesota." (*Id.* ¶ 22.) Plaintiffs also allege that the "State of Minnesota and DHS, an agency of the State of Minnesota, are responsible for developing and implementing the Medicaid Waiver Services to eligible individuals." (*Id.* ¶ 20.)

The Court concludes that the State of Minnesota has waived its Eleventh Amendment sovereign immunity for claims under § 504 of the Rehabilitation Act by accepting federal funds and participating in Medicaid. However, Minnesota's waiver of sovereign immunity for such claims is limited to DHS, the agency that accepts and distributes federal Medicaid funds through the State's MA program. Therefore, the Court agrees with Defendants that the State of Minnesota is not a proper party to this action and should be dismissed.

Furthermore, the Court concludes that allowing this claim to proceed against both Commissioner Johnson Piper in her official capacity and DHS is redundant. "An official-capacity suit is merely another way of pleading an action directly against the public entity itself." *Roberts v. Dillon*, 15 F.3d 113, 115 (8th Cir. 1994). Therefore, "any naming of [the public entity] in the heading of the complaint [is] . . . redundant" to a suit against an official in her official capacity. *See id*; *see also Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) (affirming a district court's dismissal of a claim against a police sergeant in his official capacity "as redundant of the claim against

the City"). This is particularly true here where Minnesota statutes specifically identify

the Commissioner of DHS herself as the "state agency" responsible for administering the

State's Medicaid program. (*See* Am. Compl. ¶ 22 (citing Minn. Stat. §§ 256B.02, subd.

5 and 256B.04, subd. 1).) Thus, the Court will additionally dismiss DHS as a party to

this lawsuit, allowing Plaintiffs' Rehabilitation Act claim against Commissioner Johnson

Piper in her official capacity as the Commissioner of DHS to proceed. *See Thomas v.*

*Missouri*, 2012 WL 1554919, at *4-5 (E.D. Mo. April 30, 2012) (dismissing the State of

Missouri from plaintiff's claim under § 504 Rehabilitation Act and allowing the claim to

proceed against the director of the Missouri Department of Social Services).[12]

## IV.   Plaintiff's Claims

### A.   Medicaid Act Claims

Plaintiffs allege that Defendants have violated multiple provisions of the Medicaid

Act through their administration of Minnesota's Waiver Services programs. Medicaid is

a cooperative program through which the federal government and participating states

provide medical assistance to individuals in need. *See Ark. Med. Soc'y, Inc. v. Reynolds*,

6 F.3d 519, 521 (8th Cir. 1993). States are not obligated to participate in Medicaid;

---

[12]   The Court emphasizes that its dismissal of DHS as a party should have no
practical effect on the Court's analysis of Plaintiffs' Rehabilitation Act claim or the relief
available to Plaintiffs' in this case. Because Commissioner Johnson Piper is sued in her
official capacity, the claims against her are treated as claims against DHS itself. Thus,
any allegations about DHS's conduct in Plaintiffs' Amended Complaint are
interchangeable with allegations about Commissioner Johnson Piper's own particular
conduct. *See, e.g.*, *Ark. Med. Soc'y, Inc. v. Reynolds*, 6 F.3d 519, 522 (8th Cir. 1993)
("The defendant/appellant in this action is the Director of DHS, the agency which
administers Medicaid in Arkansas. The appellant will be referred to as DHS.").

however, if they choose to do so, states must comply with federal law in administering

their Medicaid programs.  *See Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 433 (2004);

*Lankford v. Sherman*, 451 F.3d 496, 504 (8th Cir. 2006).  This requirement applies with

equal force whether the state is providing services that are mandatory or optional for the

state to include in their Medicaid programs.  *See Lankford*, 451 F.3d at 504.  States that

participate in Medicaid must submit a plan to the federal government for approval by the

Secretary of HHS.  *See id.*

With respect to the particular services at issue in this case, the Medicaid Act

provides:

> The Secretary may by waiver provide that a State plan approved under this
> subchapter may include as 'medical assistance' under such plan payment
> for part or all of the cost of home or community-based services . . .
> approved by the Secretary which are provided pursuant to a written plan of
> care to individuals with respect to whom there has been a determination
> that but for the provision of such services the individuals would require the
> level of care provided in a hospital or a nursing facility or intermediate care
> facility for the mentally retarded[13] the cost of which could be reimbursed
> under the State plan.

42 U.S.C. § 1396n(c)(1).  Federal regulations clarify that such waivers "are intended to

provide the flexibility needed to enable States to try new or different approaches to the

efficient and cost-effective delivery of health care services, or to adapt their programs to

the special needs of particular areas or groups of beneficiaries."  42 C.F.R. § 430.25(b).

Consistent with such flexibility, waivers permit exceptions to certain state Medicaid plan

requirements.  *Id.*  Specifically, a home or community-based services ("HCBS") waiver

---

[13]     The Court takes exception with the outdated and offensive language in this statute.

under 42 U.S.C. § 1396n(c) may waive three state plan requirements laid out in 42 U.S.C.

§ 1396a(a)—statewideness (subsection (a)(1)), comparability of services

(subsection (a)(10)(B)), and income and resource rules (subsection (a)(10)(C)(i)(III)).

*See* 42 U.S.C. § 1396n(c)(3); 42 C.F.R. § 430.25(d)(2); *see also Bryson v. Shumway*, 308

F.3d 79, 82 (1st Cir. 2002); *Susan J. v. Riley*, 254 F.R.D. 439, 451 n.7 (M.D. Ala. 2008);

*Lewis*, 94 F. Supp. 2d at 1234.  In addition, as Defendants point out, some Medicaid Act

provisions illustrate states' ability to limit the availability of HCBS Waiver Services

under certain circumstances.  *See, e.g.*, 42 U.S.C. § 1396n(c)(4)(A); *id.* § 1396n(c)(9).

Nonetheless, "the Secretary may not waive any requirements that protect the well-being

of Medicaid recipients."  *Wood v. Tompkins*, 33 F.3d 600, 602 (6th Cir. 1994).  The Court

will further discuss the specific Medicaid Act requirements at issue below.

 As Spending Clause legislation, the Medicaid Act may be enforced by the federal

government through withdrawal of federal funding from the states.  *See Lankford*, 451

F.3d at 508 ("For legislation enacted pursuant to Congress's spending power, like the

Medicaid Act, a state's non-compliance typically does not create a private right of action

for individual plaintiffs, but rather an action by the federal government to terminate

federal matching funds."); *see also* 42 U.S.C. § 1396c (establishing the Secretary's

authority to terminate federal funding based on state non-compliance).  However, the

Supreme Court and lower federal courts have also found some provisions of the Medicaid

Act to be privately enforceable by individuals in a claim under 42 U.S.C. § 1983.

 Section 1983 imposes liability against any person acting under color of law who

"subjects, or causes to be subjected, any citizen of the United States or other person

within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.  This provision applies to deprivations of both Constitutional and statutory rights.  *Maine v. Thiboutot*, 448 U.S. 1, 4-8 (1980).  Applying the Supreme Court's three-part test established in *Blessing v. Freestone*, 520 U.S. 329 (1997), and clarified in *Gonzaga University v. Doe*, 536 U.S. 273 (2002), the Eighth Circuit has articulated the proper inquiry for courts seeking to determine whether a private cause of action may be maintained under § 1983 for a violation of a particular federal statute.  Courts must ask whether:

> (1) Congress intended the statutory provision to benefit the plaintiff; (2) the asserted right is not so 'vague and amorphous' that its enforcement would strain judicial competence; and (3) the provision clearly imposes a mandatory obligation upon the states.  If the legislation meets this test, there is a presumption it is enforceable under section 1983.  The presumption is rebutted if Congress explicitly or implicitly forecloses section 1983 enforcement.  The availability of administrative mechanisms alone, however, cannot defeat the plaintiff's ability to invoke section 1983, so long as the other requirements of the three-part test are met.

*Lankford*, 451 F.3d at 508 (citations omitted).  With regard to the first prong, "'anything short of an unambiguously conferred right' does not support an individual right of action under section 1983."  *Id.* (quoting *Gonzaga*, 536 U.S. at 283).

Plaintiffs contend that the various Medicaid Act provisions under which they have asserted § 1983 claims against Defendants are privately enforceable.  Although they do not directly challenge the enforceability of these provisions, Defendants assert that the Supreme Court's recent decision in *Armstrong v. Exceptional Child Care Ctr., Inc.*, 135 S. Ct. 1378 (2015), "rais[es] questions as to private enforcement" under the Medicaid

Act.  (*See* Doc. No. 37 at 20.)  In *Armstrong*, the Supreme Court concluded that "the

Medicaid Act implicitly precludes private enforcement of [42 U.S.C. § 1396a(a)(30)(A)]"

to pursue a claim against a state in equity.  135 S. Ct. at 1385.  The Court reached this

conclusion for two reasons.  First, "the sole remedy Congress provided for a State's

failure to comply with Medicaid's requirements . . . is the withholding of Medicaid funds

by the Secretary of Health and Human Services."  *Id.*  The Court emphasized that this

fact alone would not necessarily prevent a private individual from pursuing equitable

relief for a violation of the Medicaid Act.  *Id.*  However, the Court found a second reason

to support its conclusion that the provision was not privately enforceable—"the judicially

unadministrable nature of § 30(A)'s text."  *Id.*  The Court noted, "[i]t is difficult to

imagine a requirement broader and less specific than § 30(A)'s mandate that state plans

provide for payments that are 'consistent with efficiency, economy, and quality of care,'

all the while 'safeguard[ing] against unnecessary utilization of . . . care and services.'"

*Id.*  These two factors combined precluded private enforcement of § 30(A).  *Id.*

The Court is not persuaded that *Armstrong* dictates a particular result as to the

enforceability of Plaintiffs' claims in this case.  *Armstrong* dealt with 42 U.S.C.

§ 1396a(a)(30)(A), Medicaid's "equal access" provision.  The enforceability of a

particular Medicaid Act provision under § 1983 must be independently assessed by the

Court; the fact that one provision fails to establish a private cause of action does not

govern the enforceability of a separate and distinct provision.  *See Minn. Pharmacists*

*Ass'n v. Pawlenty*, 690 F. Supp. 2d 809, 819 n.7 (D. Minn. 2010) ("[T]here are

substantial differences—indeed decisive differences for purposes of the Section 1983

question—between the numerous requirements under Section 1396a(a)."). As discussed in further detail below, the provisions at issue in this case are distinguishable from the equal access provision which the Supreme Court found to be "judicially unadministrable" in *Armstrong*. 135 S. Ct. at 1385. Although the Court's opinion in *Armstrong* may raise general questions regarding the Supreme Court's overall approach to private enforcement actions in this context, its holding is limited to the equal access provision. Thus, *Armstrong* does not provide a basis for an across-the-board rejection of all private enforcement actions under the Medicaid Act's numerous varied provisions. To the extent Defendants challenge the enforceability of the specific provisions at issue in this case, the Court will address those challenges in the context of analyzing Defendants' additional challenges to Plaintiffs' claims below.

### 1.    Count I:  Reasonable Promptness

Count I of Plaintiff's Amended Complaint alleges a violation of 42 U.S.C. § 1983 through failure to furnish services with reasonable promptness in violation of 42 U.S.C. § 1396a(a)(8). Defendants argue that Plaintiffs have failed to state a legally cognizable claim with respect to Count I.

The reasonable promptness requirement provides that "[a] State plan for medical assistance must . . . provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C.

§ 1396a(a)(8).[14]   Regulations also require the state to establish time standards to

determine an individual's eligibility for Medicaid in no more than ninety days and to

"[f]urnish Medicaid promptly to beneficiaries without any delay caused by the agency's

administrative procedures."  *See* 42 C.F.R. § 435.912; *id.* § 435.930; *see also Doe ex rel.*

*Doe v. Chiles*, 136 F.3d 709, 717 (11th Cir. 1998); *Boulet v. Cellucci*, 107 F. Supp. 2d 61,

72 (D. Mass. 2000).

Numerous federal Circuit Courts of Appeal have found § 1396a(a)(8)'s reasonable

promptness requirement to be privately enforceable under § 1983.  *See Romano v.*

*Greenstein*, 721 F.3d 373, 378-79 (5th Cir. 2013); *Doe v. Kidd*, 501 F.3d 348, 356-57

(4th Cir. 2007); *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 189 (3d Cir. 2004);

*Bryson*, 308 F.3d at 88-89; *Chiles*, 136 F.3d at 717; *see also Bertrand ex rel. Bertrand v.*

*Maram*, 495 F.3d 452, 456-58 (7th Cir. 2007) (assuming that § 1396a(a)(8) creates an

enforceable private right and noting the circuit authority holding the same); *Mandy R. v.*

*Owens*, 464 F.3d 1139, 1143 (10th Cir. 2006) (same).  Multiple federal district courts

have reached the same result.  *See Susan J.*, 254 F.R.D. at 453; *Lewis*, 94 F. Supp. 2d at

1235; *Boulet*, 107 F. Supp. 2d at 73.  *But see M.A.C. v. Betit*, 284 F. Supp. 2d 1298, 1308

(D. Utah 2003).

Under the three-part test outlined by the Supreme Court in *Blessing* and adopted

by the Eighth Circuit in *Lankford*, these courts determined that the reasonable promptness

requirement is:  (1) intended to benefit "eligible individuals"; (2) not so "vague and

---

[14]   As noted above, payment for HCBS Waiver Services is deemed "medical
assistance" under the Medicaid Act.  *See* 42 U.S.C. § 1396n(c)(1).

amorphous" that it cannot be judicially enforced; and (3) mandatorily imposed upon participating states. *See, e.g.*, *Sabree*, 367 F.3d at 189-94 (engaging in a detailed and thorough application of the *Blessing* test and concluding "[w]ithout difficulty" that § 1396a(a)(8) satisfies the test). These courts also concluded that Congress unambiguously conferred individual rights through this provision as required by *Gonzaga* and did not indicate an intent to foreclose § 1983 enforcement in the Medicaid Act. *See, e.g.*, *id.* at 190-93; *see also Chiles*, 136 F.3d at 718-19. Specifically, courts have found the reasonable promptness requirement to be enforceable in § 1983 actions brought by individuals, like Plaintiffs, who were waiting extended periods of time for Waiver Services. *See Bryson*, 308 F.3d at 88-89; *Susan J.*, 254 F.R.D. at 445, 453-54; *Lewis*, 94 F. Supp. 2d at 1222, 1235; *Boulet*, 107 F. Supp. 2d at 62-63, 73. Consistent with the persuasive analysis in these cases, the Court concludes that § 1396a(a)(8) easily meets the three-part *Blessing* test and unambiguously confers enforceable rights upon eligible individuals. In addition, as multiple courts have held, Congress did not indicate an intent to foreclose § 1983 enforcement of the Medicaid Act's requirements, notwithstanding the availability of administrative enforcement mechanisms in the Act. *See Sabree*, 367 F.3d at 193; *Chiles*, 136 F.3d at 718-19. Under the standard outlined by the Eighth Circuit in *Lankford*, 451 F.3d at 508, the Court concludes that Plaintiffs may assert a § 1983 claim based on Defendants' purported failure to comply with § 1396a(a)(8)'s reasonable promptness requirement.

Having resolved this threshold question, the Court turns to Defendants' challenges to the merits of Plaintiffs' reasonable promptness claim. Defendants construe Plaintiffs'

Amended Complaint to request that the State fund Waiver Services for all eligible applicants, and they argue that § 1396a(a)(8) does not establish such a requirement.  In particular, Defendants emphasize that the Waiver Services provisions of the Medicaid Act allow states to impose limits on the waiver programs, suggesting that there can be no entitlement to Waiver Services.  Relying primarily on the Seventh Circuit's decision in *Bertrand ex rel. Bertrand v. Maram*, 495 F.3d 452 (7th Cir. 2007), Defendants also argue that the Court should defer to the HHS Secretary's approval of Minnesota's waiver application which included:  (1) the State's plan to utilize priority criteria to allocate Waiver Services; (2) a cap on total enrollment; and (3) a description of the State's use of reserves.  Because the HHS Secretary has authority to waive the requirements of § 1396a in approving a state's waiver application, Defendants argue that the Secretary's approval of Minnesota's plan forecloses Plaintiffs' claim that Defendants have violated the reasonable promptness requirement.  Specifically, Defendants argue that their use of reserves is a rational policy decision approved by the federal government and suggest that a challenge to this approval should be through the HHS Secretary rather than through litigation.  Finally, to the extent Plaintiffs' claims center on underspending by Minnesota counties, Defendants argue that they are not redressable by DHS.

Plaintiffs argue that the weight of authority establishes that otherwise eligible individuals have an entitlement to Waiver Services which can be enforced if the state fails to provide such services with reasonable promptness.  Plaintiffs characterize the Seventh Circuit's decision in *Bertrand* as a "disfavored, minority view" and urge the Court to reject its reasoning.  (Doc. No. 43 at 25-26.)  Plaintiffs direct the Court to other

cases, including *Lewis v. New Mexico Department of Health*, 275 F. Supp. 2d 1319

(D.N.M. 2003), and argue that the Court should follow *Lewis*'s reasoning to hold that

DHS's failure to spend legislatively appropriated Waiver Services funding violates

Medicaid's reasonable promptness requirement.  Additionally, Plaintiffs argue that

*Bertrand* is factually distinguishable because Minnesota does not employ a slot-based

system to allocate Waiver Services like the Illinois system analyzed in *Bertrand*.

Because Minnesota utilizes what Plaintiffs refer to as "service optimizing" to allocate

Waiver Services within available funding, Plaintiffs argue that "where there is sufficient

money available within a county's waiver allocation, any person deemed eligible for the

waiver should be offered those services."  (Doc. No. 43 at 27.)  Plaintiffs also argue that

the reasonable promptness requirement, unlike some Medicaid Act provisions, cannot be

waived by the HHS Secretary in approving a waiver application.  Plaintiffs clarify that

their claims do not challenge the state-level reserves maintained for crisis needs but

rather center on the amount of underspending at the county level which Plaintiffs

characterize as unreasonable.  According to Plaintiffs, Defendants' are responsible for

this statewide underspending problem which has forced Plaintiffs and others to remain on

waiting lists for Waiver Services.  Finally, Plaintiffs point out that the enrollment limit on

the CADI Waiver program expired in July 2015, making any delay in the provision of

these Waiver Services unreasonable.

　　　The Court concludes that Plaintiffs have plausibly alleged a violation of

§ 1396a(a)(8)'s reasonable promptness requirement.  As a preliminary matter, the Court

acknowledges that the Medicaid Act allows states to place some limitations on the

provision of HCBS Waiver Services.  *See, e.g.*, 42 U.S.C. § 1396n(c)(4)(A) (providing

that a waiver may limit the provision of benefits to those for whom services will not

exceed the level of care needed in an institutional facility); *id.* §1396n(c)(9) (referring to

a state's ability to impose a numeric limit on the total number of individuals receiving

HCBS Waiver Services).  When these limits apply, all otherwise eligible individuals are

not necessarily entitled to Waiver Services.  *See Bryson*, 308 F.3d at 86 ("State plans . . .

certainly have the right to include a limit on the number of waiver slots they request.");

*Skandalis v. Rowe*, 14 F.3d 173, 181 (2d Cir. 1994) ("Certainly no broad or categorical

entitlement can be deemed secured under a program that allows a state to impose a limit

of as few as 200 people on the total number of participants." (referencing 42 U.S.C.

§ 1396n(c)(10))).  However, the Court (unlike Defendants) does not interpret Plaintiffs'

Amended Complaint as seeking that all otherwise eligible applicants be provided Waiver

Services.  Plaintiffs focus their claims on Defendants' mismanagement and

underspending of legislatively appropriated Waiver Services funds.  Within appropriated

funding, Plaintiffs claim that Defendants must provide Waiver Services to eligible

individuals rather than allowing counties to maintain unnecessarily large reserves.  The

Court will thus analyze whether Plaintiffs have stated a legally cognizable reasonable

promptness claim on this basis.  In light of the relevant caselaw, the Court concludes that

Plaintiffs have plausibly alleged a violation of the reasonable promptness provision in

this case.

In the case chiefly relied upon by Defendants, *Bertrand ex rel. Bertrand v.*

*Maram*, 495 F.3d 452, 458 (7th Cir. 2007), the State of Illinois operated a

federally-approved HCBS waiver program with a cap on enrollment of 10,000 individuals.  The available slots were allocated by the state according to priority criteria.  The plaintiffs challenged the state's failure to provide them with reasonably prompt Waiver Services because the state found they did not fall into one of seven priority categories established by the state.  *Id.* at 454.  The Seventh Circuit affirmed the lower court's grant of summary judgment in favor of the state, finding no violation of § 1396a(a)(8)'s reasonable promptness requirement.  *Id.* at 459.  The court specifically rejected the argument that "the state must use an unsorted queue and provide services to everyone who could get some benefit from them."  *Id.* at 458.  In particular, the court explained that "[t]he only way to ensure that slots are available for those highest on the priority list is to hold some of them open at all times . . . to avoid turning away people 'in crisis situations' . . . and other high-need applicants."  *Id.*  The Seventh Circuit emphasized that the Illinois system had been explicitly approved by the Centers for Medicare and Medicaid Services ("CMS"), the HHS bureau responsible for granting waiver applications.  *Id.* at 458-59.  The court explained, "A state is entitled to use 'priority population criteria' as an entry-control device if the [HHS] Secretary has approved that use."  *Id.* at 457.  Further, the court noted that "Plaintiffs ha[d] not offered any evidence tending to establish that CMS granted the state's request in ignorance of how Illinois employs the priority population criteria."  *Id.* at 459.

In *Makin ex rel. Russell v. Hawaii*, 114 F. Supp. 2d 1017 (D. Haw. 1999), another case cited by Defendants, plaintiffs challenged their placement on waiting lists for Waiver Services and argued that the Medicaid Act (§ 1396a(a)(8) as well as other

provisions) required the state to promptly provide them with services, "regardless of availability of funds." *Id.* at 1025. The State of Hawaii admitted individuals who qualified for home and community-based services into its waiver program based on priority criteria. The state capped its provision of Waiver Services to the extent of its legislative appropriations, and a waiting list existed because the demand for services purportedly exceeded available funding. *Id.* at 1021-23. However, the record also established that the state failed to fill all of its available slots in a prior year and allowed some allocated funds to revert to the state treasury. *Id.* at 1022 n.6, 1023 n.8. The court explained that "under the Medicaid statute, the State need not provide services to new 'eligible' individuals until slots become available." *Id.* at 1027. As a result, the court denied the plaintiffs' motion for partial summary judgment but noted that the plaintiffs had "established a question of material fact as to the State's failure to provide the services under the Act by showing that the State had excess [Waiver Services] funds and that it returned some money to the State Treasury." *Id.* at 1028. Thus, the court denied the state's motion for partial summary judgment "as to the so-called 'unfilled' slots since [the state had] not provided any justification for their failure to fill them." *Id.* at 1031.

Plaintiffs cite *Bryson v. Shumway*, 308 F.3d 79 (1st Cir. 2002), for the proposition that § 1396a(a)(8) is enforceable upon showing that the state is failing to fill open and available waiver slots with reasonable promptness. In *Bryson*, the State of New Hampshire offered HCBS waiver services under a federally-approved plan with specific numeric limits on the number of available slots each year. *Id.* at 81-83. While it was undisputed that the state had historically maintained some unfilled waiver slots, the

parties disagreed about how many slots had been kept open and for what reasons.  In

addition, the parties disputed whether open slots remained at the time the plaintiffs' claim

was being considered.  *Id.* at 83.  The plaintiffs challenged the fact that they had not been

provided HCBS waiver services, relying in part on § 1396a(a)(8).  *Id.* at 83-84.  The First

Circuit noted that the Medicaid Act clearly allowed states to include numeric limits on

the number of waiver slots provided.  *Id.* at 86.  However, the court determined that there

were insufficient facts in the record to establish whether New Hampshire was allocating

its waiver slots with reasonable promptness:

> When an individual ceases to use the waiver plan services, there is
> necessarily a time gap while an individual on the waiting list is chosen to
> take the unfilled slot and while services are made available.  Because of
> that lag in time, the fact that some slots are unfilled may be consistent with
> New Hampshire diligently filling the empty slots with reasonable
> promptness.  It may also indicate that New Hampshire is not being
> reasonably prompt in its provision of medical assistance. . . .  More
> information is necessary in order to ascertain whether or not the guarantee
> of reasonable promptness has been satisfied.

*Id.* at 89.  The First Circuit therefore remanded the plaintiffs' reasonable promptness

claim for further factual development on these issues.  *Id.* at 90.

   *Boulet v. Celucci*, 107 F. Supp. 2d 61 (D. Mass. 2000), considered a reasonable

promptness challenge to the plaintiffs' placement on a waiting list for Waiver Services in

group home settings.  *Id.* at 63-64.  The defendants did not dispute that the plaintiffs were

eligible for Waiver Services.  *Id.* at 69.  However, the defendants argued that the

plaintiffs could not enforce the reasonable promptness provision because they had no

entitlement to Waiver Services.  *Id.* at 76.  Thus, the court first addressed the threshold

issue of the plaintiffs' entitlement to Waiver Services.  Based on its analysis of a separate

Medicaid Act provision—§ 1396n(c)(2)(C)'s "freedom of choice" provision—the court concluded that "[b]ecause Massachusetts has chosen to implement a waiver plan, the waiver statute provides eligible individuals in Massachusetts with an entitlement to waiver services and affords them the full protections of the Medicaid Act with regard to those services." *Id.* at 76-77.   The court then explained, however, how Massachusetts' numeric cap on waiver services operated as a limitation on eligibility for otherwise eligible individuals:  "[i]ndividuals who apply after the cap has been reached are not eligible, or alternatively, the waiver services are not 'feasible' for them until the cap has risen to include them." *Id.* at 77.   Thus, the court held that "eligible individuals under the cap are entitled to waiver services." *Id.* at 77.   After making this determination, the court turned to the merits of the plaintiffs' reasonable promptness claim and held that the defendants' maintenance of waiting lists for Waiver Services violated reasonable promptness "[t]o the extent settings are available for the delivery of the waiver services." *Id.* at 78-79.   Specifically, the court noted the long periods of time that plaintiffs had been waiting for services and explained, "[h]ere, where some of the delays extend more than a decade, I have little trouble finding that the defendants have not been reasonably prompt if facilities are available for offering the requested services." *Id.* at 80.   The record, however, did not clearly establish whether such facilities were available.   Thus, the court limited its holding by finding that the defendants had violated the reasonable promptness requirement to the extent facilities were actually available.  *Id.*

   *Lewis v. New Mexico Department of Health*, 275 F. Supp. 2d 1319 (D.N.M. 2003)*,* the case chiefly relied upon by Plaintiffs, considered the State of New Mexico's

federally-approved Waiver Services program.  Provision of services under the state's

program was limited by "the availability of appropriations provided expressly for this

purpose," and the state had specific caps on the number of individuals authorized to

receive services.  *Id.* at 1337.  The plaintiffs challenged the fact that New Mexico had

failed to serve the total number of authorized individuals under its waiver program while

maintaining waiting lists made up of several thousand individuals.  *Id.*  The plaintiffs also

challenged the state agency's routine underspending over several years.  *Id.* at 1338.  The

defendants disputed both the size of the waiting lists and the extent of underspending.  *Id.*

at 1339.  In analyzing plaintiffs' reasonable promptness claim under § 1396a(a)(8), the

court acknowledged that states have a right to place some limits on the provision of

Waiver Services.  *Id.* 1343.  This did not, however, preclude the enforceability of the

reasonable promptness provision in the context of a state's Waiver Services program.

The court reviewed relevant caselaw, including both *Boulet* and *Makin*, summarized

above.  *Id.* at 1340-43.  Consistent with the reasoning in these cases, the court explained

that the reasonable promptness provision applies "once the state determines an individual

is eligible for waiver services and a slot is available for that individual."  *Id.*

　　　In light of this conclusion, the court analyzed New Mexico's failure to utilize

appropriated funding specifically intended for Waiver Services.  The court considered the

state's admitted failure to spend its allocated funding in prior years and particularly noted

an unspent balance of nearly $4 million in one year.  *Id.* at 1344.  The court explained,

"[t]his is a significant amount of money Defendants could have used to create more

unduplicated recipient slots for individuals registered for waiver services."  *Id.*  While

acknowledging that states have considerable discretion to implement their Waiver

Services programs, the court concluded that "this discretion is not unfettered." *Id.* at

1345.  The court explained:

> Once the State sets up its waiver programs, it is obligated to implement the
> waiver programs as it has fashioned them.  In this case, the State has set
> limits for waiver services up to the "availability of appropriations provided
> *expressly* for this purpose."  By not spending the appropriations earmarked
> for waiver services, Defendants are not fulfilling their obligations.

*Id.*  The court declined to credit defendants' numerous explanations for the delays in

providing services, noting that many of their reasons were based on the state's own

administrative procedures.  *Id.* (citing 42 C.F.R. § 435.930(a)).  The court concluded that

the delays lasting years entitled plaintiffs to summary judgment on their reasonable

promptness claims "as to those eligible individuals for whom there is an available

unduplicated slot."  *Id.*

Finally, Plaintiffs urge the Court to follow *Susan J. v. Riley*, 254 F.R.D. 439 (M.D.

Ala. 2008).  *Susan J.* involved a reasonable promptness challenge to Alabama's HCBS

Waiver program which had a federally-approved cap on enrollment.  *Id.* at 446-48.  The

State of Alabama used a waiting list as a "planning tool" to allocate services to eligible

individuals according to specific priority criteria measured by "criticality scores."  *Id.* at

448.  Adopting *Boulet*'s reasoning, the court held that "the cap on waiver services is

'simply a constraint on eligibility' and does not relieve Defendants of their statutory

obligations with respect to class members who would not exceed the cap."  *Id.* at 454

(quoting *Boulet*, 107 F. Supp. 2d at 77).  Following *Boulet* and *Lewis*, the court explained

that "eligible persons . . . are those who (1) meet the requirements for participation in the

54

HCB Waiver programs, and (2) are entitled to one of the lawfully limited number of waiver slots that exist." *Id.*[15]

The Court finds each of these cases to be persuasive in articulating the principles courts should consider when applying § 1396a(a)(8)'s requirement that medical assistance "shall be furnished with reasonable promptness to all eligible individuals" in the context of Waiver Services. *See* 42 U.S.C. § 1396a(a)(8). As explained above, individuals who qualify for Waiver Services do not have an absolute entitlement to such services. *See Bertrand*, 495 F.3d at 458; *Lewis*, 275 F. Supp. 2d at 1343. Specifically, states may impose caps on their total Waiver Services allocation, use priority criteria to allocate services according to need, or use a method that incorporates both of these limits. *See Bertrand*, 495 F.3d at 457; *Susan J.*, 254 F.R.D. at 448; *Bryson*, 308 F.3d at 86; *Makin*, 114 F. Supp. 2d at 1021-23. When there is no available slot for an individual or that individual does not meet the state's priority criteria, he or she is not "eligible" for Waiver Services for purposes of enforcing § 1396a(a)(8). *See Bertrand*, 495 F.3d at 457-59; *Susan J.*, 254 F.R.D. at 454; *Boulet*, 107 F. Supp. 2d at 77; *Makin*, 114 F. Supp. 2d at 1027. However, with respect to otherwise eligible individuals below the cap or for whom funding is available, a state's failure to fill available waiver slots or use funding appropriated for Waiver Services may violate the reasonable promptness requirement or

---

[15]      *Susan J.* was before the court on a motion for class certification. Applying the rule regarding eligibility to enforce the reasonable promptness provision, the court determined that there was insufficient evidence in the record to determine whether the waiver programs were full. The court was therefore unable to evaluate the numerosity requirement for class certification and denied plaintiffs' motion with respect to the subclass of plaintiffs asserting a reasonable promptness claim.

at least raise questions as to whether such a violation has occurred.  *See Bryson*, 308 F.3d at 89; *Lewis*, 275 F. Supp. 2d at 1345; *Boulet*, 107 F. Supp. 2d at 78-89; *Makin*, 114 F. Supp. 2d at 1028, 1031.  This is true even if the state utilizes federally-approved caps or priority criteria.  *See id.*

Because Medicaid regulations require the state to "[f]urnish Medicaid promptly to beneficiaries without any delay caused by the agency's administrative procedures," *see* 42 C.F.R. § 435.930, a state's mismanagement of allocated funding, which leads to an unreasonable delay in the provision of services, may establish a violation of the reasonable promptness requirement.  Still, unspent Waiver Services funding or unfilled slots may not be unreasonable in all cases.  For example, if the slots or funds are reserved for crisis situations or to place individuals according to a priority system as in *Bertrand*, the state may be providing services in a reasonably prompt manner.  Similarly, as the First Circuit explained in *Bryson,* if funds are unspent for a period of time "while an individual on the waiting list is chosen to take the unfilled slot," that may be consistent with reasonable promptness depending on the state's diligence.  308 F.3d at 89.

In light of these principles, the Court concludes that Plaintiffs have plausibly alleged a violation of the reasonable promptness provision.  Plaintiffs allege that the State has sufficient funds available to take them and other eligible individuals off the Waiver Services waiting lists while also maintaining some crisis reserves at the state level.  Specifically, Plaintiffs allege that Defendants allow counties to reserve allocated Waiver Services funds in amounts that "far exceed[] what is reasonable or necessary."  (Am. Compl. ¶ 41.)  Plaintiffs' Amended Complaint provides detailed facts to support this

allegation, including a summary of significant underspending across Minnesota counties. Plaintiffs identify specific admissions by Defendants in DHS reports illustrating that DHS has been aware of this underspending and has acknowledged that many counties "had room in their budgets to provide additional services or add more participants to programs." (*Id.* ¶ 43.) In addition, Plaintiffs reference a DHS report specific to Hennepin County which states that "there is room to add more participants via new or reuse slots or service optimization to reduce or eliminate the waiting list." (*Id.* ¶ 44.) With respect to Hennepin County's reserves, the report states that "[t]ypically a 1% to 2% allocation reserve is more than adequate to manage risk for a county of this size." (*Id.*)

At this stage, the Court finds that Plaintiffs have plausibly alleged that there is sufficient appropriated funding available that Defendants have unreasonably allowed to go unspent while Plaintiffs remain on waiting lists for Waiver Services. Plaintiffs have also plausibly alleged that DHS has oversight over the State's Waiver Services program such that their claims are redressable even in the absence of the counties as individual parties in this case. Consistent with the persuasive caselaw summarized above, the Court concludes that Plaintiffs' allegations state a plausible claim for a violation of § 1396a(a)(8)'s reasonable promptness requirement.

Relying on *Bertrand*, Defendants argue that the HHS Secretary's approval of Minnesota's waiver application defeats Plaintiffs' reasonable promptness claim. Specifically, Defendants stress that Minnesota's waiver application referenced priority criteria, a cap on enrollment, and the State's use of reserves. The record at this stage,

however, does not conclusively establish what the HHS Secretary knew about Defendants' ongoing administration of the Waiver Services program when it approved Minnesota's waiver application.  Further, there is an insufficient record before the Court to establish whether Defendants are in fact implementing the Waiver Services program in Minnesota consistent with what the Secretary approved.  Unlike *Bertrand* which was resolved on summary judgment, this case is before the Court at the pleading stage. Without further factual development, the Court declines to infer complete approval of Defendants' administration of Minnesota's Waiver Services programs from the HHS Secretary's approval of the State's waiver application.

In addition, to the extent Defendants argue that the HHS Secretary waived § 1396a(a)(8)'s reasonable promptness requirement in approving Minnesota's waiver application, the Court disagrees.  As noted above, the Medicaid Act and corresponding regulations identify three Medicaid Act requirements that can be waived under 42 U.S.C. § 1396n(c), and the reasonable promptness requirement is not one of those three.  *See* 42 U.S.C. § 1396n(c)(3); 42 C.F.R. § 430.25(d)(2); *see also Bryson*, 308 F.3d at 82 (1st Cir. 2002); *Susan J.*, 254 F.R.D. at 451 n.7 (M.D. Ala. 2008); *Lewis*, 94 F. Supp. 2d at 1234 ("[T]he waiver provision expressly allows the Secretary to waive certain Medicaid Act requirements, 42 U.S.C. § 1396n(c)(3), but does not include the 'reasonable promptness' provision in this list of exemptions.").[16]

---

[16]    Based on the weight of authority holding otherwise, the Court also disagrees with any suggestion in *Bertrand* that § 1396a(a)(8)'s reasonable promptness requirement can

(Footnote Continued on Next Page)

The Court concludes that Plaintiffs have plausibly alleged a violation of the

Medicaid Act's reasonable promptness provision, and Plaintiffs' claim on this basis may

proceed.

## 2.   Count II:  Freedom of Choice

In Count II, Plaintiffs allege a violation of 42 U.S.C. § 1983 for failure to inform

of feasible alternatives and denial of choice of Waiver Services in violation of 42 U.S.C.

§ 1396n(c)(2)(C), one of the Medicaid Act's "freedom of choice" provisions.  Defendants

argue that Plaintiffs have failed to state a legally cognizable claim with respect to

Count II.

The freedom of choice provision in § 1396n(c)(2)(C) states:

> A waiver shall not be granted under this subsection unless the State
> provides assurances satisfactory to the Secretary that . . . such individuals
> who are determined to be likely to require the level of care provided in a
> hospital, nursing facility, or intermediate care facility for the mentally
> retarded are informed of the feasible alternatives, if available under the
> waiver, at the choice of such individuals, to the provision of inpatient
> hospital services, nursing facility services, or services in an intermediate
> care facility for the mentally retarded.

42 U.S.C. § 1396n(c)(2)(C).  Regulations clarify that CMS may decline to grant a waiver

or may terminate a waiver unless the state agency provides the following assurance:

> Assurance that when a beneficiary is determined to be likely to require the
> level of care provided in a hospital, NF, or ICF/IID, the beneficiary or his
> or her legal representative will be—(1) Informed of any feasible
> alternatives available under the waiver; and (2) Given the choice of either
> institutional or home and community-based services.

---

(Footnote Continued From Previous Page)
be waived by the Secretary under a 42 U.S.C. § 1396n(c) waiver.  *See Bertrand*, 495 F.3d
at 457.

42 C.F.R. § 441.302(d).  The Court analyzes the enforceability of § 1396n(c)(2)(C) under

§ 1983 before considering whether Plaintiffs have otherwise stated a viable claim under

this provision on the merits.

Multiple courts have determined that § 1396n(c)(2)(C) is privately enforceable in

a § 1983 action.  *See Ball v. Rodgers*, 492 F.3d 1094, 1103 (9th Cir. 2007); *see also*

*Wood v. Tompkins*, 33 F.3d 600, 607-12 (6th Cir. 1994); *Ill. League of Advocates for the*

*Developmentally, Disabled v. Quinn*, Civ. No. 13-C-1300, 2013 WL 5548929, at *9

(N.D. Ill. 2013); *Zatuchni v. Richman*, Civ. No. 07-cv-4600, 2008 WL 3408554, at *7-11

(E.D. Pa. Aug. 12, 2008); *Masterman v. Goodno*, Civ. No. 03-2939, 2004 WL 51271, at

*10 (D. Minn. Jan. 8, 2004).  As one court explained, "[a]lthough there are older cases

coming down on both sides of this question, the leading post-*Gonzaga University*

authority holds that § 1396n(c)(2)(C) is enforceable via § 1983." *Ill. League of*

*Advocates*, 2013 WL 5548929, at *9.  The Ninth Circuit's analysis in *Ball* is particularly

persuasive.  Applying the three-part *Blessing* test as clarified by the Supreme Court in

*Gonzaga*, the Ninth Circuit engaged in a detailed analysis of the statutory text,

regulations, and legislative history before concluding that § 1396n(c)(2)(C) creates rights

privately enforceable under § 1983.  *Ball*, 492 F.3d at 1103-17.[17]

---

[17]    The court contrasted § 1396n(c)(2)(C)'s freedom of choice provision with 42
U.S.C. § 1396a(a)(30)(A)'s equal access provision, which it held did not confer
individual enforcement rights under § 1983.  *Id.* at 1102, 1109-12, 1115.  Thus, *Ball*
continues to carry persuasive weight notwithstanding the Supreme Court's more recent
decision holding that § 1396a(a)(30)(A) cannot be privately enforced.  *See Armstrong*,
135 S. Ct. at 1385.

Following the Ninth Circuit's thorough analysis and that of other courts who have addressed this question, the Court concludes that § 1396n(c)(2)(C)'s freedom of choice provision is privately enforceable under § 1983.  First, the statutory text repeatedly references the "individuals" upon whom the statute confers an enforceable right, specifically "such individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded." 42 U.S.C. § 1396n(c)(2)(C).  Second, the right is not so vague and amorphous that it cannot be judicially enforced; the statute and its corresponding regulations clearly illustrate that the freedom of choice provision establishes a two-fold right to both information about feasible alternatives and a choice of such alternatives, if available.  *Id.*; *see also* 42 C.F.R. § 441.302(d).  Third, the language of the provision imposes a mandatory obligation upon the states because it provides that a waiver "shall not be granted" unless the state provides the specified assurances.  42 U.S.C. § 1396n(c)(2)(C).  Thus, under the *Blessing* test, the freedom of choice provision is presumptively enforceable under § 1983.  *See Lankford*, 451 F.3d at 508.  Further, as explained above with respect to the reasonable promptness provision, the availability of administrative enforcement mechanisms under the Medicaid Act is insufficient to overcome this presumption and foreclose § 1983 enforcement.  *See id.*  Thus, the Court concludes that Plaintiffs may properly assert a § 1983 claim for a violation of § 1396n(c)(2)(C)'s freedom of choice provision.

The Court now turns to whether Plaintiffs have sufficiently alleged a violation of § 1396n(c)(2)(C).  Defendants argue that § 1396n(c)(2)(C) does not require states to

make options available, but rather, that the freedom of choice provision simply requires states to provide information about available choices. Again construing Plaintiffs' Amended Complaint as seeking the provision of Waiver Services to all eligible individuals, Defendants argue that Plaintiffs have failed to identify any cases to support the proposition that §1396n(c)(2)(C) requires this result. Defendants also suggest that § 1396n(c)(2)(C) only applies to enrolled participants in the Waiver Services program and not to all eligible individuals. Notwithstanding their argument that § 1396n(c)(2)(C) applies only to enrolled participants in the Waiver Services program, Defendants also argue that individuals who are assessed for services are provided information about feasible alternatives. Finally, Defendants contend that Plaintiffs' presence on a waiting list for Waiver Services indicates that they have been made aware that Waiver Services are an alternative to institutional care.

Plaintiffs argue that § 1396n(c)(2)(C) requires states to both provide information about feasible alternatives to institutional care and to offer Waiver Services that are available. Plaintiffs further argue that this provision applies to all eligible individuals, including those, such as Plaintiffs, on waiting lists. Plaintiffs challenge Defendants' position that § 1396n(c)(2)(C) does not require states to make services available. Plaintiffs assert that Defendants have access to sufficient funds "to make Waiver Services 'available' and to offer them to Plaintiffs as a 'feasible alternative' to institutional care." (Doc. No. 43 at 30.) In Plaintiffs' view, the services that Defendants claim are unavailable are in fact available but are not being provided to Plaintiffs based on Defendants' mismanagement of Waiver Services funds. In response to Defendants'

suggestion that Plaintiffs have been informed of available alternatives, Plaintiffs clarify

that their § 1396n(c)(2)(C) claim "is not founded on a mere failure to inform."  (*Id.*)

Instead, Plaintiffs explain, their challenge is based on "Defendant's ongoing failure to

provide the actual choice of Waiver Services, despite available funding."  (*Id.* at 31.)

The Court first evaluates Defendants' argument that the freedom of choice

provision does not require states to make additional service options available to Plaintiffs.

To support their argument, Defendants again direct the Court to the Seventh Circuit's

decision in *Bertrand*.  As discussed above, *Bertrand* involved a challenge to the State of

Illinois' HCBS waiver program which filled available waiver slots according to priority

criteria up to a total enrollment cap of 10,000 individuals.  The plaintiffs did not meet

priority criteria and were therefore denied services.  *Bertrand*, 495 F.3d at 454.  The

Seventh Circuit rejected the plaintiffs' argument that § 1396n(c)(2)(C) requires the state

to make services available to otherwise eligible individuals.  *Id.* at 459.  The court

explained, "this subsection does not *make* any particular option 'available' to anyone.  It

just requires the provision of information about options that *are* available."  *Id.*

Other courts have reached similar conclusions.  For example, in *Makin*, another

case involving a Waiver Services program with priority criteria and population limits, the

court explained:  "Though [§ 1396n(c)(2)(C)] requires the State to give the Plaintiffs a

choice from among the services, it only requires it to allow a choice from among the

'available' services.  Unfortunately, when the spaces are filled in the HCBS-MR

program, it is no longer 'available' under the waiver."  *Makin*, 114 F. Supp. 2d. at 1032.

In *Makin*, the court granted the Defendants' motion for summary judgment on this claim,

finding that "Plaintiffs are not entitled to the HCBS-MR services under the Medicaid statute once the 'slots' are filled by other eligible individuals." *Id.*; *see also Ill. League of Advocates for the Developmentally, Disabled v. Ill. Dep't of Human Servs.*, 803 F.3d 872, 878 (7th Cir. 2015) ("[C]hoice is limited to 'feasible' options 'available' under the waiver."); *Boulet*, 107 F. Supp. 2d at 77 ("[W]aiver services are not 'feasible' for [individuals who apply after a numeric cap has been reached] until the cap has risen to include them.").

On the other hand, courts have also recognized that plaintiffs may have a viable claim under § 1396n(c)(2)(C) if the state fails to inform a plaintiff of feasible alternative placements, denies eligible individuals the right to choose an available alternative, or if fact issues remain regarding the availability of such alternatives. *See Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1322-23 (W.D. Wash. 2015); *Ill. League of Advocates*, 2013 WL 5548929, at *10; *Rolland v. Cellucci*, 52 F. Supp. 2d. 231, 241 (D. Mass. 1999). *Rolland* is particularly instructive.  In *Rolland*, the court acknowledged that the freedom of choice provision was limited to "feasible alternatives," but allowed the plaintiffs' claim to proceed because the feasibility of various alternatives could only be assessed through discovery.  52 F. Supp. 2d at 240-41.  The court explained:  "At this point in the litigation . . . there are sufficient allegations that some feasible alternatives . . . exist and that Plaintiffs are being denied a meaningful choice as to their participation therein." *Id.* at 241.  Here, the Court agrees that this approach is appropriate for analyzing the Plaintiffs' freedom of choice claim.

Next, Defendants contend that § 1396n(c)(2)(C) applies only to enrolled participants in the Waiver Services program and not to all eligible individuals. The Court disagrees. To support their argument, Defendants rely on the Fourth Circuit's opinion in *Doe v. Kidd*. *See* 501 F.3d at 359. In *Doe*, the Fourth Circuit considered whether the freedom of choice provision entitled the plaintiff to choose the type of setting in which she would receive Waiver Services. *Id.* at 358. In analyzing the plaintiff's claim, the Fourth Circuit discussed the freedom of choice provision as an obligation with respect to "participants in the waiver program." *Id.* at 359. The court also quoted a 2001 United States Department of Health and Human Services policy manual which referenced "all people enrolled in the waiver" and "all waiver participants" in discussing the state's obligation to provide access to needed services covered by the waiver. *Id.*

The Court is not persuaded that the Fourth Circuit's opinion, or the policy manual quoted therein, establish that § 1396n(c)(2)(C) can only be enforced by enrolled participants. *Doe* involved an individual already receiving services. Therefore, the Fourth Circuit had no need to analyze or discuss the freedom of choice provision's applicability to Waiver Services applicants or individuals on Waiver Services waiting lists. Surely, § 1396n(c)(2)(C) applies to enrolled participants; however, the Court does not interpret the provision to apply *only* to such individuals. Rather, the Court concludes that the plain text of the statute controls, and the freedom of choice provision may be enforced by "such individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded," whether or not they have been enrolled as participants in the Waiver Services

65

program.  *See* 42 U.S.C. § 1396n(c)(2)(C).  Other courts appear to agree.  *See Ill. League*

*of Advocates*, 803 F.3d at 877 ("For the state to be eligible for the waiver, it must make

sure that *the individuals likely to need institutional care* 'are informed of the feasible

alternatives, if available under the waiver, at the choice of such individuals, to the

provision of inpatient hospital services, nursing facility services or services in an

intermediate care facility for the mentally retarded.'" (emphasis added)); *cf. Grant ex rel.*

*Family Eldercare v. Gilbert*, 324 F.3d 383, 388 (5th Cir. 2003) (finding that

§ 1396n(c)(2)(C) affords a right of information to "waiver applicants" and holding that a

plaintiff had no standing to sue under the provision as he had not applied for waiver

services).

Finally, to the extent Defendants argue that the freedom of choice provision only

requires states to *provide information* about available alternatives to institutional care, the

Court disagrees.  The statute requires states to ensure that eligible individuals "are

informed of the feasible alternatives, if available under the waiver, at the choice of such

individuals . . . ."  42 U.S.C. § 1396n(c)(2)(C).  Corresponding regulations make the

two-fold nature of this requirement clear, providing that the state must give assurances

that eligible individuals "will be—(1) Informed of any feasible alternatives available

under the waiver; and (2) Given the choice of either institutional or home and

community-based services."  42 C.F.R. § 441.302(d); *see also Ball*, 492 F.3d at 1107

(identifying the "explicitly identified rights" established under the freedom of choice

provision as "(a) the right to be informed of alternatives to traditional, long-term

institutional care, and (b) the right to choose among those alternatives"); *Masterman*,

66

2004 WL 51271, at *5 ("If feasible alternatives to institutional placement exist, individuals must be given the choice of either of those options."); *Ill. League of Advocates for the Developmentally, Disabled v. Ill. Dep't of Human Servs.*, 60 F. Supp. 3d 856, 885-86 (N.D. Ill. 2014); *see also Boulet*, 107 F. Supp. 2d at 76 ("Requiring that the state inform individuals of feasible alternatives 'at the choice of such individuals' would mean little if the eligible individuals were not entitled to these alternatives.").

The Court concludes that Plaintiffs have stated a viable claim under § 1396n(c)(2)(C)'s freedom of choice provision. In the Court's view, the freedom of choice provision entitles eligible individuals to similar protections as the reasonable promptness provision. If all of the slots in a state's Waiver Services program are full, a numeric cap on enrollment has been reached, or funding is not available because the state is reserving an appropriate amount for crisis situations, Waiver Services are not a "feasible alternative" and the state has no obligation to provide them to otherwise eligible individuals. However, if such services are available, eligible individuals must be both informed of the availability of those services and given the choice of receiving such services in lieu of institutional care.

As the Court concluded above in analyzing Plaintiffs' reasonable promptness claim, Plaintiffs have plausibly alleged that there is sufficient appropriated funding available that Defendants have allowed to go unspent while Plaintiffs remain on waiting lists for Waiver Services. In other words, Plaintiffs have plausibly alleged that Waiver Services are a "feasible alternative" and are "available" but that Plaintiffs are not being offered the choice to receive such services due to Defendants' mismanagement of the

State's Waiver Services programs.  The Court concludes that these allegations state a plausible claim for a violation of § 1396n(c)(2)(C)'s freedom of choice provision enforceable under § 1983.[18]

### B.    Count III:  Violation of Due Process

Count III of Plaintiff's Amended Complaint alleges a violation of 42 U.S.C. § 1983 through a violation of Plaintiffs' Fourteenth Amendment Due Process rights, as well as the notice and fair hearing requirements contained in the Medicaid Act, 42 U.S.C. § 1396a(3), and corresponding regulations, 42 C.F.R. §§ 431.200 to 431.250.  Defendants argue that Plaintiffs have failed to plead a viable Due Process claim.

Defendants argue that Plaintiffs cannot adequately allege a due process claim because the Waiver Services they seek are not an entitlement.  Defendants emphasize the voluntary nature of the State's participation in the Waiver Services program, as well as federally-approved limits on the program such as "funding limitations, waitlists, reserve spending amounts, and priority lists . . . ."  (Doc. No. 37 at 32.)  Defendants argue that those who are not yet enrolled in the program have no cognizable property interest in Waiver Services and therefore no claim for procedural due process protections.  Emphasizing the flexibility of due process requirements, Defendants argue that Plaintiffs have received adequate process because they were notified of their placement on a

---

[18]    The Court notes that it does not construe Plaintiffs' claim to request that the State provide the choice of Waiver Services to *all* otherwise eligible individuals.  Rather, Plaintiffs appear to seek that Waiver Services be deemed available within appropriated funding so that Plaintiffs can exercise their right to choose Waiver Services under § 1396n(c)(2)(C).

waiting list and have a right to appeal county determinations under Minnesota Statute

§ 256.045, subdivision 3.[19]  Defendants further argue that even if Plaintiffs had a viable

Due Process claim, their claims would fail the three-part balancing established in

*Mathews v. Eldridge*, 424 U.S. 319 (1976).

Plaintiffs argue that individuals applying for Waiver Services, as well as current

recipients, can assert a viable due process claim based on a claim of entitlement to

benefits.  Plaintiffs, who have applied for but have not received Waiver Services, contend

that "Minnesota's statutes, rules and Waiver plans create the basis for establishing [their]

expectation for Waiver eligibility."  (Doc. No. 43 at 33.)  Because they have applied for

the Waiver Services programs and have been deemed eligible, Plaintiffs argue, they have

a cognizable property interest in Waiver Services protectable under the Due Process

Clause.  Plaintiffs also argue that statutory procedural rights under Minnesota law

establish an independent source for their property interest.  Separate from these

arguments, Plaintiffs further assert that they have enforceable rights under federal

Medicaid laws which entitle them to notice and a fair hearing, notwithstanding whether

they have a constitutionally-protected property interest in Waiver Services.  Finally,

Plaintiffs point out that Defendants have ignored their factual allegations.  Specifically,

---

[19]     This statute provides that "State agency hearings are available for . . . any person
applying for, receiving or having received public assistance, medical care, or a program
of social services granted by the state agency of a county agency . . . whose application
for assistance is denied, not acted upon with reasonable promptness, or whose assistance
is suspended, reduced, terminated, or claimed to have been incorrectly paid."  Minn. Stat.
§ 256.045, subd. 3(a)(1).

Plaintiffs contend that they have not been properly notified and have not had an opportunity to be heard, contrary to Defendants' arguments.

### 1.    Fourteenth Amendment Due Process

The Due Process Clause of the Fourteenth Amendment prohibits the states from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  To state a procedural due process claim, a plaintiff must demonstrate:  (1) the existence of a constitutionally protected liberty or property interest; and (2) that the defendant deprived the plaintiff of that interest without constitutionally adequate process.  *See Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013); *Schmidt v. Des Moines Pub. Schs.*, 655 F.3d 811, 817 (8th Cir. 2011).

The first prong in the Court's due process inquiry requires the Court to determine whether Plaintiffs have properly alleged that they have a constitutionally protected liberty or property interest at stake.  *See Kroupa*, 731 F.3d at 818.  "To have a property interest in a benefit, a person . . . must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).  Property interests arise not from the Constitution itself, but from "existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  *Id.*  Because a property interest can arise from a "claim of entitlement" to government benefits, eligible individuals applying for such benefits may validly assert a Due Process claim.  *See Daniels v. Woodbury Cty.*, 742 F.2d 1128, 1132 (8th Cir. 1984)

("Applicants who have met the objective eligibility criteria of a wide variety of governmental programs have been held to be entitled to protection under the due process clause." (quoting *Holbrook v. Pitt*, 643 F.2d 1261, 1278 n.35 (7th Cir. 1981))); *see also Lewis*, 94 F. Supp. 2d at 1237 ("[T]he weight of authority holds that applicants do have a constitutionally protected interest in government benefits for which they have applied.").

As explained previously, the Court agrees that Waiver Services are not an absolute entitlement given the limited nature of the Waiver Services program. *See Skandalis*, 14 F.3d at 181 (concluding there is "no broad or categorical entitlement" to waiver services given the state's ability to impose numeric limits on participation). However, state and federal statutes create a legitimate claim of entitlement to Waiver Services for eligible individuals who meet the state's priority criteria and for whom there is sufficient funding available. *See Boulet*, 107 F. Supp. 2d at 77 ("[E]ligible individuals under the cap are entitled to waiver services."); *Makin*, 114 F. Supp. 2d at 1030 ("Plaintiffs have no entitlement to the HCBS-MR services under the statute unless there are open slots within the 'population limits' that can be filled."). Based on Minnesota laws governing the Waiver Services programs[20] and federal Medicaid provisions such as the reasonable promptness and freedom of choice provisions, such individuals have a reasonable expectation of entitlement to Waiver Services.

Plaintiffs allege that they have been deemed eligible for Waiver Services. (Am. Compl. ¶ 48.) Further, Plaintiffs allege that Defendants could provide more eligible

---

[20]     *See, e.g.*, Minn. Stat. §§ 256B.49, subd. 11 (a)-(b); 256B.092, subds. 1f, 4, 5, 7; Minn. R. 9525.0016, subps. 7-13.

individuals with Waiver Services by properly administering legislatively appropriated funds. (*See id.* ¶¶ 40-50.) Like an individual who is "under the cap" or "within the 'population limits'" in states where such mechanisms are utilized to allocate services, Plaintiffs have a valid claim of entitlement to Waiver Services based on their plausible allegations of underspending and mismanagement of Minnesota's Waiver Services programs. Thus, Plaintiffs have sufficiently established that they have a constitutionally protected property interest for which adequate process is due.

The Court next considers the adequacy of the procedural protections provided to Plaintiffs. *See Kroupa*, 731 F.3d at 820. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 52 (1965)). The opportunity to be heard must be coupled with "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). The requirements of notice and an opportunity to be heard are necessarily intertwined and dependent upon one another: "Adequate notice is integral to the due process right to a fair hearing, for the 'right to be heard has little reality or worth unless one is informed.'" *Bliek v. Palmer*, 102 F.3d 1472, 1475 (8th Cir. 1997) (quoting *Mullane*, 339 U.S. at 314).

Ultimately, the requirements of due process are flexible and depend upon the particular situation involved and the interests at stake. *See Mathews*, 424 U.S. at 334. In

evaluating the sufficiency of the available procedures, courts should consider three

factors:

> First, the private interest that will be affected by the official action; second,
> the risk of an erroneous deprivation of such interest through the procedures
> used, and the probable value, if any, of additional or substitute procedural
> safeguards; and finally, the Government's interest, including the function
> involved and the fiscal and administrative burdens that the additional or
> substitute procedural requirement would entail.

*Id.* at 335.

Plaintiffs argue that they have not received adequate notice or an opportunity to be

heard with respect to their placement on waiting lists for Waiver Services.  Plaintiffs

allege that eligible individuals placed on waiting lists "are routinely denied advance

notice of the decision not to offer them Waiver Services," are not told whether they fall

into a priority category for services, and "are not provided specific factual or legal

reasons for why they are initially placed on wait lists or kept on wait lists instead of being

offered Waiver Services."  (Am. Compl. ¶ 53.)  Plaintiffs also allege that such individuals

"are routinely denied the opportunity to challenge their placement on a wait list in a

hearing on the merits."  (*Id.* ¶ 55.)  The named Plaintiffs claim they have received no

formal updates about their progress toward moving off the waiting lists.  (*Id.* ¶¶ 59.C,

60.C, 61.C., 62.C.)  Three of the named Plaintiffs allege that they have never been

provided any notice or opportunity to challenge being denied Waiver Services.  (*Id.*

¶¶ 59.C, 60.C, 62.C.)  One named Plaintiff, Pearson, alleges that she received a single

notice which purported to deny her Waiver Services but that failed to explain the legal

basis justifying the action.  (*Id.* ¶ 61.C.)

Although Plaintiffs are plainly aware that they are on waiting lists for Waiver
Services, the Court does not equate the mere placement on a waiting list with
constitutionally adequate notice.  And, even if Plaintiffs have a statutory right to contest
county determinations under Minnesota law, *see* Minn. Stat. § 256.045, subd. 3(a)(1), this
right is undermined by Defendants' alleged failure to ensure that Plaintiffs received
detailed notice informing them of the basis for their placement on waiting lists.  *See
Bliek*, 102 F.3d at 1475.

At this stage of the litigation and based on the allegations in Plaintiffs' Amended
Complaint, the Court concludes that the *Mathews* balancing factors weigh in favor of
allowing Plaintiffs' to pursue their Due Process claim.  First, Plaintiffs have a legitimate
and important interest in the services they seek which would enable them to more fully
integrate into their communities and achieve independence in their lives like individuals
without disabilities.  Second, the risk of erroneous deprivation is significant if individuals
have no knowledge of the factual basis underlying the decision to place them on a
waiting list and no meaningful opportunity to challenge that decision.  Third, the
government would not be unduly burdened by a requirement that Defendants ensure
counties provide a detailed notice explaining the reasons for an individual's initial or
ongoing placement on a waiting list and explaining that such placement can be appealed
under existing state administrative procedures.

Final resolution of these factors will necessarily depend on facts which can only
be acquired through discovery, and the Court acknowledges that its evaluation of the
*Mathews* factors may evolve as this case proceeds.  At this early stage, however, and

construing the facts alleged in Plaintiffs' Amended Complaint in the light most favorable

to Plaintiffs, the Court concludes that Plaintiffs have stated a plausible claim that

Defendants have violated their Fourteenth Amendment Due Process rights.

## 2.    Medicaid Act Fair Hearing Requirement

Plaintiffs' § 1983 Due Process claim also rests on the Medicaid Act's notice and

hearing requirements outlined in 42 U.S.C. § 1396a(a)(3) and corresponding regulations.

Defendants have not raised specific arguments to challenge the adequacy of Plaintiffs'

claim on this basis.  The Court will nonetheless address the Medicaid Act's requirements

as they support and reinforce Plaintiffs' Fourteenth Amendment Due Process claim.

The Medicaid Act requires state plans to "provide for granting an opportunity for a

fair hearing before the State agency to any individual whose claim for medical assistance

is denied or is not acted upon with reasonable promptness."  42 U.S.C. § 1396a(a)(3).

Further, when an individual applies for Medicaid or when the state takes "any action

affecting his or her claim," the agency must provide the applicant or beneficiary with

written notice of the right to a hearing, the method of obtaining a hearing, and the right to

represent oneself or use a representative.  *See id.* § 431.206.  The notice provided at the

time of an action affecting an applicant or beneficiary's claim must contain, among other

things, an explanation of the reasons for the action.  *See id.* § 431.210.  Plaintiffs assert a

§ 1983 claim against Defendants based on their purported violation of these fair hearing

and notice requirements.

The Court first addresses whether § 1396a(a)(3)'s fair hearing requirement is

enforceable in a § 1983 claim.  Applying the test established by the Eighth Circuit in

*Lankford*, 451 F.3d at 508, the Court concludes that § 1396a(a)(3) unambiguously confers a right to a fair hearing upon "any individual whose claim for medical assistance is denied or is not acted upon with reasonable promptness."  *See* 42 U.S.C. § 1396a(a)(3). Further, enforcing this right would not "strain judicial competence" as the fair hearing requirements are closely analogous to procedural due process rights routinely enforced by the Courts.  *See Lankford*, 451 F.3d at 508; *see also Gean v. Hattaway*, 330 F.3d 758, 772-73 (6th Cir. 2003).  Finally, the provision imposes a mandatory obligation upon states administering a Medicaid plan.  *See Lankford*, 451 F.3d at 508.  And, as the Court has previously concluded, Congress did not explicitly or implicitly foreclose § 1983 enforcement of the Medicaid Act.  *See id*; *Sabree*, 367 F.3d at 193.  Thus, the Medicaid Act's fair hearing requirements are privately enforceable by individuals such as Plaintiffs in a § 1983 claim.  *See Shakhnes v. Berlin*, 689 F.3d 244, 254 (2d Cir. 2012); *Gean*, 330 F.3d at 772-73; *McCartney ex rel. McCartney v. Cansler*, 608 F. Supp. 2d 694, 699 (E.D.N.C. 2009).

Next, the Court considers whether Plaintiffs' have plausibly alleged a violation of their procedural due process rights under § 1396a(a)(3).  The Medicaid Act's fair hearing requirement applies to individuals "whose claim for medical assistance is denied or is not acted upon with reasonable promptness."  42 U.S.C. § 1396a(a)(3).  Under the Medicaid Act, "medical assistance" includes home or community-based services such as the Waiver Services at issue in this case.  *See* 42 U.S.C. § 1396n(c)(1) ("The Secretary may by waiver provide that a State plan approved under this subchapter may include as 'medical assistance' under such plan payment for part or all of the cost of home or

76

community-based services . . . ."). Courts have thus applied the Medicaid Act's fair

hearing requirements in the context of waiver services. *See Bryson*, 308 F.3d at 90-91;

*Susan J.*, 254 F.R.D. at 456-57.

Here, Plaintiffs' indefinite placement on waiting lists for Waiver Services entitles

them to a fair hearing and adequate notice under § 1396a(a)(3).  Plaintiffs allege that they

have not received notice specifying the reasons for their placement on waiting lists and

that they have not had an opportunity to challenge the ongoing denial of Waiver Services.

Although Minnesota statutes indicate that some form of notice and a hearing may be

available to individuals such as Plaintiffs, *see* Minn. Stat. § 256B.0911, subd. 3a(h);

Minn. Stat. § 256.045, subd. 3(a)(1), the Court assumes the allegations in Plaintiffs'

Amended Complaint to be true.  If further factual development reveals that Plaintiffs

were in fact provided proper notice explaining their right to a fair hearing, the Court may

ultimately reach a different conclusion.  However, at this stage, the Court concludes that

Plaintiffs' allegations support a plausible claim that Defendants have violated the

Medicaid Act's fair hearing requirements.

Whether framed as a violation of the Fourteenth Amendment Due Process clause

or a violation of the Medicaid Act's fair hearing and notice requirements, Plaintiffs have

plausibly alleged that Defendants have violated their procedural due process rights.

### C.  Counts IV & V:  Violation of the Americans with Disabilities Act and § 504 of the Rehabilitation Act

In Counts IV and V, Plaintiffs assert violations of the ADA, 42 U.S.C. § 12132, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).  Defendants argue that Plaintiffs have failed to adequately plead a violation of either statute.

Congress passed the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).  It did so in light of the following findings pertinent to this case:

> (2) historically, society has tended to isolate and segregate individuals with disabilities, and . . . such forms of discrimination . . . continue to be a serious and pervasive social problem;
>
> (3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services; . . .
>
> (5) individuals with disabilities continually encounter various forms of discrimination, including . . . segregation . . . ;
>
> (7) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals. . . .

*Id.* § 12101(a).

Title II of the ADA, applicable to public entities, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Further, an implementing regulation referred to as the "integration mandate" states:  "A public entity shall administer services, programs, and activities in the most integrated

78

setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R.

§ 35.130(d). The preamble to these regulations describes "the most integrated setting" as

"a setting that enables individuals with disabilities to interact with nondisabled persons to

the fullest extent possible." 28 C.F.R. Pt. 35, App. B, Subp. B., § 35.130. In addition,

public entities must "make reasonable modifications in policies, practices, or procedures

when the modifications are necessary to avoid discrimination on the basis of disability,"

but can avoid this obligation by "demonstrat[ing] that making the modifications would

fundamentally alter the nature of the service, program, or activity." 28 C.F.R.

§ 35.130(b)(7).

    The Rehabilitation Act includes similar provisions, including its own "integration

mandate." *See* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in

the United States . . . shall, solely by reason of his or her disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under any

program or activity receiving Federal financial assistance . . . ."); 28 C.F.R. § 41.51(d)

("Recipients shall administer programs and activities in the most integrated setting

appropriate to the needs of qualified handicapped persons."). Given the similarities

between the ADA and § 504 of the RA, "cases interpreting either are applicable and

interchangeable." *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998) (citation

omitted).

    In *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), the Supreme Court

analyzed the ADA's integration mandate and its relationship to claims of discrimination

under 42 U.S.C. § 12132. *Olmstead* involved two women who were institutionalized in a

state-run mental health facility despite their treatment providers' opinions that they could

be appropriately treated in the community. *Id.* at 593. The *Olmstead* plaintiffs claimed

that their continued placements violated Title II of the ADA. *Id.* at 594. The Supreme

Court considered the text of the ADA, including the ADA's Congressional findings; the

integration mandate and reasonable modification regulations; and the Department of

Justice's interpretation of the relevant law to evaluate whether "undue institutionalization

qualifies as discrimination 'by reason of . . . disability.'" *See id.* at 588-93, 596-601. The

Court held that "[u]njustified isolation . . . is properly regarded as discrimination based

on disability." *Id.* at 597.

A plurality of the Court went on to explain how a state's obligation under the

integration mandate must be evaluated in light of the reasonable modification regulation:

"The State's responsibility, once it provides community-based treatment to qualified

persons with disabilities, is not boundless." *Id.* at 603. The Court also described how a

state may be able to rebut a claim of discrimination under the integration mandate if "it

had a comprehensive, effectively working plan for placing qualified persons with mental

disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace

not controlled by the State's endeavors to keep its institutions fully populated." *Id.* In

conclusion, the Court stated:

> Under Title II of the ADA, States are required to provide community-based
> treatment for persons with mental disabilities when the State's treatment
> professionals determine that such placement is appropriate, the affected
> persons do not oppose such treatment, and the placement can be reasonably
> accommodated, taking into account the resources available to the State and
> the needs of others with mental disabilities.

*Id.* at 607.

In 2011, twelve years after the *Olmstead* decision, the Department of Justice

("DOJ") issued a statement on enforcement of the integration mandate ("DOJ

Statement").  *See* U.S. Dep't of Justice Civil Rights Division, *Statement of the*

*Department of Justice on Enforcement of the Integration Mandate of Title II of the*

*Americans with Disabilities Act and Olmstead v. L.C.* (June 22, 2011),

http://www.ada.gov/olmstead/q&a_olmstead.htm [hereinafter "DOJ Statement"].  In this

statement, the DOJ clarifies its interpretation of the integration mandate.  *Id.*  It reiterates

the definition of "most integrated setting" as "a setting that enables individuals with

disabilities to interact with non-disabled persons to the fullest extent possible."  *Id.* at 3.

It further describes such settings in the following manner:

> Integrated settings are those that provide individuals with disabilities
> opportunities to live, work, and receive services in the greater community,
> like individuals without disabilities.  Integrated settings are located in
> mainstream society; offer access to community activities and opportunities
> at times, frequencies and with persons of an individual's choosing; afford
> individuals choice in their daily life activities; and, provide individuals with
> disabilities the opportunity to interact with non-disabled persons to the
> fullest extent possible.

*Id.*  These settings are contrasted with segregated settings which "often have qualities of

an institutional nature."  *Id.*  Consistent with the holding in *Olmstead*, the DOJ explains

that the integration mandate applies in situations "where a public entity administers its

programs in a manner that results in unjustified segregation of persons with disabilities."

*Id.*  In response to the question, "Do the ADA and *Olmstead* apply to persons at serious

risk of institutionalization or segregation?" the DOJ answers, "Yes, the ADA and the

*Olmstead* decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings. Individuals need not wait until the harm of institutionalization or segregation occurs or is imminent." *Id.* at 5.

Defendants argue that Plaintiffs' claims under the ADA and the Rehabilitation Act fail as a matter of law because Plaintiffs have not alleged that they are institutionalized or at risk of imminent institutionalization.  Alternatively, Defendants argue that Plaintiffs' claims must fail because their requested relief is not a reasonable modification and would be a fundamental alteration to the state's existing services.  Defendants emphasize that the Supreme Court has held that a waiting list moving at a reasonable pace is an appropriate reasonable modification and assert that it is Plaintiffs' burden to establish that the requested modification is reasonable.  Defendants argue that the Court should be sympathetic to their fundamental alteration defense and give the State leeway in implementing its programs and Minnesota's *Olmstead* Plan approved by this Court in *Jensen, et al. v. Minnesota Department of Human Services, et al.*, Civ. No. 09-1775 (D. Minn.).  With respect to the Rehabilitation Act in particular, Defendants argue that Plaintiffs' claim must fail because Plaintiffs have not alleged that disability was the "sole impetus" for any adverse action against them in this case.

In response to Defendants' argument that Plaintiffs have no viable claim because they are not at risk of institutionalization, Plaintiffs argue that the DOJ Statement supports a broader reading of the integration mandate than Defendants propose. Plaintiffs urge the Court to give substantial deference to the DOJ's interpretation of its

own regulations and argue that Plaintiffs' allegations of isolation and seclusion state

viable ADA and Rehabilitation Act claims, notwithstanding their current living

arrangement in the community.  In Plaintiffs' view, "[a]lthough they are not living in an

institution, the limited, restrictive services that Defendants are providing do not permit

Plaintiffs 'to live, work, and receive services in the greater community, like individuals

without disabilities,' as required by the Integration Mandate."  (Doc. No. 43 at 40-41.)

With respect to Defendants' fundamental alteration arguments, Plaintiffs assert that

Minnesota's *Olmstead* Plan does not provide a complete solution to the harms they assert.

### 1.    Failure to Plead Risk of Institutionalization

The Court first considers Defendants' argument that Plaintiffs have failed to

establish an integration mandate claim because they have failed to plead that they are

currently institutionalized or at risk of institutionalization.  The Court rejects Defendants'

narrow interpretation of the integration mandate.  The text of the mandate requires

Defendants to administer their "services, programs and activities in the most integrated

setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R.

§ 35.130(d); *see also* 28 C.F.R. § 41.51(d).  Although the Supreme Court's interpretation

of the integration mandate in *Olmstead* arose in the context of claims by two individuals

who had been institutionalized, nothing within the integration mandate limits its

application to the precise situation faced by the *Olmstead* plaintiffs.  Rather, the preamble

to the ADA regulations suggests that the integration mandate's scope is much broader,

referring to "the most integrated setting" as "a setting that enables individuals with

disabilities to interact with nondisabled persons *to the fullest extent possible*."  28 C.F.R.

Pt. 35, App. B, Subp. B., § 35.130 (emphasis added).

The Supreme Court's rationale in *Olmstead* also supports a broad reading of the

integration mandate and its proscription of undue segregation as a form of prohibited

discrimination under Title II of the ADA.  The Supreme Court began its analysis of the

integration mandate by discussing Congress's relevant findings in enacting the ADA.

*See Olmstead*, 527 U.S. at 588.  As they relate to this case, these findings identify forms

of discrimination, apart from institutionalization, which may establish cognizable claims

under the integration mandate.  For example, Congress found that "society has tended to

*isolate and segregate* individuals with disabilities."  42 U.S.C. § 12101(a)(2) (emphasis

added).  In addition, it found that "discrimination against individuals with disabilities

persists in such critical areas as *employment, housing, public accommodations, education,*

*transportation, communication, recreation, institutionalization, health services, voting,*

*and access to public services*."  *Id.* § 12010(a)(3) (emphasis added).  It described the

"various forms of discrimination" encountered by individuals with disabilities, "including

. . . *segregation*."  *Id.* § 12010(a)(5) (emphasis added).  Finally, the findings explain that

"the Nation's proper goals regarding individuals with disabilities are to assure *equality of*

*opportunity, full participation, independent living*, and economic self-sufficiency for such

individuals. . . ."  *Id.* § 12101(a)(7) (emphasis added).  These findings suggest that the

ADA and the integration mandate have an expansive reach, touching upon all aspects of

an individual's life in which "isolat[ion] and segregat[ion]" may be experienced.  *See id.*

§ 12101(a)(2).

In *Olmstead*, the Supreme Court also identified "two evident judgments" reflected in its conclusion that the plaintiffs' unjustified institutionalization was an actionable form of discrimination under the ADA:

> First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life. . . . Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment.

*Id.* at 600-01. These judgments, discussed by the Supreme Court in the context of institutionalized isolation, can be applied equally to other forms of segregation that exclude individuals with disabilities from "participating in community life" and "diminish[] [their] everyday life activities" in a wide range of settings. *See id.*

The DOJ Statement also suggests that the integration mandate's application is not limited to the context of institutionalization.[21] The DOJ describes an integrated setting

---

[21]     Under *Auer v. Robbins*, 519 U.S. 452 (1997), an agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation." *Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 878 (8th Cir. 2011) (quoting *Auer*, 519 U.S. at 461). Agency interpretations may also receive lesser deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), based on a number of factors which give an agency interpretation the "power to persuade, if lacking power to control." *Draper v. Colvin*, 779 F.3d 556, 561 (8th Cir. 2015) (quoting *Skidmore*, 323 U.S. at 140). Here, the Court applies *Skidmore* deference, relying on the DOJ Statement for its persuasive value without determining whether any part of the DOJ Statement interpreting the integration mandate is controlling upon the issue presented before the Court in this case. *Cf. Olmstead*, 527 U.S. at 597-98 ("Because the Department [of Justice] is the agency directed by Congress to issue regulations implementing Title II, its views warrant respect." (citation omitted)).

broadly as one "that provide[s] individuals with disabilities opportunities to *live, work, and receive services in the greater community*, like individuals without disabilities." DOJ Statement at 3. In contrast to integrated settings, the DOJ explains, "segregated settings often have qualities of an institutional nature." *Id.* Notably, in this description, the DOJ did not limit the application of the term "segregated settings" to institutions alone. And in describing various examples of such segregated settings, the DOJ emphasized that the term is not limited to the examples provided within the DOJ Statement. *See id.*

Throughout its interpretation, the DOJ refers to "segregation" as a separate and distinct concept from "institutionalization," suggesting that the integration mandate may be implicated outside of the institutional context. For example, in the portion of the DOJ Statement relied upon by Defendants, the DOJ explains that "the ADA and the *Olmstead* decision extend to persons at serious risk of institutionalization *or segregation* and are not limited to individuals currently in institutional *or other segregated settings*." *Id.* at 5. If institutionalization were the only form of prohibited segregation actionable under the integration mandate, the DOJ's additional reference to "segregation" and "segregated settings" would be rendered meaningless. As the DOJ explains: "The ADA's integration mandate is implicated where a public entity administers its programs in a manner that results in *unjustified segregation* of persons with disabilities." *Id.* at 3. Such segregation may result from the operation of a public entity's "facilities and/or programs." *Id.* Simply put, although the DOJ Statement recognizes that institutionalization is a prohibited form of segregation under the integration mandate, its interpretation indicates

that other forms of segregation may also lead to viable claims of discrimination under the ADA.

In keeping with the DOJ Statement, courts have recognized *Olmstead* claims where the plaintiffs faced no risk of institutionalized residential segregation.  In *Lane v. Kitzhaber*, 841 F. Supp. 2d 1199, 1205 (D. Or. 2012), the court found that the plaintiffs' allegations of segregation in employment facilities for individuals with disabilities known as "[s]heltered workshops" fell under the scope of *Olmstead* and the integration mandate. *Id.* at 1201, 1205-06.  The court in *Lane* discussed the "two evident judgments" identified by the Supreme Court in *Olmstead* and explained, "[t]hose same criticisms apply equally to offering no choice of employment services other than working in a sheltered workshop." *Id.* at 1205.  The *Lane* court also rejected the argument that the integration mandate requires plaintiffs to allege actual or threatened institutionalization. *Id.*  It did so based on "the broad language and remedial purposes of the ADA, the corresponding lack of any limiting language in either the ADA or the integration mandate itself, and the lack of any caselaw restricting the reach of the integration mandate." *Id.*  The *Lane* court's cogent and persuasive analysis applies equally in this case.

Likewise, the Seventh Circuit has held that plaintiffs need not allege a risk of institutionalization to state viable integration mandate claims under the ADA and the Rehabilitation Act. *See Steimel v. Wernert*, 823 F.3d 902, 910-14 (7th Cir. 2016).  The plaintiffs in *Steimel* had been moved by the State of Indiana to a limited Waiver Services program that the plaintiffs alleged "dramatically curtailed their ability to participate in community activities." *Id.* at 908.  Specifically, under the limited program, the plaintiffs'

time in the community was reduced from 40 hours per week to 10 to 12 hours per week.

*Id.*  The plaintiffs proposed two theories to support their claim under the integration

mandate:  "(1) that the state's policies have impermissibly rendered the plaintiffs

institutionalized in their own homes, and (2) that the state's policies have put them at

serious risk of institutionalization."  *Id.* at 910.

The Seventh Circuit framed its analysis of plaintiffs' claims in light of *Olmstead*'s

underlying rationale:

> *Olmstead* dealt only with the problem of unjustified institutional
> segregation.  Its rationale, however, reaches more broadly. . . .  The Court
> had no occasion to consider whether the same evils it had identified for
> institutional placements might exist in some settings outside of an
> institution.  This case presents that question:  whether isolation in the home
> for a person 'who can handle and benefit from' time out in the general
> community is also inconsistent with the integration mandate.  We see no
> reason why the same analysis should not apply.

*Id.* (citation omitted).  In reaching this conclusion, the Seventh Circuit explained that

"[i]solation in a home can just as 'severely diminish[] the everyday life activities' of

people with disabilities."  *Id.* at 910-11 (quoting *Olmstead*, 527 U.S. at 601).  The court

determined that "the [integration mandate] . . . logically applies to all settings, not just to

institutional settings."  *Id.* at 911.  It broadly concluded that the integration mandate "bars

unjustified segregation of persons with disabilities, wherever it takes place."  *Id.*

Ultimately, the Seventh Circuit held that "the integration mandate is implicated where the

state's policies have either (1) segregated persons with disabilities in their homes, or (2)

put them at serious risk of institutionalization."  *Id.* at 914.

Given the language of the integration mandate, Congress's extensive findings in enacting the ADA, the *Olmstead* Court's rationale, the DOJ's persuasive interpretation, and the analogous interpretations in *Lane* and *Steimel*, the Court concludes that "[u]njustified isolation . . . is properly regarded as discrimination based on disability" beyond the limited scope of institutionalization.  *Olmstead*, 527 U.S. at 597.[22]

Applying this interpretation of the integration mandate under the ADA and the Rehabilitation Act, the Court concludes that Plaintiffs have adequately alleged that they are suffering from unjustified isolation and segregation based on Defendants' administration of Minnesota's Waiver Services program.  Plaintiffs allege that they experience feelings of isolation and segregation from society due to their placement on waiting lists and their inability to access Waiver Services.  (*See* Am. Compl. ¶¶ 59.B, 60.A, 61.A, and 62.A.)  Guggenberger alleges that he "often feels stuck at home, and experiences isolation and disconnectedness from the community."  (*Id.* ¶ 59.B.) Similarly, Hannon alleges that he "has feelings of segregation from the community."  (*Id.*

---

[22]    Defendants cite cases in which the *Olmstead* decision and the integration mandate were held to apply to individuals facing a risk of institutionalization.  *See, e.g.*, *Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013); *Cruz v. Dudek*, Civ. No. 10-23048, 2010 WL 4284955 (S.D. Fla. Oct. 12, 2010); *M.A.C.*, 284 F. Supp. 2d 1298.  These decisions do not undermine the Court's conclusion that the integration mandate also applies to other forms of segregation.  Rather, these cases illustrate the propriety of extending the *Olmstead* holding beyond its limited facts.  These courts recognized that the form of discrimination suffered by the *Olmstead* plaintiffs may also be felt by individuals who are not currently institutionalized.  *See, e.g.*, *Pashby*, 709 F.3d at 322 (relying on *Olmstead* and the DOJ's interpretation of the integration mandate regulations to reject the state's argument that *Olmstead* was limited in application to individuals who were actually institutionalized).  The Court has determined that these authorities do not preclude—and in fact support—the Court's conclusion that the integration mandate also applies to non-institutional segregated settings.

¶ 60.A.)  He further alleges that he wants "the ability to make more of his own choices" and "desires more independence and integration into the community on a social and cultural level in a manner that is appropriate for his needs."  (*Id.*)  Pearson alleges that she wishes to move out of her parents' home "and feels isolated from the community in her current living arrangement."  (*Id.* ¶ 61.A.)  She further alleges that she seeks "independence and integration into the community on a social, cultural and vocational level" and desires "interaction with peers with disabilities and without disabilities."  (*Id.*)  Brick alleges that she "has feelings of sadness and isolation" and "feels segregated from society by the inability to integrate into the social, cultural and vocational community of her choice, as other persons without disabilities her age are doing."  (*Id.* ¶ 62.A.)

Although the Plaintiffs receive some services, the Plaintiffs allege that they lack specific services available under the DD and CADI Waiver Services programs which would increase their ability to live, work, and access the community in the most integrated setting appropriate to their needs.  (*See id.* ¶¶ 59.A, 59.B, 60.B, 61.B, 62.A.)  For example, Guggenberger alleges that he lacks supports and services which could aid him in developing independent living skills to transition to "a community based living arrangement" outside of his parental home.  (*Id.* ¶¶ 59.A, 59.B.)  Hannon also desires a more independent living arrangement, and he alleges that he is need of several services available under the DD waiver such as "independent housing options, assistance and supervision in developing and maintaining independent living skills and in accessing the community, and employment supports."  (*Id.* ¶¶ 60.A, 60.B.)  Similarly, Brick alleges that CADI Waiver Services including "assistance with financial management and

budgeting; nutrition and menu planning; healthcare management; and assistance in obtaining and maintaining gainful employment" would help her to live more independently.  (*Id.* ¶ 62.A.)

Given these numerous detailed allegations, the Court concludes that Plaintiffs have plausibly alleged that they are not living, working, and receiving services in "a setting that enables [them] to interact with nondisabled persons to the fullest extent possible."  *See* 28 C.F.R. Pt. 35, App. B, Subp. B., § 35.130.  They have specifically identified the types of services they seek under the DD and CADI Waiver Services programs and have plausibly alleged that their isolation and segregation is the result of Defendants' mismanagement of these programs.

## 2.    Reasonable Modification and Fundamental Alteration

The Court next addresses Defendants' arguments relating to the reasonable modification regulation and the fundamental alteration defense.  The reasonable modification regulation provides that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).  In *Olmstead*, a plurality of the Supreme Court explained that a state may successfully assert a fundamental alteration defense to an integration mandate claim if it could demonstrate it had "a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace . . . ."  527 U.S. at 605-06.

91

While it is Plaintiffs' burden to establish that their requested modifications would be a

reasonable remedy to Defendants' alleged violations of the integration mandate,

Defendants bear the burden of establishing that the requested relief would fundamentally

alter its programs or services.  *See* 28 C.F.R. § 35.130(b)(7); *see also Gorman*, 152 F.3d

at 912 (describing the fundamental alteration argument as an affirmative defense).

> In their Amended Complaint, Plaintiffs specifically allege:
>
> It would not fundamentally alter the HCBS Waiver programs to require
> [Defendants] to spend or cause to be spent all or substantially all of the
> money legislatively appropriated each year for eligible persons to receive
> Waiver Services and to require the Plaintiffs and members of the Plaintiff
> class to be provided authorization for Waiver services for which they are
> eligible, with reasonable promptness.

(Am. Compl. ¶ 98.)  Plaintiffs allege that under Defendants' oversight, the counties in

which they reside "routinely and repeatedly maintained reserves and failed to spend all of

their available Waiver funds, while Plaintiffs remained on wait lists."  (*Id.* ¶ 63.)  They

further contend that "[t]he services Plaintiffs request could have been provided without

fundamentally altering the nature of the State's programs or unduly burdening the State."

(*Id.* ¶ 65.)  Specifically, Plaintiffs allege that "[t]he requested services could have been

provided with the unspent Waiver funds."  (*Id.*)  Plaintiffs support their allegations with

specific facts regarding amounts unspent over several years and cite DHS documents

acknowledging an ability to "add more participants" to the Waiver Services programs

within allocated funding.  (*Id.* ¶¶ 44-47.)  Construing these allegations in the light most

favorable to the Plaintiff, the Court concludes that Plaintiffs have plausibly alleged that

their requested relief would be a reasonable modification of Defendants' Waiver Services program.

Turning to Defendants' fundamental alteration defense, the Court determines that it cannot properly evaluate the defense at this stage of the litigation.  Given Plaintiffs' allegations and the complexity of the issues involved in Defendants' administration of a statewide Waiver Services program, determining whether Plaintiffs' request would constitute a fundamental alteration of Defendants' programs is a fact-specific inquiry that the Court cannot presently resolve in Defendants' favor.  *See Van Orden v. Schaefer*, Civ. No. 09-00971, 2014 WL 5320232, at *7 (E.D. Mo. Oct. 17, 2014) (describing reasonable accommodation and fundamental alteration questions as "fact-intensive issues that require further development of the record"); *see also Haddad v. Dudek*, 784 F. Supp. 2d 1308, 1331 (M.D. Fla. 2011) ("Defendants' affirmative defense that it has [a] 'comprehensive, effectively working plan,' and 'a waiting list that move[s] at a reasonable pace' is not apparent from the face of the Complaint."); *Michelle P. ex rel. Diesenroth v. Holsinger*, 356 F. Supp. 2d 763, 769 (E.D. Ky. 2005) (declining to consider a fundamental alteration defense at the motion to dismiss stage and noting that "since the Plaintiffs do not seek the creation of new programs, whether the relief requested would result in a fundamental alteration 'is a matter that can be resolved only by a careful examination of the facts and circumstances. . .'" (citation omitted)); *Martin v. Taft*, 222 F. Supp. 2d 940, 972 (S.D. Oh. 2002) ("[W]hether requested relief would entail a fundamental alteration is a question that cannot be answered in the context of a motion to dismiss under Fed. R. Civ. P. 12(b)(6).").

While it is true that courts should remain "sympathetic to fundamental alteration defenses" and "give states 'leeway' in administering services for the disabled," *Arc of Wash. State Inc. v. Braddock*, 427 F.3d 615, 618 (9th Cir. 2005) (citations omitted), courts must also evaluate whether a state's plan is "comprehensive, effective, and moving at a reasonable pace." *Sanchez v. Johnson*, 416 F.3d 1051, 1067 (9th Cir. 2005).  When confronted with a fully developed factual record demonstrating an "effectively working" state plan for allocating services to individuals with disabilities, courts should "not tinker with that scheme." *See id.* at 1067-68.  But the mere existence of a state plan may not defeat an integration mandate claim if the court is "not persuaded that [the state's efforts] have been sufficient," *Frederick L. v. Dep't of Pub. Welfare of Pa.*, 422 F.3d 151, 157 (3d Cir. 2005), or if the state agency has not "demonstrate[d] a reviewable commitment to action," *Pa. Prot. & Advocacy v. Pa. Dep't of Pub. Welfare*, 402 F.3d 374, 383 (3d Cir. 2005).  Notably, courts evaluating fundamental alteration defenses have identified whether the state agency "responsibly spent its budgetary allocations" as a relevant factor for courts to consider.  *Pa. Prot. & Advocacy*, 402 F.3d at 383; *see also Bryson v. Stephen*, Civ. No. 99-cv-558, 2006 WL 2805238, at *7 (D.N.H. 2006) (crediting the state's fundamental alteration defense and noting that "amounts budgeted to serve those with developmental disabilities are uniformly spent fully and for that purpose").

In this case, the fact that Defendants have established an *Olmstead* Plan including goals relating to the prompt provision of Waiver Services does not irrefutably defeat Plaintiffs' integration mandate claims.  The *Olmstead* Plan is aspirational, and Plaintiffs' plausible allegations of mismanagement and underspending by the State raise important

94

questions regarding the ongoing effectiveness of the plan in achieving its goals.  Without

a developed evidentiary record on the effectiveness of Minnesota's *Olmstead* Plan or the

manner in which Defendants have utilized appropriated Waiver Services funds, the Court

is unable to credit Defendants' fundamental alteration defense.

### 3.      Rehabilitation Act Claim

Finally, the Court addresses Defendants' argument that Plaintiffs have failed to

plead a proper claim under the Rehabilitation Act because Plaintiffs have not alleged that

their disabilities were the "sole impetus" for Defendants' adverse actions.  Title II of the

ADA proscribes discrimination against individuals with disabilities "by reason of

disability," 42 U.S.C. § 12132, whereas the Rehabilitation Act prohibits such

discrimination "solely by reason of [an individual's] disability," 29 U.S.C. § 794(a).

Under these provisions, plaintiffs may assert claims involving various types of

discrimination.  For example, a plaintiff may allege a claim of disparate treatment which

involves intentional discrimination based on disability.  *See Peebles v. Potter*, 354 F.3d

761, 765 (8th Cir. 2004).  A plaintiff could also assert a discrimination claim resulting

from a failure to reasonably accommodate the plaintiff's disability.  *See id.*  In this case,

Plaintiffs base their Rehabilitation Act claim on Defendants' alleged failure to provide

Waiver Services despite available funding in violation of the integration mandate.  This

failure, Plaintiffs allege, "is a form of discrimination based on disability prohibited by the

Rehabilitation Act and its implementing regulations."  (Am. Compl. ¶ 33.)

In *Olmstead*, the Supreme Court held that "[u]njustified isolation . . . is properly

regarded as discrimination based on disability."  527 U.S. at 597.  As the Seventh Circuit

has explained, this holding established that "the word 'discrimination' as used in

[42 U.S.C.] § 12132 includes not only disparate treatment of comparably situated persons

but also undue institutionalization of disabled persons, *no matter how anyone else is*

*treated.*" *Amundson ex rel. Amundson v. Wisc. Dep't of Health Servs.*, 721 F.3d 871, 873

(7th Cir. 2013) (citing *Olmstead*, 527 U.S. at 597-603). Similarly, the DOJ has explained

that "an *Olmstead* claim is distinct from a claim of disparate treatment or disparate

impact and accordingly does not require proof of those forms of discrimination." DOJ

Statement at 4; *see also id.* ("In *Olmstead*, the court held that the plaintiffs could make

out a case under the integration mandate even if they could not prove 'but for' their

disability, they would have received the community-based services they sought."). The

Court concludes that the Rehabilitation Act's "solely by reason of . . . disability"

requirement need not be separately analyzed in cases alleging a violation of the

integration mandate because the alleged discrimination—undue isolation—stems from a

failure to satisfy an affirmative duty, regardless of discriminatory intent.

The Eighth Circuit's decision in *Peebles v. Potter*, 354 F.3d 761 (8th Cir. 2004),

involving a claim of discrimination based on failure to make reasonable accommodations,

supports the Court's conclusion. In *Peebles,* the Eighth Circuit discussed the

Rehabilitation Act's "solely by reason of . . . disability" language and indicated that it is

relevant to disparate treatment claims but not to discrimination claims based on a failure

to reasonably accommodate an individual's disability. *Id.* at 767 & n.5. It explained:

> In a reasonable accommodation case, the 'discrimination' is framed in
> terms of the failure to fulfill an affirmative duty—the failure to reasonably
> accommodate the disabled individual's limitations. . . . As such, it is not

96

> the employer's discriminatory intent in taking adverse . . . action against a
> disabled individual that matters.  Rather, discrimination occurs when the
> employer fails to abide by a legally imposed duty.  The known disability
> triggers the duty to reasonably accommodate and, if the employer fails to
> fulfill that duty, we do not care if he was motivated by the disability. . . .

*Id.* at 767.  The Eighth Circuit noted that the Rehabilitation Act's sole impetus

requirement "addresses motivation from the disability, which . . . is irrelevant to (and

unlikely to accompany) the employer's failure to accommodate the employee's

disability."  *Id.* at 767 n.5.

Like the reasonable accommodation claim at issue in *Peebles*, integration mandate

claims are based on a public entity's "failure to fulfill an affirmative duty," specifically

the failure to ensure that individuals with disabilities receive services in the most

integrated setting appropriate to their needs.  *See id.* at 767.  Thus, as in a reasonable

accommodation case, "[the court need] not care if [the defendant] was motivated by the

disability," and the Rehabilitation Act's sole impetus requirement need not be considered.

*Id.*[23]  As further support for this conclusion, the Court notes that federal courts analyzing

integration mandate challenges under the ADA and the Rehabilitation Act consistently

interpret the provisions together, notwithstanding the "solely by reason of . . . disability"

language in the Rehabilitation Act.  *See Pa. Prot. & Advocacy*, 402 F.3d at 379 ("In light

---

[23]    The Court notes that the Eighth Circuit recently referenced the Rehabilitation
Act's sole impetus requirement in the context of a reasonable accommodation claim.  *See
Dick v. Dickinson State Univ.*, ___ F.3d ___, Civ. No. 15-2419, 2016 WL 3442405, at *3-
4 (8th Cir. June 23, 2016).  Given the Eighth Circuit's limited analysis of the requirement
in *Dick*, the Court concludes that this case does not undermine the validity of the Eighth
Circuit's more thorough discussion of the issue in *Peebles* or the Court's conclusion in
this case.

of the similarities between the integration provisions of the ADA and RA and their implementing regulations, we construe and apply them in a consistent manner."); *see also Davis v. Shah*, 821 F.3d 231, 259 (2d Cir. 2016); *Pashby*, 709 F.3d at 321; *M.R.*, 697 F.3d at 733; *Frederick L.*, 422 F.3d at 154; *Sanchez*, 416 F.3d at 1062-63; *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607-08 (7th Cir. 2004); *Fisher*, 335 F.3d at 1179; *Hiltibran v. Levy*, 793 F. Supp. 2d 1108, 1115-16 (W.D. Mo. 2011); *St. Marie v. Ludeman*, Civ. No. 09-3141, 2010 WL 924420, at *3 (D. Minn. Mar. 11, 2010).

In light of the above, the Court concludes that Plaintiffs have stated viable integration mandate claims cognizable under both the ADA and the Rehabilitation Act.

## V.    Necessary Parties

Finally, the Court considers Defendants' argument that Minnesota counties are necessary parties to this lawsuit under Federal Rule of Civil Procedure 19. Defendants' argument raises a potential basis for dismissal under Rule 12(b)(7). *See* Fed. R. Civ. P. 12(b)(7). In deciding whether to dismiss on this basis, "the court must accept the complaint's allegations as true" and may consider matters beyond the pleadings. *Omega Demolition Corp. v. Hays Grp., Inc.*, 306 F.R.D. 225, 227 (D. Minn. 2015). As Defendants acknowledge, the burden is on the party seeking dismissal. *See id.*

Rule 19(a) designates a person a required party if "in that person's absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A). A party is also required if "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest." Fed. R.

Civ. P. 19(a)(1)(B)(i).[24]  In conducting a Rule 19 analysis, courts should focus on the

relief available between the parties rather than "the speculative possibility of further

litigation between a party and an absent person."  *Gwartz v. Jefferson Mem'l Hosp. Ass'n*,

23 F.3d 1426, 1428 (8th Cir. 1994) (quoting *LLC Corp. v. Pension Benefit Guar. Corp.*,

703 F.2d 301, 305 (8th Cir. 1983)).

With regard to the first basis for required joinder, the court must consider whether

"meaningful relief" is available to the plaintiff.  *Henne v. Wright*, 904 F.2d 1208, 1212

n.4 (8th Cir. 1990).  Third-parties are not necessarily required parties under Rule 19

merely because they are involved in conduct underlying a plaintiff's claims.  *See Equal*

*Emp't Opportunity Comm'n v. Cummins Power Generation, Inc.*, 313 F.R.D. 93, 99-101

(D. Minn. 2015).  If the defendant is independently liable for the plaintiffs' claims, the

court may properly conclude that it can accord complete relief in the absence of such

third-parties.  *See id.; see also Halderman v. Pennhurst State Sch. & Hosp.*, 542 F. Supp.

619, 624 (E.D. Pa. 1982).

Regarding the second basis, "the mere fact the underlying litigation will affect or

otherwise impact a non-party's interests does not mean the non-party is indispensable."

*See Cummins*, 313 F.R.D. at 102.  An existing party may sufficiently protect any interests

---

[24]      Rule 19 also provides a third basis for finding an individual or entity to be a
required party—"if that person claims an interest relating to the subject of the action and
is so situated that disposing of the action in the person's absence may . . . leave an
existing party subject to a substantial risk of incurring double, multiple, or otherwise
inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1)(B)(ii).
Defendants do not appear to assert that this provision applies in this case, and the Court
concludes that it does not.

the absent party might claim, rendering the absent party not required under Rule 19(a).

*See id.* In addition, if the absent party would have no recourse to protect the claimed

interest even absent the litigation, the outcome of the action may have no practical effect

on that party's ability to protect their interest. *See CSX Transp., Inc. v. Forst*, 777

F. Supp. 435, 443-45 (E.D. Va. 1991).

Defendants argue that the Court could not grant complete relief to Plaintiffs in the

absence of Minnesota counties because the counties and DHS have independent

obligations in administering the Waiver Services programs. According to Defendants,

the counties' independent obligations include managing allocated funds at the county

level and providing notices and information to recipients. Defendants also argue that the

counties have interests that could be impaired through this litigation because they are

financially responsible for overspending allocated Waiver Services funding.

The Court disagrees. First, given Defendants' oversight authority and ultimate

responsibility for administering the State's Medicaid plan, the absence of the counties as

parties would not prevent the Court from according meaningful relief to the Plaintiffs.

*See* Fed. R. Civ. P. 19(a)(1)(A); *Henne*, 904 F.2d at 1212 n.4. Plaintiffs seek declaratory

and injunctive relief relating to the Defendants' alleged failures to ensure that Waiver

Services are provided with reasonable promptness and that proper procedural

requirements are followed. Notwithstanding the counties' role in the administration of

the Waiver Services programs, the Commissioner has ultimate responsibility for the

State's provision of Waiver Services under both federal Medicaid law and Minnesota

statutes. *See* 42 C.F.R. §§ 431.10(b), 431.10(e), 435.903; *see also* Minn. Stat. §§ 256.01,

subd. 2(a); 256B.04, subd.1; 256B.05, subd. 1.  If a county fails to properly utilize its

allocated resources to account for individuals on Waiver Services waiting lists, the

Commissioner can remedy that failure by reallocating funds between counties.  Minn.

Stat. §§ 256B.0916, subd. 5; 256B.092, subd. 12(c); 256B.49, subd. 11a(c).  In addition,

the Commissioner is responsible for supplying forms to the counties and has ultimate

responsibility for ensuring county compliance with Medicaid fair hearing requirements.

*See* 42 C.F.R. § 431.10(b)(3); Minn. Stat. § 256B.04, subd. 3.  While the counties play a

role in the State's administration of the Waiver Services program, the Court can award

proper relief to remedy Plaintiffs' claims through an order affecting the Commissioner

alone.  *See Halderman*, 542 F. Supp. at 624 (concluding that absent counties were not

necessary parties and noting that "the Commonwealth defendants have sufficient control

over all counties in the State such as to enable the Commonwealth defendants to comply

with this Court's Orders").

  Second, the counties' absence from this litigation would not practically impair or

impede any interest they could claim based on their responsibility for overspending

allocated Waiver Services funds.  Plaintiffs allege that Defendants allow counties to

maintain crisis reserves in excess of what is reasonable or necessary.  (Am. Compl.

¶¶ 40-41, 50.)  Plaintiffs also allege that Defendants maintain additional crisis reserves at

the state level to handle unexpected costs.  (*Id.* ¶ 40.)  To remedy statewide

underspending, Plaintiffs ask the Court to order relief which would require Defendants to

"fund and provide Waiver Services with reasonable promptness and a reasonable pace to

members of the plaintiff class."  (*Id.* at Prayer for Relief ¶ G.)  It is not clear that granting

the relief Plaintiffs seek will result in any overspending liability for Minnesota counties, as Defendants would be required to responsibly oversee the distribution of funding statewide.  In addition, as Defendants acknowledge, Minnesota statutes only permit the Commissioner to recoup county overspending if the amount of overspending exceeds statewide appropriations for Waiver Services.  *See* Minn. Stat. §§ 256B.0916, subd. 11; 256B.49, subd. 26.

Further, to the extent Minnesota counties could claim a valid interest in the outcome of this litigation, their role as local agencies of DHS suggests that their interests will be adequately protected by the Commissioner's own presence in this lawsuit.  In overseeing the State's Medicaid program, the Commissioner is directed to do so "with full consideration for the interests of counties, to plan and implement a unified, accountable, comprehensive health services system that . . . avoids shifting funding burdens to county tax resources."  *Id.* § 256B.04, subd. 1a.  In addition, it is unclear whether the counties would have recourse to protect their purported interest absent this litigation, as they are subject to the Commissioner's direction and oversight in their administration of the Waiver Services programs.  *See CSX Transp., Inc.*, 777 F. Supp. at 443-45 (finding that localities were not required parties in an action challenging the state agency's assessment of railroad property, notwithstanding their interest in receiving tax revenues based on the assessments, in part because the localities had no control over the agency's assessment decisions).  Thus, the Court concludes that Defendants have not met their burden of establishing that Minnesota counties have an interest in this litigation that will be impaired in their absence.

The Court can accord meaningful relief to Plaintiffs in the absence of Minnesota counties, and the counties do not have an interest that would be practically impaired by the Court's resolution of Plaintiffs' claims. Therefore, Minnesota counties are not necessary parties in this case.

## CONCLUSION

Because Plaintiffs seek prospective declaratory and injunctive relief against Commissioner Johnson Piper in her official capacity for ongoing violations of federal law, the Court concludes that this case may proceed notwithstanding Defendants' Eleventh Amendment sovereign immunity arguments. Further, the Court concludes that the State of Minnesota has waived its sovereign immunity with respect to claims under § 504 of the Rehabilitation Act based on the State's acceptance of federal funding through participation in the Medicaid program. However, this waiver is limited to DHS, the state agency that accepts federal funding, so the Court will grant Defendants' motion to the extent it seeks the dismissal of the State of Minnesota as a party. Further, because the claims against DHS and Commissioner Johnson Piper in her official capacity are redundant, the Court will also dismiss DHS as a party to this case.

Based upon the allegations in Plaintiffs' Amended Complaint and a careful review of the governing legal authority, the Court concludes that Plaintiffs have plausibly alleged viable claims for relief against Commissioner Johnson Piper under the Medicaid Act, the ADA, § 504 of the Rehabilitation Act, and the Due Process Clause of the Fourteenth Amendment. Plaintiffs have standing to assert these claims, and this case is neither moot nor unripe based on recent changes to Minnesota laws or the

implementation of Minnesota's *Olmstead* Plan.  In addition, Minnesota counties are not required parties to this action because the Court could award the relief Plaintiffs seek in the counties' absence.

**ORDER**

Based on the files, record, and proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1.     Defendants' Motion to Dismiss (Doc. No. [35]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

    a.     The motion is **GRANTED** to the extent it seeks dismissal of the State of Minnesota as a party.  The State of Minnesota is thus **DISMISSED** as a party to this action.

    b.     The motion is **DENIED** in all other respects.

2.     The Minnesota Department of Human Services is **DISMISSED** as a party to this action.  All claims against Commissioner Johnson Piper, Commissioner of the Minnesota Department of Human Services, in her official capacity shall proceed.


Date:  July 28, 2016                    s/Donovan W. Frank
                                        DONOVAN W. FRANK
                                        United States District Judge