# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| Maxwell Mikkelson, by his parents and Guardians, Scott and Annmarie Mikkelson, and R.H., a minor child by R.H.'s parent, Heather Heath, and on behalf of others similarly situated, | Civil No. 15-3439 (DWF/BRT) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Emily Johnson Piper, Commissioner of the Minnesota Department of Human Services, | |
| Defendant. | |

_____

Pamela S. Hoopes, Esq., Barnett I. Rosenfield, Esq., and Steven C. Schmidt, Esq., Mid-Minnesota Legal Aid, Minnesota Disability Law Center, and Mark R. Azman, Esq., and Shamus P. O'Meara, Esq., O'Meara Leer Wagner & Kohl, PA, counsel for Plaintiffs.

Scott H. Ikeda, Ian M. Welsh, and Aaron Winter, Assistant Attorneys General, Minnesota Attorney General's Office, counsel for Defendant.

_____

# INTRODUCTION

This matter is before the Court on the Motion to Dismiss filed by Defendant Emily Johnson Piper ("Commissioner Johnson Piper" or "Defendant"), Commissioner of the Minnesota Department of Human Services ("DHS"). (Doc. No. 91.) For the reasons set forth below, the Court denies the motion.

# BACKGROUND[1]

## I.    Minnesota's Waiver Services for Individuals with Disabilities

The State of Minnesota participates in Medicaid, a health care program operated and funded jointly by individual states and the federal government.  (Doc. No. 80 ("Third Am. Compl.") ¶ 18.)  Plaintiffs allege that federal Medicaid requirements obligate Minnesota to provide various services, including treatment in institutional settings, for persons with developmental disabilities.  (*Id.* ¶ 19.)  As an alternative to providing care and treatment in institutional settings, Plaintiffs allege that Minnesota may provide Home and Community Based Waiver Services ("Waiver Services"), which encompass a variety of services and supports which Plaintiffs allege are "designed to help people with disabilities live in his or her own home and access his or her community."  (*Id.* ¶¶ 1, 20.)  Plaintiffs allege that states that choose to offer these optional Waiver Services must do so in accordance with federal law.  (*Id.* ¶ 21.)

Defendant operates four Waiver Services programs for individuals with disabilities as part of Minnesota's Medicaid program known as Medical Assistance ("MA").  (*Id.* ¶¶ 29, 30.)  According to Plaintiffs, these Waiver Services programs include the Developmental Disabilities ("DD") Waiver, the Community Alternatives for

---

[1]     In its July 28, 2016 Order, the Court summarized the allegations in the Amended Complaint in this matter.  (*See* Doc. Nos. 54, 41.)  Given the substantial similarities between the Amended Complaint and the Third Amended Complaint currently at issue, the factual background in this order largely mirrors the Court's July 28, 2016 Order. However, the Court has considered Plaintiff's Third Amended Complaint anew and has evaluated Defendant's Motion to Dismiss in light of the current, operative version of the complaint.

Disabled Individuals ("CADI") Waiver, the Community Alternative Care ("CAC") Waiver, and the Brain Injury ("BI") Waiver. (*Id.* ¶ 30.) Plaintiffs allege that Defendant "serves as the 'single state agency' responsible for the administration of the Medicaid program in Minnesota." (*Id.* ¶ 16.) Plaintiffs allege that "Defendant is responsible for developing and implementing the Medicaid Waiver Services to eligible individuals." (*Id* ¶ 14.) According to Plaintiffs, Defendant is also "responsible for overseeing the agencies which provide or arrange services to all persons with developmental disabilities." (*Id.* ¶ 16.) Plaintiffs allege that they, along with thousands of similarly situated individuals, have been deemed eligible for Waiver Services but have been put on waiting lists for services. (*Id.* ¶ 41.)

Plaintiffs allege that Minnesota "[c]ounties act as 'local agencies' of the state and Defendant's agency" to aid in the administration of the Waiver Services programs. (*Id.* ¶¶ 30, 31.) Specifically, Plaintiffs allege that Defendant identifies each county's total budget to spend for each Waiver, and the counties "create individual waiver services budgets and . . . manage those budgets in the aggregate, pursuant to policies created by Defendant and within amounts specified by Defendant as available to serve eligible persons under each waiver." (*Id.* ¶¶ 32, 33.) Plaintiffs claim that the counties are authorized by state statute "to reserve a certain portion of the available funding for unexpected situations that might arise during the year." (*Id.* ¶ 34.) In addition, Plaintiffs allege that "Defendant also withholds funds under each Waiver to address unexpected, crisis needs." (*Id.*) Plaintiffs assert that these additional reserves withheld by Defendant "eas[e] the burden on counties to handle all unexpected costs at a local level." (*Id.*)

Plaintiffs allege that Waiver Services funds are returned to the State's general fund if unspent in a given year. (*Id.* ¶ 36; *see also id.* ¶ 42.) In particular, Plaintiffs assert that "[u]nspent Waiver funds are not carried over or otherwise reserved for the Waiver programs to remove people from the waitlists and pay for Waiver Services in future years." (*Id.* ¶ 36.)

## II.     The Named Plaintiffs[2]

The two named Plaintiffs in this case allege that they "have not moved up or off the various wait lists at a reasonable pace or received Waiver Services within a reasonable time" and that the services they seek "could have been and can be provided with the unspent or currently available Waiver funds." (*Id.* ¶¶ 53, 54.) According to these individuals, the counties in which they reside "have routinely and repeatedly maintained reserves and failed to spend all of their available Waiver funds, while Plaintiffs remained on wait lists or were otherwise denied Waiver Services." (*Id.* ¶ 52.)

Plaintiff Maxwell Mikkelson ("Mikkelson") is a twenty-two-year-old individual with a developmental disability, autism, and language deficits who desires "to be less isolated from his community and more independent from his family and paid caregivers." (*Id.* ¶¶ 50, 50.A.) Mikkelson currently "receives personal care assistant services and

---

[2]     The Court has been made aware of certain factual developments with respect to the two named Plaintiffs. For purposes of this order on Defendant's Motion to Dismiss, the Court recites these background facts as alleged in Plaintiffs' Third Amended Complaint. The factual developments of which the Court has been made aware do not materially impact the Court's analysis of Defendant's Motion to Dismiss which has been limited by agreement of the parties to Defendant's Eleventh Amendment and separation-of-powers arguments.

attends a sheltered work shop program." (*Id.* ¶ 50.A.)  Mikkelson alleges that he needs DD Waiver Services such as assistive technology, staffing, and respite care to live a more fully integrated life.  (*Id.* ¶ 50.B.)  He alleges that he "has been eligible and waiting for the DD Waiver since he was approximately 8 years old but has been told at various times that the waiver is 'unavailable' and that there is 'no funding.'"  (*Id.* ¶ 50.C.)  In addition, Mikkelson asserts that "[i]n 2015, his family was told that waivers were available but he was never ultimately offered one."  (*Id.*)  He alleges that he has received "few updates on any progress toward obtaining waiver services" and that he not received a written notice of denial or information about how to challenge being denied Waiver Services.  (*Id.*)

Plaintiff R.H. is a minor with a severe intellectual disability and autism.  (*Id.* ¶ 51, 51.A.)  R.H. needs "significant assistance" with many daily tasks and behaviors, is nonverbal, and "requires ongoing supervision and intervention for . . . severe self-injurious behavior and physical aggression."  (*Id.* ¶¶ 51.A, 51.B.)  R.H. alleges that he has been determined to be eligible for DD Waiver Services but instead receives CADI Waiver Services.  (*Id.* ¶¶ 51.C, 51.D.)  According to R.H., the CADI Waiver "provides an inadequate level of services and supports."  (*Id.* ¶ 51.D.)  Specifically, R.H. alleges, "the quantity and quality of services available under this waiver, for R.H., are not sufficient" because R.H. cannot access needed services "to address R.H.'s significant developmental delays and to allow R.H. to develop the skills necessary to become more independent and better access R.H.'s community."  (*Id.*)  According to the Third Amended Complaint, "R.H. has been told that the DD Waiver would offer R.H. a significantly larger services budget" through which R.H. could hire trained staff and access and pay for water therapy

and other community activities.  (*Id.* ¶ 51.E.)  Plaintiffs allege "R.H. has been denied

access to and not permitted to choose the DD Waiver" due to an alleged "policy or

practice of prohibiting people currently on the CADI Waiver from being offered or

otherwise accessing the DD Waiver."  (*Id.* ¶ 51.F.)  According to R.H., "[u]nder

Defendant's new assessment process, R.H. and other similarly situated individuals who

are otherwise eligible for DD Waiver services are categorically denied access to the DD

Waiver if they receive CADI Waiver Services."  (*Id.*)  R.H. claims that DD Waiver

Services have not been offered as an alternative to CADI Waiver Services and that R.H.

has not been provided written notice of the denial of DD Waiver Services.  (*Id.* ¶ 51.G.)

## III.    Plaintiffs' Claims

Plaintiffs bring their claims on their own behalf and on behalf of a putative class

of similarly situated individuals with disabilities[3] in Minnesota who have applied for and

been deemed eligible for DD Waiver Services but "have been denied or otherwise not

offered" such services.  (*Id.* ¶¶ 55, 56.A.)  "As of April 1, 2015," Plaintiffs allege, "there

were 3,586 persons on wait lists for the DD Waiver."  (*Id.* ¶ 44.)  Plaintiffs claim that

Defendant has "fundamentally mismanage[d]" Minnesota's Waiver Services programs,

"depriv[ing] thousands of persons with disabilities of available services and supports

intended to help them live independent, inclusive lives in their communities."  (*Id.* ¶ 1.)

Plaintiffs allege that "Defendant has failed to ensure that otherwise eligible individuals

---

[3]     Plaintiffs' putative class includes individuals who are eligible to receive DD
Waiver Services, and Plaintiffs allege that they and the putative class members are
"substantially limited in major life activities such as learning, working, walking and brain
function."  (Doc. No. 80 ("Third Am. Compl.") ¶¶ 12, 56.A, 81.)

are not improperly placed on wait lists for services when money is available under the Waivers to serve their needs."  (*Id.* ¶ 43.)

According to Plaintiffs, Defendant has failed to undertake necessary administrative steps to remedy underspending by Minnesota counties.  (*Id.*)  In addition, Plaintiffs allege that Defendant does not have an effective and comprehensive plan "for ensuring that Plaintiffs and members of the Plaintiff class be provided with DD Waiver Services within the funding appropriated by the Legislature each year, rather than placing them on wait lists, to enable them to live in the most integrated settings possible, consistent with their needs and preferences."  (*Id.* ¶ 88.)  Plaintiffs allege that Defendant's actions have caused them harm and have caused them to remain isolated from their communities in a discriminatory manner in violation of federal law.  (*Id.* ¶ 2.)

In particular, Plaintiffs allege that the State and DHS, through Commissioner Johnson Piper, "unlawfully and unnecessarily placed . . . individuals on wait lists" notwithstanding "an annual availability of funds for Waiver Services programs."  (*Id.*)  Plaintiffs allege that Defendant has "improperly allow[ed] over $1 billion of funds legislatively appropriated for [the Waiver Services] programs to go unspent."  (*Id.* ¶ 1; *see also id.* ¶ 40 (providing a chart identifying unspent DD Waiver funds from 1995 to 2010).)  Plaintiffs claim that Defendant allows counties to reserve Waiver Services funds in amounts that "far exceed[] what is reasonable or necessary."  (*Id.* ¶ 35.)  Specifically, Plaintiffs allege that "[n]early all of the counties end each Waiver year with a large reserve of unspent money for each Waiver."  (*Id.*)

To support these allegations, Plaintiffs reference multiple DHS reports documenting unspent reserves in Minnesota counties between 1995 and 2015. (*See generally id.* ¶¶ 37-40.) According to Plaintiffs, DHS has recommended in these reports that counties reduce their reserves, spend additional funding, and reduce their waiting lists. (*See id.* ¶¶ 37, 38.) Specifically, one report notes that many counties "had room in their budgets to provide additional services or add more participants to programs." (*Id.* ¶ 37.) Plaintiffs allege that Defendant's most recent Waiver Services review reported that 72 out of 81 lead agencies (Minnesota counties) had unspent reserves of 4% or more in their DD Waiver budgets. (*Id.* ¶¶ 37, 38.) Of these 72 lead agencies, 30 had reserves of 10% or more. (*Id.* ¶ 38.) Plaintiffs allege that Defendant stated in a 2013 report regarding Hennepin County, "[T]here is room to add more participants via new or reuse slots or service optimization to reduce or eliminate the waiting list and enhance the quality of participant's lives through services such as supportive [sic] employment." (*Id.*) According to Plaintiffs, this report also stated, "Typically a 1% to 2% allocation reserve is more than adequate to manage risk for county [sic] of this size." (*Id.*)

Plaintiffs allege that "Defendant failed to spend all funds appropriated for Waiver Services" in the most recent state fiscal year so that appropriated funds reverted to the State's general fund. (*Id.* ¶ 42.) Plaintiffs allege that they could have received the services they seek without fundamentally altering the State's programs or imposing an undue burden on the State. (*Id.* ¶ 54.) Specifically, Plaintiffs allege that "[t]he requested services could have been and can be provided with the unspent or currently available Waiver funds." (*Id.*; *see also id.* ¶ 87 ("It would not fundamentally alter the DD Waiver

program to require Defendant Johnson Piper to spend or cause to be spent all or substantially all of the money legislatively appropriated each year for eligible persons to receive DD Waiver Services . . . .").)

According to Plaintiffs, their lawsuit "arises from the mismanagement by Defendant of Minnesota's Waiver Services programs, permitting tens of millions of available monies to go unspent while needlessly and improperly putting persons eligible for such services on wait lists." (*Id.* ¶ 49.) Plaintiffs assert the following claims: (1) violation of 42 U.S.C. § 1983 through failure to furnish services with reasonable promptness in violation of 42 U.S.C. § 1396a(a)(8); (2) violation of 42 U.S.C. § 1983 through failure to inform of feasible alternatives and denial of choice of Waiver Services in violation of 42 U.S.C. § 1396n(c)(2)(C); (3) violation of 42 U.S.C. § 1983 through a violation of Plaintiffs' Due Process rights under the Fourteenth Amendment, the Medicaid Act, and its implementing regulations; (4) violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; and (5) violation of § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). (*Id.* ¶¶ 57-97.)

Plaintiffs allege that "Defendant has failed to take administrative steps to insure [sic] that individuals on the wait lists are removed from the list and provided Waiver Services at a reasonable pace, within a reasonable amount of time." (*Id.* ¶ 45.) Plaintiffs assert that the failure to provide DD Waiver Services with reasonable promptness is caused by Defendant's practices of failing to do the following:

> (a) sufficiently use appropriated funding for DD Waiver Services programs;
> (b) ensure that local agencies minimize the use of reserves and maximize the use of available DD Waiver funds; and (c) limit the placement of

eligible persons on to wait lists to those instances where waiver money is not currently, and is not reasonably expected to be, available.

(*Id.* ¶ 63.)  Plaintiffs also allege that Defendant "has failed to inform eligible individuals . . . of the availability of DD Waiver Services . . . and has denied Plaintiffs their right to choose DD Waiver Services rather than institutional services or other services that they might be receiving or for which they might be eligible."  (*Id.* ¶ 70.)

Further, Plaintiffs allege that eligible individuals who are placed on waiting lists "are routinely denied advance notice of the decision not to offer them Waiver Services," are not informed if they fall into a statutory priority group for allocating Waiver Services, and are not informed why they are placed or kept on waiting lists or when services may be offered.  (*Id.* ¶ 46.)  Without such information, Plaintiffs allege, individuals have a limited ability to make informed choices about accepting or applying for other services. (*Id.* ¶ 47.)  Plaintiffs also allege that individuals on waiting lists "are routinely denied the opportunity to challenge their placement on a wait list in a hearing on the merits." (*Id.* ¶ 48.)  Plaintiffs assert that such alleged due process violations combined with Defendant's "policies, practice and funding decisions, and . . . acts or omissions of allowing wait lists for DD Waiver Services despite available funding" result in continuing harm.  (*Id.* ¶ 76.)  Finally, Plaintiffs contend that Defendant's "[f]ail[ure] to provide [DD Waiver Services] despite having the funds available to do so, while providing Plaintiffs with lesser services that do not foster the same degree of independence, integration or inclusion, is a form of discrimination based on disability prohibited by" federal law.  (*Id.* ¶¶ 86, 95.)

To remedy their claims, "Plaintiffs demand the Defendant promptly comply with the law by managing appropriated funds so that persons with disabilities may receive the services they need and to which they are entitled, allowing them to experience life in the most independent and integrated settings appropriate to their needs and preferences." (*Id.* ¶ 4.) In addition, "Plaintiffs further demand that Defendant fund and provide Waiver Services with reasonable promptness and at a reasonable pace to members of the plaintiff class and that the Court enter an order that such funds remain available until members of the plaintiff class are provided such services." (*Id.* ¶ 5.)

Plaintiffs ask the Court to allow this action to proceed as a class action pursuant to Federal Rule of Civil Procedure 23. (*See id.* at Prayer for Relief ¶¶ A-D.) Plaintiffs seek declaratory, injunctive, and other relief to enforce their rights and to remedy Defendant's violations of federal law. (*See id.* ¶¶ E-I.) Specifically, Plaintiffs seek a permanent injunction requiring Defendant to provide DD Waiver Services to Plaintiffs and similarly situated individuals "in the most integrated setting appropriate to their individual needs and preferences consistent with applicable law." (*Id.* ¶ F.) Plaintiffs also seek an injunction "requiring that the Defendant provide DD Waiver Services with reasonable promptness and at a reasonable pace" and "order[ing] that all funds legislatively appropriated for DD Waiver Services remain available as lawfully appropriate until members of [the] plaintiff class are provided such services." (*Id.* ¶ G.) In addition, Plaintiffs seek injunctive relief to ensure that "all persons denied DD Waiver Services receive proper written notice of that denial." (*Id.*)

## IV.    Procedural Background

On August 28, 2015, the original Complaint in this matter was filed by Kyle Guggenberger, Jay Hannon, Brianna Hoover, Abigail Pearson, and Amber Brick against the State of Minnesota, the Minnesota Department of Human Services, and Lucinda E. Jesson, former Commissioner of the Minnesota Department of Human Services.  (Doc. No.  1.)  On October 5, 2015, these Defendants filed a Motion to Dismiss the Complaint. (Doc. No. 17.)

On December 10, 2015, the parties stipulated to the filing of an Amended Complaint.  (Doc. No. 32.)  On December 15, 2015, an Amended Complaint was filed by Kyle Guggenberger, Jay Hannon, Abigail Pearson, and Amber Brick.  (*See* Doc. Nos. 34, 41.)[4]  The Defendants filed a Motion to Dismiss the Amended Complaint the same day. (Doc. No. 35.)  On July 28, 2016, the Court granted in part and denied in part Defendants' motion, dismissing the State of Minnesota and the Minnesota Department of Human Services as parties.  (Doc. No. 54.)  The Court otherwise denied Defendants' motion.  (*Id.*)  *See generally Guggenberger v. Minnesota*, 198 F. Supp. 3d 973 (D. Minn. 2016).

On January 20, 2017, the parties stipulated to the filing of a Second Amended Complaint.  (Doc. No. 70.)  The Second Amended Complaint was filed on the docket on January 23, 2017.  (Doc. No. 72.)  On February 15, 2017, the parties stipulated to the filing of a Third Amended Complaint.  (Doc. No. 77.)  The Third Amended Complaint

---

[4]    The Amended Complaint was filed incorrectly on December 15, 2015 at Doc. No. 34 and later re-filed at Doc. No. 41.

was filed on the docket on February 17, 2017. (Doc. No. 80 ("Third Am. Compl.").) The Third Amended Complaint is brought by Maxwell Mikkelson and R.H. ("Plaintiffs") against Commissioner Johnson Piper in her official capacity. (*See id.*)

On February 21, 2017, Plaintiffs filed a Motion for Class Certification. (Doc. No. 81.) On March 3, 2017, Defendant filed a Motion to Dismiss Plaintiffs' Third Amended Complaint. (Doc. No. 91.) Defendant moved to dismiss Plaintiffs' claims under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. (*See* Doc. Nos. 91, 93.) In response to the Court's March 13, 2017 Text Only Order, the parties filed a joint letter on March 16, 2017 apprising the Court of the parties' positions on how the Court should proceed in hearing the pending motions. (*See* Doc. Nos. 97, 98.) According to this letter, the parties agree that "Defendant's pending motion to dismiss may be limited to its Eleventh Amendment and separation of powers arguments. Doc. No. 93 at 19-22." (Doc. No. 98.) In addition, the parties agree that "Defendant's other arguments raised in the Motion to Dismiss are expressly preserved, the parties' agreement is not a waiver of Defendant's arguments, and the agreement is made consistent with Defendant's reservation of rights in Doc. No. 77." (*Id.*)

Consistent with the parties' agreement, the Court will evaluate Defendant's Motion to Dismiss on only the basis of Defendant's Eleventh Amendment and separation-of-powers arguments. The Court acknowledges Defendant's reservation of rights as outlined in the parties' March 16, 2017 joint letter.

## DISCUSSION

## I.    Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject matter jurisdiction. To survive a motion to dismiss for lack of subject matter jurisdiction, the party asserting jurisdiction has the burden of proving jurisdiction. *V S Ltd. P'ship v. Dep't of Hous. & Urban Dev.*, 235 F.3d 1109, 1112 (8th Cir. 2000). "Subject-matter jurisdiction is a threshold requirement which must be assured in every federal case." *Kronholm v. F.D.I.C.*, 915 F.2d 1171, 1174 (8th Cir. 1990).

A motion to dismiss for lack of subject matter jurisdiction may challenge a plaintiff's complaint either on its face or on the factual truthfulness of its averments. *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). When a defendant brings a facial challenge—a challenge that, even if truthful, the facts alleged in a claim are insufficient to establish jurisdiction—a court reviews the pleadings alone, and the non-moving party receives the same protections as it would defending against a motion brought pursuant to Rule 12(b)(6). *Id.* In a factual challenge to jurisdiction, the court may consider matters outside the pleadings, and the non-moving party does not benefit from the safeguards of Rule 12(b)(6). *Id.* at 728-30 nn.4, 6 (holding that on a Rule 12(b)(1) motion challenging subject-matter jurisdiction, "[t]he district court has authority to consider matters outside the pleadings").

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th

14

Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).[5]

## II. Eleventh Amendment Sovereign Immunity

The Court first considers Defendant's argument that Plaintiffs seek relief that is barred under the Eleventh Amendment and principles of sovereign immunity. Defendant acknowledges that a court may order prospective injunctive relief that imposes a financial burden on the state, but argues that the relief Plaintiffs seek runs afoul of the Eleventh Amendment due to state sovereignty concerns. First, Defendant argues that state sovereignty is particularly important here because the waiting lists are governed by state law and "are not *per se* unconstitutional." (Doc. No. 93 at 20.) Second, Defendant asserts that "Plaintiffs want this Court to interfere with Defendants' [sic] management of state funding by requiring the state to keep 'available' legislatively appropriated funds that would otherwise return to the State treasury." (*Id.*) Defendant points out that granting such relief would infringe upon the Minnesota legislature's ability to make decisions regarding the allocation of state resources. Third, Defendant argues that

---

[5] Defendant appears to raise both facial and factual challenges in seeking to dismiss Plaintiffs' Third Amended Complaint based on Eleventh Amendment and separation-of-powers arguments. Although Defendant largely argues that Plaintiffs seek relief that is plainly barred on its face, Defendant also points to evidence outside of the Third Amended Complaint regarding Defendant's implementation of the *Olmstead* Plan and the DD Waiver Services program. Whether framed as a facial or a factual challenge, however, the Court reaches the same conclusion that dismissal is not warranted.

Plaintiffs' lawsuit is not about enforcing future compliance with federal law but about "control[ling] the appropriation of state funds" by requiring that state funds remain available or forcing counties to spend all of their Waiver Services funds.  (Doc. No. 102 at 3.)  Defendant argues that the *Ex parte Young* exception does not apply because "[r]ather than asking that Defendants be enjoined in some way that might have a merely ancillary monetary effect, the expenditure of state funds is the essential relief Plaintiffs seek."  (*Id.* at 5.)  Finally, Defendant argues that the requested relief is improper in light of Defendant's progress toward implementing goals in the State of Minnesota's *Olmstead* Plan.  Defendant contends that Plaintiffs' characterization of the relief they seek contradicts the actual allegations in the Third Amended Complaint.[6]

Plaintiffs, on the other hand, assert that Defendant mischaracterizes the relief sought.  According to Plaintiffs, they "do not allege that Defendant must spend all funds appropriated for Waiver services, or keep funds available 'indefinitely' in order to comply with federal law."  (Doc. No. 99 at 16-17.)  Instead, Plaintiffs argue, they allege that Defendant has refused to properly utilize appropriated funds in accordance with federal law to provide them with needed services.  Because Plaintiffs seek prospective declaratory and injunctive relief to assure Defendant's compliance with federal law, they argue, Defendant's Eleventh Amendment sovereign immunity argument fails.  According to Plaintiffs, "[t]hat [their] primary demands may 'affect the state treasury' in some way is a permissible ancillary consequence of the State's obligation to comply with federal

---

[6]     To the extent Defendant's arguments on this issue overlap with Defendant's separation-of-powers arguments, the Court addresses those arguments below.

law." (*Id.* at 15 (citation omitted).) Plaintiffs point out that they made particular amendments to their Complaint to comply with the federalism concerns Defendant previously raised. Finally, Plaintiffs contend that the *Olmstead* Plan does not support dismissal based on Eleventh Amendment sovereign immunity.[7]

The Court has previously evaluated the applicability of Eleventh Amendment sovereign immunity in this case in ruling on Defendant's prior Motion to Dismiss. *See Guggenberger*, 198 F. Supp. 3d at 997-1004. There, the Court concluded that the Amended Complaint was not barred by sovereign immunity. *Id.* at 1002. The arguments presently advanced by the parties are largely the same as those previously addressed by the Court. However, the Court has fully evaluated the parties' current arguments and the Third Amended Complaint in light of the relevant governing law. In so doing, the Court concludes that Eleventh Amendment sovereign immunity does not warrant dismissal of Plaintiffs' Third Amended Complaint.

Pursuant to the Eleventh Amendment and longstanding Supreme Court precedent, states and their agencies are immune from suit in federal court absent waiver or valid Congressional abrogation. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989);

---

[7]     Plaintiffs also ask the Court to apply the law-of-the-case doctrine and deny Defendant's Motion to Dismiss in its entirety because the Court has previously decided the legal questions raised by Defendant's current motion. The Court acknowledges that the legal issues presented are substantially similar to those previously considered by the Court in its July 28, 2016 Order. *See Guggenberger v. Minnesota*, 198 F. Supp. 3d 973, 997-1004 (D. Minn. 2016). However, a district court retains discretion to reevaluate its decisions notwithstanding law-of-the-case principles. Because Plaintiffs' Third Amended Complaint supersedes the Amended Complaint, the Court will engage in a complete analysis of Defendant's arguments to assure that Plaintiffs' current complaint is not barred by the Eleventh Amendment or separation-of-powers concerns.

*Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974); *Doe v. Nebraska*, 345 F.3d 593, 597 (8th Cir. 2003); *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 619 (8th Cir. 1995). However, the Supreme Court has repeatedly affirmed an "important limit" on Eleventh Amendment sovereign immunity under the *Ex parte Young* doctrine. *See Va. Office for Prot. & Advocacy v. Stewart ("VOPA")*, 563 U.S. 247, 254 (2011); *Ex parte Young*, 209 U.S. 123, 155-56 (1908); *see also Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 956 (8th Cir. 2015) ("In *Ex Parte Young*, the Supreme Court established a significant exception to [Eleventh Amendment] immunity.").

Under *Ex parte Young* and its progeny, state actors sued in their official capacity are not immune from suits seeking prospective injunctive relief to address ongoing violations of the Constitution or federal law. *Mo. Child Care Ass'n v. Cross*, 294 F.3d 1034, 1037 (8th Cir. 2002). This exception to Eleventh Amendment sovereign immunity is "accepted as necessary to 'permit the federal courts to vindicate federal rights,'" *VOPA*, 563 U.S. at 254-55 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984)), and "exists to 'preserve the constitutional structure established by the Supremacy Clause,'" *Mo. Child Care Ass'n*, 294 F.3d at 1037 (quoting *Antrican ex rel. Antrican v. Odom*, 290 F.3d 178, 184 (4th Cir. 2002)).

The *Ex parte Young* exception to sovereign immunity permits federal courts to grant prospective relief against state officials in order to enjoin their future compliance with federal law. *Edelman*, 415 U.S. at 664. This is true even where the prospective relief results in "a direct and substantial impact on the state treasury." *Milliken v. Bradley*, 433 U.S. 267, 289 (1977); *see also id.* at 288-90 (finding an injunctive relief

order to be proper despite its explicit requirement that the state bear one half of the cost of developing a comprehensive educational program).  Specifically, "relief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury."  *Papasan v. Allain*, 478 U.S. 265, 278 (1986); *see also id.* at 281-82 (declining to dismiss on Eleventh Amendment grounds plaintiffs' claim challenging the state's unequal allocation of resources to state school districts even if remedying the disparity "might require the expenditure of state funds").  In *Edelman*, the Supreme Court noted multiple cases where the relief imposed had a permissible impact on the state treasury, explaining:

> State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct.  Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in Ex parte Young.

415 U.S. at 667-68 (citation omitted).

However, "[f]ederal courts may not award retrospective relief, for instance, money damages or its equivalent, if the State invokes its immunity."  *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004).  The *Ex parte Young* doctrine does not permit granting retroactive relief that requires state officials "to use state funds to make reparation for the past."  *Edelman*, 415 U.S. at 665 (quoting *Rothstein v. Wyman*, 467 F.2d 226, 237 (2d Cir. 1972), *cert. denied*, 411 U.S. 921 (1973)).  In other words, a federal court may not impose a remedy designed to "bestow an award for accrued

monetary liability," *Papasan*, 478 U.S. at 282, or "compensat[e] . . . for conduct and consequences completed in the past," *Milliken*, 433 U.S. at 290 n.21.

The line between proper relief under *Ex parte Young* and relief prohibited by the Eleventh Amendment "will not in many instances be that between day and night." *Edelman*, 415 U.S. at 667. However, the Supreme Court has clarified that "a court need only conduct 'a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective'" to determine whether *Ex parte Young* applies. *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)). Consistent with the Supreme Court's explanation of the straightforward inquiry required under *Ex parte Young*, the Eighth Circuit has clarified that "[t]he proper focus [of our immunity inquiry] must be directed at whether the injunctive relief sought is prospective or retroactive in nature,' and not on 'an injunction's impact on the State's treasury.'" *See Mo. Child Care Ass'n*, 294 F.3d at 1042 (quoting *Antrican*, 290 F.3d at 186)). In short, "[s]tate immunity under the Eleventh Amendment does not apply to awards for prospective relief, but does bar the award of any retroactive relief for violations of federal law that would require payment of funds from a state treasury." *Skelton v. Henry*, 390 F.3d 614, 617 (8th Cir. 2004) (citations omitted).

Thus, the Eighth Circuit has found relief to be barred where it is an improper retrospective monetary award. *See Kittle-Aikeley v. Strong*, 844 F.3d 727, 742 (8th Cir. 2016) (reversing and vacating a district court order requiring a $50 refund to students

who had paid a state college for unconstitutional drug testing); *cf. Skelton*, 390 F.3d at 617-18 & n.3 ("The relief the plaintiffs seek, for past violations of federal regulations, would be paid out of the Missouri treasury and falls squarely within the bar of the Eleventh Amendment."). It has repeatedly described improper relief under the Eleventh Amendment as "damages." *See Montgomery v. City of Ames*, 829 F.3d 968, 973 (8th Cir. 2016) ("[T]he State and its agencies are immune from suits for damages."); *Serna v. Goodno*, 567 F.3d 944, 952 (8th Cir. 2009) ("[T]he Eleventh Amendment bars damages claims against the states, but generally does not bar claims for prospective injunctive relief against public officials in their official capacities."); *Gibson v. Ark. Dep't of Corr.*, 265 F.3d 718, 720 (8th Cir. 2001) ("The *Ex parte Young* doctrine permits only prospective injunctive relief; no money damages are available.").

However, the Eighth Circuit has found no Eleventh Amendment immunity against prospective relief even if such relief has a monetary impact upon the state. *See Love v. McCown*, 38 F. App'x 355, 355-57 (8th Cir. 2002) (affirming order directing state department of corrections to provide "various kosher food items and weekly deposits of $15 [for purchasing kosher food]" for an individual in prison); *Randolph v. Rodgers*, 253 F.3d 342, 344, 348 (8th Cir. 2001) (evaluating district court order directing state to provide hearing-impaired services pursuant to the ADA and noting that "the cost of compliance to the state treasury is wholly 'ancillary' to the prospective order enforcing federal law" (quoting *Edelman*, 415 U.S. at 668)).

To support the view that Plaintiffs' requested relief is improper, Defendant cites the Supreme Court's decision in *Virginia Office for Protection and Advocacy v. Stewart*

("*VOPA*"), 563 U.S. 247 (2011).  In *VOPA*, the Supreme Court considered whether an

"independent state agency" could properly assert a claim seeking prospective relief

against officials of the same state under *Ex parte Young*.  *Id.* at 250-51.  The Court

determined—and the parties appeared to agree—that the suit plainly met the

"straightforward inquiry" described above.  *Id.* at 255-256.  However, the state officials

argued that *Ex parte Young* should not apply based on the status of the plaintiff as a state

agency.  *Id.* at 256.  The Court disagreed.  After noting that certain exceptions to the

*Ex parte Young* doctrine had evolved to limit "abuses of the doctrine that threaten to

evade sovereign immunity," the Court held that no similar sovereignty interests were

threatened by the suit.  *Id.* at 256-61.

Citing *Edelman*, the Court stated in *VOPA* that "*Ex parte Young* cannot be used to

obtain an injunction requiring the payment of funds from the State's treasury."  563 U.S.

at 256-57.  Defendant cites *VOPA* and quotes this language in arguing that "[w]here, as

here, plaintiffs request relief that would necessarily require the expenditure of state funds,

the Eleventh Amendment serves as a complete bar to plaintiffs' claims."  (Doc. No. 102

at 4.)  However, the Court concludes that the Supreme Court's statement in *VOPA*

regarding the expenditure of funds does not carry the weight Defendant advocates.  This

sentence followed the Court's explanation of judicially-developed limits over "abuses of

the [*Ex parte Young*] doctrine," and was merely part of a summary explanation of such

limits.  *Id.* at 256-57.  The Supreme Court did not indicate that it was overruling previous

cases such as *Milliken*, *Papasan*, and *Edelman* itself which acknowledged that

prospective relief may be granted notwithstanding an ancillary effect on the state

treasury. Because the central question presented in *VOPA* did not require the Court to address these longstanding principles, its statement regarding "payment of funds from the State's treasury," *id.* at 256-57, did not materially alter the proper *Ex parte Young* analysis described above.[8] *See Chester Upland Sch. Dist. v. Pennsylvania*, 861 F. Supp. 2d 492, 518 (E.D. Pa. 2012) ("[N]otwithstanding the comments in *VOPA* that *Ex Parte Young* does not permit an injunction affecting the state treasury, the nuances to this rule as developed in *Edelman* and *Milliken* remain intact. This Court will not dismiss . . . Plaintiffs' . . . claims for injunctive relief merely because they may implicate state funds."). Thus, the Court focuses its inquiry on "whether the injunctive relief sought is prospective or retroactive in nature,' and not on '[the] impact on the State's treasury.'" *See Mo. Child Care Ass'n*, 294 F.3d at 1042 (quoting *Antrican*, 290 F.3d at 186)).[9]

Applying these principles to Plaintiffs' Third Amended Complaint, the Court concludes that Plaintiffs seek relief that falls under the *Ex parte Young* exception to

---

[8] In *Virginia Office for Protection and Advocacy v. Stewart ("VOPA")*, 563 U.S. 247 (2011), the Supreme Court also remarked that: "The specific indignity against which sovereign immunity protects is the insult to a State of being haled into court without its consent. That effectively occurs, our cases reasonably conclude, when (for example) the object of the suit against a state officer is to reach funds in the state treasury . . . ." *Id.* at 258. As with the language quoted by Defendant, the Court concludes that this summary reference to suits impacting the state treasury does not override the Supreme Court's prior decisions permitting prospective injunctive relief that imposes a substantial ancillary effect on the treasury.

[9] As the Court noted in its prior order addressing the Motion to Dismiss Plaintiffs' Amended Complaint, the Court declines to adopt the approach advocated in some cases out of the Sixth and Seventh Circuits that appear to focus on how the requested relief would impact the state treasury. *See Guggenberger*, 198 F. Supp. 3d at 999 n.9.

sovereign immunity.  Plaintiffs have asserted their claims against Commissioner Johnson Piper in her official capacity, and they plainly seek relief that is prospective in nature and aimed at remedying the ongoing violations of federal law alleged in the Third Amended Complaint.  To remedy their integration mandate claims under the ADA and the RA, Plaintiffs seek an injunction requiring Defendant to provide DD Waiver Services to Plaintiffs "in the most integrated setting appropriate to their individual needs and preferences consistent with applicable law."  (Third Am. Compl. at Prayer for Relief ¶ F.) Consistent with their reasonable promptness claim under the Medicaid Act, 42 U.S.C. § 1396a(a)(8), Plaintiffs seek "injunctive relief requiring that the Defendant provide DD Waiver Services with reasonable promptness and at a reasonable pace" and "order[ing] that all funds legislatively appropriated for DD Waiver Services remain available as lawfully appropriate until members of [the] plaintiff class are provided such services." (*Id.* ¶ G.)  In light of their Due Process claims, Plaintiffs seek an order requiring that "all persons denied DD Waiver Services receive proper written notice of that denial."  (*Id.*) As the Court reads Plaintiffs' Third Amended Complaint, Plaintiffs seek relief designed to ensure compliance with federal law in the future.  Because the relief sought is prospective and tied to allegations of ongoing violations of federal law, the fact that Plaintiffs' request for relief implicates funds in the state treasury does not preclude their claims under *Ex parte Young*.

Multiple federal appellate courts have permitted claims seeking such relief notwithstanding objections based on state sovereign immunity.  *See Antrican*, 290 F.3d at 186 ("The plaintiffs requested an injunction mandating that in the future, State officials

bring the North Carolina Medicaid program into compliance with the Medicaid Act.  This

mandate might potentially impact the State treasury, but it is nonetheless prospective.");

*Lewis v. N.M. Dep't of Health*, 261 F.3d 970, 975-78 (10th Cir. 2001) (finding relief

seeking provision of waiver services with reasonable promptness proper under *Ex parte*

*Young*); *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1283, 1285-87 (10th Cir. 1999)

(permitting claims under the ADA, Medicaid Act, RA, and other federal laws seeking

statewide improvements to disability services system). The Tenth Circuit's decision in

*Lewis* is particularly instructive.  There, the court explained:

> The plaintiffs in the case before us clearly seek prospective equitable relief:
> they ask that state officials be compelled to comply with federal statutes
> that allegedly entitle them to the reasonably prompt provision of waiver
> services. They are not, for example, asking to be reimbursed for past home
> or community-based services. The relief sought simply requires that
> officials conform their future actions to federal law, and any effect on the
> state treasury is, therefore, ancillary.

*Lewis*, 261 F.3d at 977–78 (internal quotation marks and citation omitted).

In an analogous context, the Eighth Circuit has also permitted a case to proceed

under *Ex parte Young* where the plaintiffs sought to direct state officials to comply with

federal law governing foster-care and adoption services jointly funded by the federal

government and participating states and administered by states under a

federally-approved plan.  *See Mo. Child Care Ass'n*, 294 F.3d at 1035-1043.  Responding

to the defendants' argument that *Ex parte Young* should not apply because the state "may

be required to increase its expenditure of state funds to comply with a judgment," the

Eighth Circuit explained:

That as a practical matter this suit may result in an order requiring Missouri
to change the method it employs to calculate foster-care maintenance
payments, and thus going forward to access funds in its treasury, does not
remove this suit from the class of suits allowed under *Ex parte Young*.

*Id.* at 1042.  Consistent with these cases and in light of the governing law described

above, the Court finds that Plaintiffs seek permissible relief under *Ex parte Young*.

The Court could grant relief to remedy Plaintiffs' claims without infringing upon

Eleventh Amendment sovereign immunity, and any impact upon the state treasury would

be ancillary to the relief imposed.  Thus, the Court concludes that Eleventh Amendment

sovereign immunity does not support dismissal of Plaintiffs' Third Amended

Complaint.[10]

## III.    Separation of Powers

The Court next considers Defendant's argument that Plaintiffs seek improper relief

in light of federalism and separation-of-powers principles.  Defendant argues that "by

requiring Defendants [sic] keep funding available, Plaintiffs' requested relief improperly

removes from the State's executive and legislative branches questions of how the state

spends its limited funds."  (Doc. No. 93 at 21.)  Defendant suggests that Plaintiff's Third

---

[10]     The Court also notes that Eleventh Amendment sovereign immunity poses no bar
to Plaintiffs' claim against Commissioner Johnson Piper under § 504 of the
Rehabilitation Act.  Under the Rehabilitation Act, a State that accepts federal funds
"waives its [Eleventh Amendment] immunity . . . with regard to the individual agency
that receives them."  *Jim C. v. United States*, 235 F.3d 1079, 1081 (8th Cir. 2000); *see
also* 42 U.S.C. § 2000d-7(a)(1).  Here, Plaintiffs allege that Minnesota participates in the
Medicaid program jointly funded by the state and the federal government.  (Third Am.
Compl. ¶ 18.)  Plaintiffs also allege that Commissioner Johnson Piper "serves as the
'single state agency' responsible for the administration of the Medicaid program in
Minnesota."  (*Id.* ¶ 16.)  Thus, the Court concludes that Plaintiffs' Rehabilitation Act
claim is not subject to dismissal based on sovereign immunity.

Amended Complaint is "an improper attempt to secure funding for waiver services, a political decision reserved to [the] Legislature and the Governor." (Doc. No. 102 at 1.) Defendant also asserts that that Plaintiffs' requested relief would invalidate Minnesota law governing the disposition of unspent funding. Referencing the Court's previous order, Defendant notes that the Court has already identified the federalism concerns inherent in such relief.

Relying on the Court's prior order in this case, Plaintiffs contend that their requested relief does not implicate special sovereignty interests. Plaintiffs assert that they do not seek funding to be kept available indefinitely and emphasize that they "do not ask the Court to take control of the State's budget, to infringe on the essential functions of the executive or legislative branches, or to address the legislative process at all." (Doc. No. 99 at 19.) According to Plaintiffs, the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), illustrates how a federal court may properly require state officials to comply with federal law without violating federalism or separation-of-powers concerns.

Defendant's separation-of-powers arguments are closely related to the "special sovereignty interests" exception to claims arising under *Ex parte Young*. Under this exception, even if a claim is proper under *Ex parte Young*, a court "may also question whether the suit and the remedy it seeks 'implicate[] special sovereignty interests' such that an *Ex Parte Young* action will not lie." *Union Elec. Co. v. Mo. Dep't of Conservation*, 366 F.3d 655, 658 (8th Cir. 2004) (quoting *Coeur d'Alene*, 521 U.S. at 281). Indeed, while acknowledging the "straightforward inquiry" identified by the

27

Supreme Court, Justice Kennedy noted in a concurring opinion that "our *Ex parte Young* jurisprudence requires careful consideration of the sovereign interests of the State as well as the obligations of state officials to respect the supremacy of federal law." *Verizon Md., Inc.*, 535 U.S. at 648 (Kennedy, J., concurring). The Court is mindful of these competing interests and sensitive to the federalism interests inherent in any case proceeding under *Ex parte Young*.

Further, because Plaintiffs' Third Amended Complaint arises out of the alleged mismanagement of state funds, the Court agrees with Defendant that the federalism interests in this case merit close consideration. *See Horne v. Flores*, 557 U.S. 433, 448 (2009) ("Federalism concerns are heightened when . . . a federal court decree has the effect of dictating state or local budget priorities."); *see also Rizzo v. Goode*, 423 U.S. 362, 378 (1976) ("Where . . . the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" (quoting *Stefanelli v. Minard*, 342 U.S. 117, 120 (1951))). Notwithstanding the necessary caution with which a federal court must proceed in directing remedies against state officials, however, the Supreme Court has also emphasized that "federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief." *Horne*, 557 U.S. at 450.

The fact that Plaintiffs' lawsuit arises out of the state's administration of its Medicaid program also impacts the Court's analysis of Defendant's separation-of-powers arguments. As the Tenth Circuit noted in another Medicaid Act case, "[a] state's interest

28

in administering a welfare program at least partially funded by the federal government is not such a core sovereign interest as to preclude the application of *Ex parte Young*." *J.B.*, 186 F.3d at 1287; *see also Antrican*, 290 F.3d at 182, 189 (finding no special sovereignty interests in a § 1983 Medicaid case because it "involve[d] a federally designed healthcare program in which the federal government has invited the States to participate if they agree to certain federally established conditions"); *Lewis*, 261 F.3d at 978 (finding that claims "challenging the administration of New Mexico's Medicaid plan" do not infringe special sovereignty interests). The Eighth Circuit has similarly noted that a state's choice to utilize federal funds in a social welfare program obliges the state "either to run its program in conformity with [governing federal law] or to forego the federal funds." *Mo. Child Care Ass'n*, 294 F.3d at 1042 n.10.

The sovereignty concerns at issue in actions proceeding under *Ex parte Young* also affect the scope of relief available. A remedy imposed to address ongoing violations of federal law may be "extensive." *Fond du Lac Band of Chippewa Indians v. Carlson*, 68 F.3d 253, 256 (8th Cir. 1995). "Where necessary to ensure compliance with federal law, the Supreme Court has approved broad injunctive relief aimed at state officials." *Id.* At the same time, when imposing equitable relief against state officials, federal courts should "not mandate detailed or burdensome procedures for compliance." *Katie A., ex rel. Ludin v. Los Angeles Cty.*, 481 F.3d 1150, 1157 (9th Cir. 2007). Courts must "give adequate consideration to the views of state . . . authorities" and "refrain[] from dictat[ing] precisely what course the State should follow." *Lewis v. Casey*, 518 U.S. 343, 362 (1996) (internal quotation marks and citation omitted). Concerns over state

sovereignty are properly addressed by involving state officials in developing appropriate relief. *See Frew*, 540 U.S. at 442 ("[P]rinciples of federalism require that state officials with front-line responsibility for administering [a significant federal program] be given latitude and substantial discretion."); *Katie A.*, 481 F.3d at 1157 ("[T]he court appropriately allowed defendants an opportunity jointly to develop the remedial plan needed to implement the injunction. No further deference was required; the order itself required only that defendants supply the services that the court found to be required under federal law.").

Considering these governing principles, the Court concludes that Plaintiffs' case may proceed despite the federalism interests implicated by their claims. Specifically, the Court concludes that Plaintiffs' request relating to DD Waiver Services funding does not warrant dismissal based on principles of federalism or the separation-of-powers. As the Court noted in its previous order addressing the Motion to Dismiss Plaintiffs' Amended Complaint, the request that appropriated funds "remain available" could be construed to interfere with State funding decisions based on Minnesota law governing unspent allocations. *See Guggenberger*, 198 F. Supp. 3d at 1001 n.10; *see also* Minn. Stat. § 16A.28, subd. 3. Plaintiffs amended this request in the Third Amended Complaint to seek an order directing that "all funds legislatively appropriated for DD Waiver Services remain available *as lawfully appropriate* until members of [the] plaintiff class are provided such services." (Third Am. Compl. at Prayer for Relief ¶ G (emphasis added).) The Court again notes that Plaintiffs' request could be clearer on this point regarding the relief they seek. However, the Court will adopt its prior approach on this issue and

30

"reserve determination on the precise scope of relief it may impose in the future,

emphasizing that any relief it grants will properly account for the important federalism

concerns Defendant[] [has] raised." *Guggenberger*, 198 F. Supp. 3d at 1001 n.10. Even

if the Court ultimately concludes that it lacks authority to direct that certain funds

"remain available," the Court can properly direct Defendants to comply with the

Medicaid Act by providing DD Waiver Services to eligible individuals in a reasonably

prompt manner. Thus, the Court concludes that this requested relief does not warrant

dismissal of Plaintiffs' claims at this stage.

Second, the Court does not construe Plaintiffs' Third Amended Complaint to

request relief that would improperly interfere with state funding decisions or dictate the

allocation of state resources. Specifically, the Third Amended Complaint appears to

focus on the alleged mismanagement of allocated Waiver Services funding and does not

request a supplemental appropriation of funds from the state legislature.[11] If the Court

ultimately concludes that Defendant is administering the state's DD Waiver Services

program in a manner that violates federal law, the Court could direct Commissioner

Johnson Piper to comply with the law while inviting the state to participate in developing

the precise contours of appropriate relief to be imposed.[12]

---

[11] Defendant notes that prior versions of Plaintiffs' complaint included requests for "supplemental appropriations" or "freezing funds." (*See* Doc. No. 93 at 2-4.) The Court, however, evaluates the present motion in light of the allegations and relief requested in the Third Amended Complaint.

[12] The Court also concludes that the state's implementation of the *Olmstead* Plan does not preclude Plaintiffs' claims. While the *Olmstead* Plan may be a relevant

(Footnote Continued on Next Page)

In short, the Court concludes that Defendant's arguments based on the separation-of-powers and principles of federalism are largely premature. The Court is cognizant of the important limits on its authority to order relief in this context, and it acknowledges the federalism interests at issue in light of Plaintiffs' claims. However, the Court must also uphold the federal law and ensure state compliance with such law going forward. Thus, the Court declines to dismiss Plaintiffs' Third Amended Complaint based on separation-of-powers concerns and will withhold determination on the scope of a proper remedy until such time as the Court concludes that relief is warranted.[13]

## CONCLUSION

Because Plaintiffs seek prospective injunctive relief against Commissioner Johnson Piper in her official capacity for ongoing violations of federal law, the Court concludes that this case may proceed notwithstanding Defendant's Eleventh Amendment sovereign immunity arguments. Further, any claim of sovereign immunity with respect to Plaintiffs' claim under § 504 of the Rehabilitation Act is waived based on DHS's

---

(Footnote Continued From Previous Page)

consideration in evaluating Plaintiffs' claims on the merits, the mere presence of an *Olmstead* Plan outlining goals relating to the provision of DD Waiver Services does not justify dismissal of Plaintiffs' claims at this stage.

[13] Defendants also argue that Plaintiffs' requested relief would interfere not only with state sovereignty, but also with the determinations of the legislative and executive branches at the federal level. The Court disagrees that federal separation-of-powers concerns warrant dismissal. As the Court previously concluded in its prior order, such concerns do not justify dismissal. *See Guggenberger*, 198 F. Supp. 3d at 1002. Neither the congressionally-sanctioned limits on the provision of waiver services nor the federal government's approval of the state's DD Waiver Services plan preclude this Court from considering Plaintiffs' claims arising out of Defendant's alleged mismanagement of the state's Medicaid program.

acceptance of federal funding through participation in the Medicaid program. Finally, separation-of-powers principles do not justify dismissal of Plaintiffs' Third Amended Complaint.

The Court concludes by noting that it believes that the best interests of all parties could be served by coming together to reach a possible resolution in this matter. Should the parties wish to utilize the Court's available resources to facilitate any settlement discussions, the Court will assist the parties in this regard.

## ORDER

Based on the files, record, and proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss (Doc. No. [91]) is **DENIED**.

Date: July 6, 2017            s/Donovan W. Frank
                                               DONOVAN W. FRANK
                                               United States District Judge